## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF KANSAS

**KEIKO EDGAR, DENA BURGE, LEIGH HOCKETT, JORDAN FURLAN, GINA GILOMEN-STUDY, UHA HEALTH INSURANCE, ANNE ARUNDEL COUNTY, and ROGERS MACHINERY COMPANY, INC., individually and on behalf of all others similarly situated,**

**Plaintiffs,**

**v.**

**TEVA PHARMACEUTICAL INDUSTRIES, LTD., TEVA PHARMACEUTICALS USA, INC., TEVA PARENTERAL MEDICINES, INC., TEVA NEUROSCIENCE, INC., TEVA SALES & MARKETING, INC., and CEPHALON, INC.,**

**Defendants.**

**Case No. 22-2501-DDC-TJJ**

---

### MEMORANDUM AND ORDER

The law encourages manufacturers of generic pharmaceuticals to bring generic drugs to market by providing incentives for them to challenge weak patents. Should the generic manufacturer file an FDA approval application for its generic drug, then the brand-name manufacturer often sues for patent infringement. Thus begins a garden variety patent infringement suit. But, sometimes, the patent infringement suit reaches a suspicious looking settlement called a reverse payment settlement. A reverse payment settlement refers to an agreement by a brand-name manufacturer (and patent holder) to compensate a generic

manufacturer (and alleged patent infringer) in exchange for settling the patent infringement litigation, thus delaying the generic manufacturer's entry into the product market.

Plaintiffs here allege that defendants[1] entered a reverse payment settlement that ended patent litigation over defendants' brand-name drug, Nuvigil.  Plaintiffs allege that Mylan, Inc. wanted to bring generic Nuvigil to the market—which would've erased defendants' Nuvigil monopoly—and defendants sued Mylan for patent infringement.  Plaintiffs further allege that defendants' Nuvigil patents were weak but, rather than litigate the patent infringement suit, defendants and Mylan agreed to compensate Mylan with a reverse payment settlement that delayed the generic Nuvigil's market entry.  According to plaintiffs, defendants compensated Mylan by making a swap.  Defendants agreed to stay out of the EpiPen market, allowing Mylan to maintain its monopoly over the EpiPen.  And Mylan agreed to stay out of the Nuvigil market, allowing defendants to maintain their Nuvigil monopoly.

Plaintiffs now bring four claims against defendants for the alleged Nuvigil[2] reverse payment settlement:  (1) a Sherman Act claim; (2) claims for Conspiracy and Combination in Restraint of Trade under various state laws; (3) claims for Monopolization and Monopolistic Scheme under various state laws; and (4) a Racketeer Influenced and Corrupt Organizations Act

---

[1]     Plaintiffs sued the following seven defendants:  Teva Pharmaceutical Industries, Ltd., Teva Pharmaceuticals USA, Inc., Teva Parenteral Medicines, Inc., Teva Neuroscience, Inc., Teva Sales & Marketing, Inc., Cephalon, Inc., and William S. Marth.  Doc. 42 at 4 (1st Am. Compl. ¶ 1).  The parties since have stipulated to the dismissal of all claims against Mr. Marth.  Doc. 58.  The court thus uses the term "defendants" to refer to the six remaining defendants.  The court, following the parties' lead, also uses the term "Teva" to refer collectively to these six defendants.  *See* Doc. 42 at 4 (1st Am. Compl. ¶ 1); Doc. 47 at 11 n.1.

     Relatedly, the court notes that Mr. Marth filed his own, separate Motion to Dismiss (Doc. 49).  Given Mr. Marth's dismissal, the court denies his motion as moot.

[2]      Plaintiffs' Amended Complaint initially asserted seven counts.  Three of those counts and part of plaintiffs' RICO claim arose from the alleged EpiPen reverse payment settlement.  Plaintiffs since have voluntarily dismissed their claims based on the EpiPen.  Doc. 63 at 13.

(RICO) claim.  Defendants have filed a Motion to Dismiss (Doc. 47).[3]  As explained below, the court grants the motion in part and denies it in part.

## I.  Background

The following facts come from plaintiffs' First Amended Complaint (Doc. 42).  The court accepts the facts as true and views them in the light most favorable to plaintiffs, as the parties opposing the Motion to Dismiss.  *Doe v. Sch. Dist. No. 1*, 970 F.3d 1300, 1304 (10th Cir. 2020) (explaining that on a motion to dismiss the court "accept[s] as true all well-pleaded factual allegations in the complaint and view[s] them in the light most favorable to" the party opposing the motion (citation and internal quotation marks omitted)).  The court begins with the relevant regulatory background.

### *The Hatch-Waxman Act*

Congress passed the Hatch-Waxman Act in 1984 to regulate generic entry into the drug market.  Doc. 42 at 20 (1st Am. Compl. ¶ 63).  Under the Hatch-Waxman Act, a company who wants to sell or market a new generic product submits an Abbreviated New Drug Application ("ANDA") to the FDA.  *Id.* (1st Am. Compl. ¶ 61).  When the FDA evaluates the ANDA, it compares the proposed generic product to the branded product.  *Id.* (1st Am. Compl. ¶ 62).  The FDA refers to the branded product as a "Reference Listed Drug" (RLD).  *Id.*

The Hatch-Waxman Act requires all ANDA applicants to make certifications about the RLD's patents, including a "Paragraph IV certification"—it's a certification by the ANDA applicant that, in the applicant's opinion, the RLD's patent is invalid, or the new proposed

---

[3]  Defendants also filed a Motion for Hearing (Doc. 50).  Our court's local rule provides:  "The court may set any motion for oral argument or hearing at the request of a party or on its own initiative."  D. Kan. Rule 7.2.  After reviewing the parties' comprehensive and thoughtful filings, the court finds that the filings explain the parties' positions sufficiently.  The court thus concludes that a hearing will not assist its work.  And so, to grant defendants' motion would contradict Fed. R. Civ. P. 1 because a hearing is unnecessary.  Exercising its discretion, the court denies this request for hearing.

generic won't infringe on the RLD's patent.  *Id.* (1st Am. Compl. ¶ 64).  An ANDA applicant

filing a Paragraph IV certification must notify:  (i) the relevant patent holder and (ii) the holder

of the approved drug application who claims that patent.  *Id.* at 20–21 (1st Am. Compl. ¶ 65).

Once a patent holder receives a Paragraph IV certification, it may file a patent infringement suit

within 45 days.  *Id.* at 21 (1st Am. Compl. ¶ 66).  This patent infringement suit triggers an

automatic 30-month stay of any FDA approval of the ANDA.  *Id.*  Notably, the first generic

manufacturer to file an ANDA with a Paragraph IV certification enjoys a 180-day exclusivity

period.  21 U.S.C. § 355(j)(5)(B)(iv).  The court next reviews how this regulatory scheme shaped

the EpiPen patent litigation and then, the Nuvigil patent litigation.

### *EpiPen Patent Litigation Settlement*

The EpiPen is an epinephrine auto-injector (EAI) that delivers a controlled dose of

epinephrine, which treats severe allergic reaction known as anaphylaxis.  Doc. 42 at 18 (1st Am.

Compl. ¶¶ 48–50).  In 2007, Mylan Pharmaceuticals, Inc. acquired Dey Pharma L.P., which later

was renamed Mylan Specialty, L.P.  *Id.* (1st Am. Compl. ¶ 52).  Dey held the exclusive right and

license to market, distribute, and sell the EpiPen in the United States.  *Id.* at 18–19 (1st Am.

Compl. ¶ 53).  Meridian Medical Technologies, Inc.[4] manufactured the EpiPen.  *Id.*  From 2007

to 2020, Mylan Specialty marketed and sold EpiPen devices, supplied by Meridian under the

parties' Supply Agreement.  *Id.*  The Supply Agreement required Meridian to prosecute and

maintain any patents or patent applications for EpiPen products.  *Id.* at 19 (1st Am. Compl. ¶ 55).

The Supply Agreement also required the parties to notify each other of potential infringement

and jointly determine in good faith the appropriate course of action.  *Id.*

In 2007, Teva filed ANDA-0589 announcing its intention to develop a generic EAI.  *Id.*

at 21 (1st Am. Compl. ¶ 67).  The FDA deemed Teva's application acceptable for filing in

---

[4]    Meridian is a subsidiary of Pfizer Inc.  Doc. 42 at 18 n.30 (1st Am. Compl. ¶ 53).

November 2008.  *Id.*  When Teva submitted its ANDA, Meridian held a patent for the auto-injector component of the branded EpiPen.  *Id.* (1st Am. Compl. ¶ 69).  To secure ANDA approval, Teva had to demonstrate that its device was equivalent to the EpiPen.  *Id.* (1st Am. Compl. ¶ 70).  But Teva couldn't just copy the EpiPen without infringing Meridian's patents—assuming, that is, the patents were valid.  *Id.* (1st Am. Compl. ¶ 71).  To avoid infringing these patents, Teva's proposed generic EAI had developed a different auto-injector than EpiPen used.  *Id.* (1st Am. Compl. ¶ 72).

In July 2009, consistent with the Hatch-Waxman Act, Teva notified King Pharmaceuticals LLC and Meridian—Pfizer subsidiaries the court will refer to collectively as Pfizer—that it had filed an ANDA to market a generic version of EpiPen and had submitted a Paragraph IV certification.  *Id.* at 22 (1st Am. Compl. ¶ 73).  Pfizer then sued Teva in the District of Delaware on August 28, 2009, seeking to enforce U.S. Patent No. 7,449,012B2 ("'012 Patent").  *Id.* (1st Am. Compl. ¶ 74).  Mylan and Pfizer entered a Common Interest Agreement in connection with the EpiPen patent litigation against Teva.  *Id.* (1st Am. Compl. ¶ 75).  In November 2010, Teva submitted a Paragraph IV certification over another Pfizer EpiPen patent: U.S. Patent No. 7,794,432B2 ("'432 Patent").  *Id.* (1st Am. Compl. ¶ 76).  Pfizer quickly amended the complaint in the EpiPen patent litigation asking to enforce the '432 Patent.  *Id.* (1st Am. Compl. ¶ 77).

Both the '012 Patent and '432 Patent expire in September 2025.  *Id.* (1st Am. Compl. ¶ 78).  And both patents are weak.  *Id.*  As a result, all parties would've known that Pfizer's suit was very unlikely to succeed.  *Id.*  Indeed, Pfizer voluntarily dismissed its claims based on the '432 Patent, indicating that Pfizer and Mylan knew the '432 Patent wasn't a viable basis for a patent infringement claim.  *Id.*

In March 2011, Teva and Pfizer discussed, via email, setting up a phone call about the EpiPen patent litigation. *Id.* at 22–23 (1st Am. Compl. ¶ 79). The EpiPen patent litigation bench trial began on February 16, 2012. *Id.* at 23 (1st Am. Compl. ¶ 80). On April 26, 2012, Pfizer and Teva executed a binding term sheet that granted Teva a license to launch its generic EAI on or after June 22, 2015, subject to the FDA's approval. *Id.* (1st Am. Compl. ¶ 81). The EpiPen patent settlement agreement didn't include any money. *Id.* at 26 (1st Am. Compl. ¶ 97).

Also on April 26, 2012, Mylan and Pfizer issued a joint press release announcing, "Meridian Medical Technologies, a Pfizer subsidiary, has entered into a settlement agreement with Teva that will resolve pending patent litigation related to" the EpiPen. *Id.* at 25 (1st Am. Compl. ¶ 93). The press release didn't mention that the EpiPen settlement was part of a quid pro quo for Mylan's agreement to enter into a settlement agreement resolving the Nuvigil patent litigation in Teva's favor. *Id.* Nor did the press release mention whether Mylan was a party to the suit or settlement. *Id.* (1st Am. Compl. ¶ 95).

The settlement agreement gave Teva a license to all issued patents and a covenant not to sue based on any current or future patents covering EpiPen devices. *Id.* (1st Am. Compl. ¶ 94). So, the settlement agreement covered patents not at issue in the EpiPen patent litigation and future patents. *Id.* And, as part of the settlement agreement, Teva agreed that its license to market a generic EAI wouldn't become effective until mid-2015—three years later. *Id.*

Pfizer and Teva executed the final Settlement and License Agreement to resolve the EpiPen patent litigation on July 20, 2012. *Id.* at 23 (1st Am. Compl. ¶ 83). Though Mylan wasn't a direct signatory to the Settlement and License Agreement, on the same day that Pfizer and Teva executed that agreement, Mylan executed a Covenant Not to Sue Teva for any EpiPen patents in Mylan's ownership or control. *Id.* (1st Am. Compl. ¶ 84). The parties attached the

Covenant Not to Sue to the settlement agreement and made it part of the settlement agreement. *Id.* And, during the bench trial and settlement negotiations, Mylan received updates from Pfizer about the EpiPen patent litigation. *Id.* (1st Am. Compl. ¶ 85). After the EpiPen patent litigation settlement—in a July 2012 earnings call—Mylan CEO Heather Bresch said that "the runway was absolutely clear . . . through 2015, through our settlement with Teva." *Id.* at 25–26 (1st Am. Compl. ¶ 96) (emphasis omitted). This statement on the earnings call again confirms that Mylan was involved in the EpiPen patent litigation settlement. *Id.* But, in the earnings call, Ms. Bresch left out that the EpiPen settlement was part of a quid pro quo for Mylan giving its agreement to enter simultaneously into a settlement agreement resolving the Nuvigil patent litigation in Teva's favor. *Id.*

Plaintiffs characterize the EpiPen patent litigation settlement as an illegal pay for delay scheme. The federal government previously had fined both Mylan and Teva over a pay for delay scheme involving a separate drug, one called Provigil. *Id.* at 23 (1st Am. Compl. ¶ 82). So, Pfizer or Mylan and Teva sought to use a different delay scheme, making the scheme harder for the federal government to detect. *Id.* (1st Am. Compl. ¶ 83).

To effectuate the scheme, Teva didn't pursue its generic EAI application aggressively. *Id.* at 29 (1st Am. Compl. ¶ 123). The FDA approved Teva's ANDA on August 16, 2018. *Id.* at 27 (1st Am. Compl. ¶ 108). This date meant it took Teva nine years and nine months to secure FDA approval. *Id.* (1st Am. Compl. ¶ 110). No other EAI has required such a long time to secure FDA approval. *Id.* at 28 (1st Am. Compl. ¶ 112). And no other auto-injector product has required such a long timeframe; the approval time for the other auto-injectors has ranged from six to 69 months. *Id.* (1st Am. Compl. ¶¶ 114–16). Plaintiffs' expert attributes this delay to Teva, not the FDA. *Id.* at 29 (1st Am. Compl. ¶¶ 121–23). But for Teva's EpiPen-for-Nuvigil

agreement with Mylan, plaintiffs allege, Teva would have exercised greater diligence in seeking FDA approval for its generic EpiPen. *Id.* at 29–30 (1st Am. Compl. ¶ 125).  In this but for world, Teva's generic EpiPen would've entered the market well before June 2015—the entry date allowed by the EpiPen patent settlement. *Id.*

### *Nuvigil Patent Litigation Settlement*

In 2009, Cephalon, Inc. launched a branded drug called Nuvigil, a prescription used to improve wakefulness. *Id.* at 30 (1st Am. Compl. ¶¶ 127–28).  Teva acquired Cephalon two years later, in 2011. *Id.* (1st Am. Compl. ¶ 129).  After the acquisition, Teva and Cephalon manufactured, distributed, and sold Nuvigil, and Nuvigil immediately became one of Teva's most profitable products. *Id.* at 31 (1st Am. Compl. ¶ 130).

In December 2009, Cephalon—not yet acquired by Teva—filed a patent infringement suit against Mylan. *Id.* at 31–32 (1st Am. Compl. ¶ 136).  Mylan had filed an ANDA to manufacture and sell a generic version of Nuvigil (armodafinil). *Id.*  Others also had filed ANDAs, so Cephalon sued six other generic manufacturers, and, in 2010, the Judicial Panel on Multi-District Litigation consolidated the cases in the District of Delaware. *Id.* at 32 (1st Am. Compl. ¶¶ 137, 139).  Cephalon's patents were weak; a reasonable and experienced patent attorney would've given Cephalon a 20% chance of prevailing on Cephalon's patent infringement claims. *Id.* (1st Am. Compl. ¶ 138).

Cephalon's filing of the Nuvigil patent infringement lawsuits triggered the Hatch-Waxman Act's 30-month stay for each Nuvigil defendant's ANDA. *Id.* (1st Am. Compl. ¶ 142).  So, the FDA couldn't give its final approval for the ANDAs while the litigation was continuing. *Id.*  Nonetheless, during this 30-month stay, the FDA tentatively approved Mylan's ANDA, which meant that Mylan's ANDA met the substantive requirements for final approval. *Id.* at 32–33 (1st Am. Compl. ¶ 143).  The stay expired on May 3, 2012. *Id.* at 33 (1st Am. Compl. ¶ 144).

8

Teva—having acquired Cephalon by this point in 2012—asked the Delaware district court where the patent infringement lawsuit was pending to issue a temporary restraining order and injunction. *Id.* (1st Am. Compl. ¶ 146). Teva's request asserted, "Other than this patent litigation, there are likely no legal impediments to Mylan's launching of its products on or after May 3[.]" *Id.* Mylan refused to agree to forgo launching its product on May 3. *Id.* (1st Am. Compl. ¶ 147).

By March 30, 2012, the parties had begun settlement negotiations for both the Nuvigil and EpiPen patent suits. *Id.* (1st Am. Compl. ¶ 148). On March 30, Mylan rejected Teva's request to extend the stay against entering the generic Nuvigil market until May 15, 2012. *Id.* Teva sent a draft term sheet to Mylan the next day. *Id.* (1st Am. Compl. ¶ 149).

On April 26, 2012, Mylan and Teva executed a binding term sheet resolving the Nuvigil patent litigation. *Id.* (1st Am. Compl. ¶ 150). Recall that Pfizer and Teva had executed a binding term sheet to resolve the EpiPen patent litigation the same day. *Id.* at 33–34 (1st Am. Compl. ¶ 151). The Nuvigil patent litigation settlement gave Mylan the right to launch certain armodafinil products on June 1, 2016 (50 mg, 150 mg, and 250 mg strength tablets) and other products on June 1, 2019 (100 mg and 200 mg strength tablets). *Id.* at 34 (1st Am. Compl. ¶ 152). Also, the settlement allowed Mylan to launch these products without infringing Teva's patents, patents set to expire in 2024. *Id.* And the settlement didn't include any money. *Id.* (1st Am. Compl. ¶ 153). Because Teva had a weak case in the Nuvigil patent case, Mylan's agreement to delay its generic Nuvigil until 2016 was valuable consideration. *Id.* (1st Am. Compl. ¶ 155).

Mylan issued a press release about the Nuvigil settlement four days after the parties had signed the agreement: April 30, 2012. *Id.* at 35 (1st Am. Compl. ¶ 159). The press release

didn't disclose that Mylan had entered the Nuvigil settlement in return for Teva's agreement in the EpiPen patent litigation. *Id.*

Though Mylan settled, the other generic competitor defendants took the cases encompassed in the Nuvigil MDL to trial, where Teva prevailed. *Id.* at 34 (1st Am. Compl. ¶ 154). The generic defendants appealed and, while the appeal remained pending, those parties settled. *Id.* In those settlements, Teva—though it had prevailed at trial—agreed to pay the generic defendants millions of dollars. *Id.* The settlements with other generic competitors indicate that Teva knew its Nuvigil patent infringement suit was weak and it expected a reversal on appeal. *Id.*

In May 2013, Mylan's outside counsel sent a letter to the FTC and DOJ that provided copies of the Nuvigil patent litigation settlement and the EpiPen patent litigation settlement. *Id.* at 35–36 (1st Am. Compl. ¶ 160). The letter asserted, "While Mylan does not believe it is required to file the EpiPen Settlement in connection with the Nuvigil Settlement, it nonetheless files this agreement as a potentially 'related' agreement solely out of an abundance of caution." *Id.* This letter remained confidential until June 2021. *Id.*

### *EpiPen Generic Delay for Nuvigil Generic Delay*

Then-President and CEO of Teva-Americas, William Marth, had extensive, repeated, and direct phone communications with Mylan CEO Ms. Bresch about both the EpiPen patent litigation settlement and the Nuvigil patent litigation settlement. *Id.* at 24 (1st Am. Compl. ¶ 86). Mr. Marth talked to Ms. Bresch about settling the EpiPen patent litigation and told his colleagues that Ms. Bresch "wants to give us a 2018 entry date but would likely agree to 2017[.]" *Id.* (1st Am. Compl. ¶ 87). Mr. Marth also told his colleagues that "jointly but not directly connected is the Nuvigil litigation"—where Mr. Marth "offered a 2018 entry date." *Id.* (brackets omitted). Other written communications revealed that Ms. Bresch had called Mr. Marth, asking him what

"exactly did we propose re epi and nuvigil?"  *Id.* (1st Am. Compl. ¶ 88).  One email said, "2014 for epi and 2018 for nuvigil.  No months specified."  *Id.*  The discussions between Mr. Marth and Ms. Bresch culminated in the parties exchanging the Nuvigil patent litigation settlement term sheet by email and discussing changes that were "agreed to between Heather [Bresch] and Mr. Marth."  *Id.* (1st Am. Compl. ¶ 89).

Other Mylan and Teva employees also discussed the EpiPen and Nuvigil settlements in the same communications.  *Id.* (1st Am. Compl. ¶ 90).  Teva called Mylan's Deputy General Counsel and "relayed the following proposal:  epipen in 2014 and nuvigil in 2018[.]"  *Id.*  Teva also noted that "the signed Nuvigil deal was" complete and "language w[ith] Pfizer on Epipen is done."  *Id.*  Mylan employees also sent an email with the subject "Epipen—Teva/Potential Settlement" and attached a "Nuvigil Settlement DRAFT."  *Id.* (1st Am. Compl. ¶ 91).  Mylan's lawyers spoke with Teva and Pfizer about the settlement by phone and email.  *Id.* at 25 (1st Am. Compl. ¶ 92).

Having recited the relevant factual background—at least as these facts apply to the current motion—the court addresses defendants' Motion to Dismiss (Doc. 47), next, starting with the relevant legal standard.

## II.        Legal Standard

### A.        Rule 8

Rule 8 prescribes "general rules of pleading."  Fed. R. Civ. P. 8.  Section (a)(2) of the Rule provides that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]"  Fed. R. Civ. P. 8(a)(2).  Although this Rule "does not require 'detailed factual allegations,'" it calls for more than a "pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of the cause of action'" which, as the

Supreme Court explained, "'will not do.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

### B.     Rule 12(b)(6)

Fed. R. Civ. P. 12(b)(6) allows a party to move the court to dismiss an action for failing "to state a claim upon which relief can be granted[.]"  Fed. R. Civ. P. 12(b)(6).  For a complaint to survive a Rule 12(b)(6) motion to dismiss, the pleading "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Id.* (quoting *Twombly*, 550 U.S. at 556); *see also Christy Sports, LLC v. Deer Valley Resort Co., Ltd.*, 555 F.3d 1188, 1192 (10th Cir. 2009) ("The question is whether, if the allegations are true, it is plausible and not merely possible that the plaintiff is entitled to relief under the relevant law." (citation omitted)).

When considering a Rule 12(b)(6) motion to dismiss, the court must assume that the factual allegations in the complaint are true.  But this obligation doesn't mean that the court is "'bound to accept as true a legal conclusion couched as a factual allegation.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

In the antitrust context, the Supreme Court observed in *Twombly* that "proceeding to antitrust discovery can be expensive."  550 U.S. at 558 (applying the plausibility pleading standard to Sherman Act claims).  So, courts must "'insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed.'"  *Id.* (quoting *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 528 n.17

(1983)).  But still, antitrust cases are not subject to a standard requiring "heightened fact pleading of specifics[.]" *Id.* at 570.  Instead, an antitrust complaint must allege "only enough facts to state a claim to relief that is plausible on its face" sufficient to "nudge[ ] the[ ] claims across the line from conceivable to plausible[.]" *Id.*; *see also In re Urethane Antitrust Litig.*, 663 F. Supp. 2d 1067, 1074 (D. Kan. 2009) (explaining on a Rule 12(b)(6) motion to dismiss antitrust claims that "the Court must ensure that plaintiffs have alleged facts to support those elements sufficient to provide the 'heft' to show an entitlement to relief and to 'nudge' plaintiffs' claims over the line from mere[ ] possibility or speculation to plausibility" (quoting *Twombly*, 550 U.S. at 557, 570)).

### C.     Rule 9

Fed. R. Civ. P. 9 governs "pleading special matters" in cases alleging fraud, like this one. Fed. R. Civ. P. 9.  For fraud allegations, "a party must state with *particularity* the circumstances constituting the fraud[.]"  Fed. R. Civ. P. 9(b) (emphasis added).  In other words, Rule 9(b) imposes a "heightened pleading standard" for fraud claims.  *Welch v. Centex Home Equity, Co.*, 323 F. Supp. 2d 1087, 1094 (D. Kan. 2004) (citations omitted).

One must read the particularity requirement contained in Rule 9(b) "in conjunction with the principles of Rule 8, which calls for pleadings to be 'simple, concise, and direct[.]'" *Schwartz v. Celestial Seasonings, Inc.*, 124 F.3d 1246, 1252 (10th Cir. 1997) (quoting Fed. R. Civ. P. 8).  Rule 9(b) thus "joins with [Rule] 8(a) to form the general pleading requirements for claims under the" False Claims Act (FCA).  *U.S. ex rel. Lemmon v. Envirocare of Utah, Inc.*, 614 F.3d 1163, 1171 (10th Cir. 2010) (citations omitted).  Our Circuit has explained that "Rule 9(b) supplements [Rule] 8(a) in setting forth the pleading requirements under the FCA."  *Id.*  And, as our Circuit also has explained, the Supreme Court's seminal rulings in *Twombly* and *Iqbal* didn't alter Rule 9's primary focus—that is, "'to afford defendant fair notice of plaintiff's claims and the factual ground upon which [they] are based[.]'"  *Id.* at 1172 (quoting *Koch v. Koch Indus.,*

*Inc.*, 203 F.3d 1202, 1236 (10th Cir. 2000)).  As a consequence, "claims under the FCA need only show the specifics of a fraudulent scheme and provide an adequate basis for a reasonable inference that false claims were submitted as part of that scheme." *Id.* (first citing *U.S. ex rel. Duxbury v. Ortho Biotech Prods.*, 579 F.3d 13, 29 (1st Cir. 2009); then citing *U.S. ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 854–55 (7th Cir. 2009); and then citing *U.S. ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190 (5th Cir. 2009)).

## III.      Analysis

The court begins its analysis with defendants' argument that plaintiffs' claims are barred by the statute of limitations.  The court then considers defendants' arguments that plaintiffs' fail to state a claim under Fed. R. Civ. P. 12(b)(6).  The court begins its Rule 12(b)(6) analysis with plaintiffs' Sherman Act claim, then pivots to plaintiffs' RICO claim, and concludes with plaintiffs' state law claims.

### A.      Statute of Limitations

The court first addresses defendants' argument that the court should dismiss plaintiffs' claims as untimely.  "Typically, facts must be developed to support dismissing a cased based on the statute of limitations." *Herrera v. City of Espanola*, 32 F.4th 980, 991 (10th Cir. 2022) (citation omitted).  So, the court's analysis starts by deciding when—on the pleaded facts— plaintiffs' federal claims began to accrue.  Then, it considers whether plaintiffs have alleged a plausible basis for tolling the statute of limitations for the federal claims.  Last, the court considers whether plaintiffs' state law claims are untimely.

#### 1.      Accrual

To determine whether plaintiffs' statute of limitations clock has expired, the court first addresses when that clock started to run.  Two accrual rules are relevant here:  the injury- occurrence rule and the injury-discovery rule.  The injury-occurrence rule applies to plaintiffs'

Sherman Act claim which means, as explained below, that plaintiffs' Sherman Act claim is untimely on its face. As a result, plaintiffs must show a basis for tolling the statute of limitations; § III.A.2 examines the tolling question. Plaintiffs' RICO claim presents a more complicated question because no binding appellate authority has decided when a RICO claim begins to accrue. So, the court addresses both sets of accrual rules for plaintiffs' RICO claim.

### a. Plaintiffs' Sherman Act claim began to accrue when plaintiffs experienced injury.

Count IV brings a Sherman Act claim, alleging defendants violated 15 U.S.C. §§ 1–2 by unlawfully restraining trade in the armodafinil market and monopolizing the armodafinil market. Doc. 42 at 54–55 (1st Am. Compl. ¶¶ 239–49). Defendants assert these claims are barred by the Sherman Act's four year statute of limitations.

"The statute of limitations for federal antitrust actions is four years." *Kaw Valley Elec. Coop. Co. v. Kan. Elec. Power Coop., Inc.*, 872 F.2d 931, 933 (10th Cir. 1989); *see also* 15 U.S.C. § 15b. Plaintiffs argue that this four year statute of limitations doesn't apply to their Sherman Act claim, however, because it applies only to claims that seek damages. Plaintiffs rely on *Hightower v. Celestron Acquisition, LLC*, which provides that where "a plaintiff seeks injunctive relief for an antitrust violation, there is no statute of limitations per se." No. 5:20-cv-3639-EJD, 2021 WL 2224148, at *4 (N.D. Cal. June 2, 2021) (citation and internal quotation marks omitted). But plaintiffs' Sherman Act claim here doesn't seek injunctive relief—it seeks *declaratory* relief. Doc. 42 at 55 (1st Am. Compl. ¶ 249). Undeterred, plaintiffs argue that "declaratory relief is merely a milder form of injunctive relief." Doc. 63 at 22 (internal quotation marks and citations omitted). That's not quite right. Our Circuit has concluded that "[d]eclaratory relief may be legal or equitable depending on the basic nature of the underlying issues." *United States v. New Mexico*, 642 F.2d 397, 400 (10th Cir. 1981). In any event, the

court need not determine whether plaintiffs' Sherman Act claim seeks legal or equitable relief because plaintiffs' claim here—even if equitable in content—still falls under a four-year limitation according to the equitable defense of laches.

Plaintiffs neglect to note the part of the *Hightower* decision that explains antitrust claims seeking injunctive relief "are 'subject to the equitable defense of laches.'" 2021 WL 2224148, at *4 (quoting *Oliver v. SD-3C LLC*, 751 F.3d 1081, 1085 (9th Cir. 2014)). Laches "bars a plaintiff from maintaining a suit if he unreasonably delays in a suit and as a result harms the defendant." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 121 (2002). When "applying laches, [courts] look to the same legal rules that animate the four-year statute of limitations[.]" *Oliver*, 751 F.3d at 1086. And when "'computing the laches period,' courts use the Clayton Act's four-year statute of limitations as a 'guideline.'" *Hightower*, 2021 WL 2224148, at *4 (quoting *Oliver*, 751 F.3d at 1086). So, whether the requested declaratory relief is legal or equitable, a four-year period applies. The court thus must determine whether plaintiffs brought their suit within four years of their antitrust claims accruing.

To calculate the date of accrual, the court must apply the injury-occurrence rule to plaintiffs' Sherman Act claim. "'The general rule is that an antitrust cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business.'" *Auraria Student Hous. at Regency, LLC v. Campus Vill. Apartments, LLC*, 843 F.3d 1225, 1247 (10th Cir. 2016) (quoting *Kaw Valley*, 872 F.2d at 933) (further citation and quotation marks omitted). That is, a Sherman Act claim begins to accrue "on the 'particular date' that 'a plaintiff feels the adverse impact of an antitrust conspiracy.'" *Id.* (quoting *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 401 U.S. 321, 339 (1971)).

Here, plaintiffs allege that defendants restrained and eliminated competition and monopolized the armodafinil market, artificially inflated the price of armodafinil, and caused plaintiffs to suffer damages by paying those artificially inflated prices.  Doc. 42 at 44, 55 (1st Am. Compl. ¶¶ 193, 248).  So, plaintiffs' Sherman Act claim began to accrue when they paid inflated prices for armodafinil.  Generic armodafinil entered the market in 2016.  Plaintiffs filed their lawsuit on December 2, 2022.  Defendants argue that plaintiffs' Sherman Act claim accrued more than four years before December 2022.  The court agrees with them.

Plaintiffs' Amended Complaint alleges:  "In December 2016, six additional generic competitors entered the market, including Teva's authorized generic product, further reducing Teva's Nuvigil sales.  It was not until these additional generic competitors entered the market that there was full price competition for brand and generic forms of Nuvigil."  *Id.* at 38 (1st Am. Compl. ¶ 171) (quotation marks, brackets, and citation omitted).  As a result, plaintiffs' claims accrued no later than December 2016, which renders their December 2022 lawsuit untimely.

So, on the face of the Amended Complaint, it's evident that the applicable limitations period has expired for plaintiffs' Sherman Act claim.  This result has consequences for the plaintiffs' burden at the motion to dismiss stage.  "While the statute of limitations is an affirmative defense, when the dates given in the complaint make clear that the right sued upon has been extinguished, the plaintiff has the burden of establishing a factual basis for tolling the statute."  *Aldrich v. McCulloch Props., Inc.*, 627 F.2d 1036, 1041 n.4 (10th Cir. 1980) (first citing *Lukenas v. Bryce's Mountain Resort, Inc.*, 538 F.2d 594, 597 (4th Cir. 1976); then citing *Burke v. Gateway Clipper, Inc.*, 441 F.2d 946, 948 (3d Cir. 1971)).

Plaintiffs assert two grounds for tolling the statute of limitations: equitable tolling and fraudulent concealment. The court examines those two tolling doctrines in § III.A.2., below. But, before it departs the accrual analysis, the court addresses accrual of plaintiffs' RICO claim.

### b. Plaintiffs' RICO claim began to accrue either when plaintiffs experienced injury or when they discovered the injury.

Defendants likewise argue that plaintiffs' civil RICO claim is untimely. Plaintiffs' RICO claim, Count VII, is subject to a four year statute of limitations. *Agency Holding Corp. v. Malley-Duff & Assocs., Inc.*, 483 U.S. 143, 156 (1987). The parties disagree when this statute of limitations started to run. The parties' dispute is understandable because neither the Supreme Court nor our Circuit has decided definitively when a civil RICO claim accrues. *See Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 192 (1997) (declining to choose between "the various discovery accrual rules used by the Circuits" in civil RICO cases because the "legal questions involved may be subtle and difficult"); *Robert L. Kroenlein Tr. ex rel. Alden v. Kirchhefer*, 764 F.3d 1268, 1277 (10th Cir. 2014) (declining to decide when a civil RICO claim accrues because plaintiffs' claims were barred either way); *see also Klehr*, 521 U.S. at 196–97 (Scalia, J., concurring) (lamenting Court's failure to resolve "the mess that characterizes civil RICO accrual decisions" (citation and internal quotation marks omitted)). Our Circuit has identified two possible rules to govern the accrual question in civil RICO suits: the injury-occurrence rule and the injury-discovery rule.

The injury-occurrence rule is the traditional one, where "a right 'accrues'—starts the clock ticking on the limitations period—'when the plaintiff has a complete and present cause of action.'" *Alden*, 764 F.3d at 1275 (quoting *Gabelli v. S.E.C.*, 568 U.S. 442, 448 (2013)). In other words, "a claim would 'accrue' when the injury occurs, even if undiscovered." *Id.*

Or the court could apply the injury-discovery rule.  The injury-discovery rule "provides that the injury 'is deemed to be discovered when, in the exercise of reasonable diligence, it could have been discovered.'"  *Id.* (quoting *Merck & Co. v. Reynolds*, 559 U.S. 633, 645 (2010)).  The injury-discovery rule is an exception to the injury-occurrence rule for cases "where the nature of the harm or the cause of the harm is difficult to detect"—such as a fraud claim.  *Id.*  "The rationale for the injury-discovery rule hinges on the deceptive nature of the injury."  *Id.*

Here, predictably, each side favors the rule that suits it best in this case.  Defendants argue the court must apply the injury-occurrence rule.  Plaintiffs argue the court must apply the injury-discovery rule.  The court need not decide which rule to apply because, under either inquiry, plaintiffs' RICO claim survives.

Assuming the injury-occurrence rule applies, then, as with their Sherman Act claim, plaintiffs' RICO claim is untimely and, as a result, plaintiffs must allege a plausible basis for tolling.  As shown below, plaintiffs have shouldered their burden to establish a basis for tolling the statute of limitations under the doctrines of equitable tolling and fraudulent concealment.  *See* § III.A.2.  So—even if untimely—the RICO claim survives.

Conversely, if the court applies the injury-discovery rule, then plaintiffs' claim is timely and—again—the RICO claim survives.  The injury-discovery rule applies "only in the exceptional case where a reasonably diligent plaintiff could not immediately know of the injury and its cause."  *Alden*, 764 F.3d at 1276–77 (citations and internal quotation marks omitted).  Our Circuit has "consistently emphasized" that the injury-discovery rule "only protects plaintiffs who are blamelessly unaware of their claim because the injury has not yet manifested itself or because the facts establishing a causal link between the injury and the cause of the injury are in the control of the tortfeasor or otherwise not evident."  *Id.* at 1277 (citation, internal quotation

marks, and brackets omitted).  "In applying the injury-discovery rule, [the court] ask[s] not only when a plaintiff actually discovers his injury, but also when a reasonably diligent plaintiff would have discovered the injury." *Id.* at 1279 (citation omitted).  This second inquiry—the one focusing on a reasonably diligent plaintiff—is an objective inquiry. *Id.* at 1279–80.  And the "limitations period generally will not begin to run until the plaintiff either has actual or inquiry notice of the injury." *Id.* at 1280 (citation omitted).  Defendants invoke the latter:  inquiry notice.  Defendants argue that "a reasonably diligent plaintiff would have had notice of all the claims well over four years before Plaintiffs filed suit."  Doc. 47 at 24.  The court examines inquiry notice in greater detail, below.

"A plaintiff is on inquiry notice whenever circumstances exist that would lead a reasonable plaintiff of ordinary intelligence, through the exercise of reasonable due diligence, to discover his or her injury." *Alden*, 764 F.3d at 1280 (citation, internal quotation marks, and brackets omitted).  "It is settled law in the majority of circuits that the issue of when a plaintiff knew or with reasonable diligence should have known of a cause of action is a question of fact for the jury." *Maughan v. SW Servicing, Inc.*, 758 F.2d 1381, 1387–88 (10th Cir. 1985) (collecting authority and reversing trial court's grant of summary judgment on statute of limitations grounds).  The court can't resolve this fact issue on a motion to dismiss.

Here, plaintiffs' First Amended Complaint alleges sufficient facts supporting a plausible inference that the discovery rule makes their RICO claim timely.  Specifically, plaintiffs allege, "Plaintiffs and the members of the Classes had no knowledge of the alleged conspiracy, or of facts sufficient to place them on inquiry notice of the claims set forth."  Doc. 42 at 46 (1st Am. Compl. ¶ 200).  Plaintiffs also allege that information "in the public domain was insufficient to place Plaintiffs and members of the Classes on inquiry notice of Teva's unlawful activities." *Id.*

(1st Am. Compl. ¶ 201).  And plaintiffs allege that they "had no means of obtaining any facts or information concerning Teva's unlawful, anticompetitive, unfair, and deceptive activities alleged, all of which were purposefully concealed by Defendants."  *Id.*

Defendants assert that three events—disclosed in the public domain before December 2, 2018—"'would have been more than adequate to raise [Plaintiffs'] suspicions as to their claim of injury.'"[5]  Doc. 47 at 24 (quoting *In re Ciprofloxacin Hydrochloride Antitrust Litig.*, 261 F. Supp. 2d 188, 224 (E.D.N.Y. 2003)).  The court rejects each one, below.

*First*, defendants assert that the April 2012 settlement announcements put plaintiffs on notice of their claims.  *Id.*  Defendants argue that "both settlements were announced to the public within days of each other in April 2012.  Those facts are essentially everything Plaintiffs use for their generic-delay theory of injury, and they were known a decade before Plaintiffs actually filed this case."  *Id.* at 24–25.  According to defendants, the settlement announcements gave plaintiffs everything they needed for "their generic-delay theory:  they show the settlements were entered into around the same time, involved the same companies, and resulted in early-entry generic launch dates."  Doc. 68 at 12.  But, the problem is, the Nuvigil settlement itself was confidential.  Doc. 42 at 45 (1st Am. Compl. ¶ 198).  And plaintiffs allege that the relevant parties "intentionally concealed the actual documents for the key settlement agreements and did

---

[5]        Defendants don't argue that paying an increased price—by itself—would suffice to alert reasonable plaintiffs of their injury.  And for good reason; the weight of authority suggests otherwise.  *In re EpiPen Direct Purchaser Litig.*, No. 20-cv-0827, 2021 WL 147166, at *6 (D. Minn. Jan. 15, 2021) ("Defendants have not shown that Plaintiffs should have discovered their injury based on EpiPen price increases alone.  After all, prices increase all the time for all sorts of reasons.  And the alleged injury here is an unlawfully *inflated* price, not just a higher price." (emphasis in original)); *In re McKesson Governmental Entities Average Wholesale Price Litig.*, 767 F. Supp. 2d 263, 272 (D. Mass. 2011) ("[Defendant] claims that knowledge of increases in [drug price] was sufficient to trigger the statute of limitations even if there was no knowledge of the underlying fraud.  In a market where drug pricing was notoriously opaque and where [drug prices] were frequently increased by manufacturers for various reasons, public payors could not possibly have known that a price increase was the result of fraud perpetrated by a wholesaler in cahoots with the price reporting service.").

everything possible to prevent crucial details of those documents from becoming public." *Id.* at 46 (1st Am. Compl. ¶ 203).

Contrast these allegations with the cases defendants invoke, all of which involved public disclosure of material settlement terms. *In re Niaspan Antitrust Litig.*, 42 F. Supp. 3d 735, 748 (E.D. Pa. 2014) (concluding plaintiffs had failed to plead fraudulent concealment with particularity because defendants didn't conceal the material terms of alleged pay for delay settlement and affirmatively disclosed settlement terms to public in press releases and by filing copies of the settlement documents with SEC); *In re Ciprofloxacin*, 261 F. Supp. 2d at 225 (concluding plaintiffs in antitrust pharmaceutical case should have been aware of operative facts where generic drug manufacturer publicly disclosed agreement that (i) acknowledged validity of name brand drug patent holder's patent and (ii) disclosed payment scheme that gave name brand drug patent holder an option either to supply drug or make payments to generic drug manufacturer's escrow account).

Here, plaintiffs plausibly allege that defendants concealed the material settlement terms. Defendants frame the settlements separately, asserting that plaintiffs should've connected the dots between the EpiPen settlement and the Nuvigil settlement. But at the heart of plaintiffs' claims lies a third, undisclosed agreement: one swapping settlement for settlement. Mylan and Pfizer's April 26, 2012, press release about the EpiPen settlement "left out that the EpiPen settlement was part of a quid pro quo for Mylan's agreement to simultaneously enter into a settlement agreement resolving the Nuvigil patent litigation in Teva's favor." Doc. 42 at 25 (1st Am. Compl. ¶ 93). And Mylan's April 30, 2012, press release "left out that Mylan entered the Nuvigil settlement in return for Teva's agreement to the EpiPen settlement." *Id.* at 35 (1st Am. Compl. ¶ 159). Plaintiffs thus plausibly allege that the April 2012 press releases failed to

disclose the material terms of the settlements and the accompanying unlawful reverse payment that would've alerted reasonable plaintiffs to discover their injury.  *See In re Pork Antitrust Litig.*, 495 F. Supp. 3d 753, 774 (D. Minn. 2020) ("Although public statements made by the Defendants could have tipped off a savvy consumer to the conspiracy, that does not mean that a reasonable person must have discovered the conspiracy through the statements.").

*Second*, defendants argue that a reasonable plaintiff would've had inquiry notice by August 22, 2016, when Congress began publicly investigating EpiPen pricing.  Doc. 47 at 25.  Defendants note that the court used this date for inquiry notice in the EpiPen MDL and a related EpiPen case.  *Id.*  But that was EpiPen.  The EpiPen MDL was different in important ways.  In the claims at issue in the EpiPen MDL, plaintiffs' Class Complaint explicitly acknowledged the Congressional hearing, alleging that "plaintiffs had no knowledge of the combination or conspiracy . . . , or of facts sufficient to place them on inquiry notice of the claims . . . until on or about (at the earliest) April 22, 2016, the date [when] Congress publicly announced its investigation of EpiPen pricing."  *In re:  EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, 336 F. Supp. 3d 1256, 1330 (D. Kan. 2018) (record citation and internal quotation marks omitted, brackets in original).  The cited Congressional hearing never mentions Nuvigil.  House Comm. on Oversight & Gov't Reform, No. 114-124, *Reviewing the Rising Price of EpiPens* (2016), https://www.govinfo.gov/content/pkg/CHRG-114hhrg24914/pdf/CHRG-114hhrg24914.pdf.  To be sure, the hearing references Teva and a pay for delay scheme.  *See id.*  But the hearing only mentions Teva's generic EpiPen and the settlement that delayed Teva's release of its generic EpiPen.  *Id.* at 34.  The court simply cannot say that this hearing—which focused entirely on EpiPen and never mentions Nuvigil—provided plaintiffs with notice of their claims as a matter of law.  It just wasn't specific enough to carry

the assigned burden.  *See In re EpiPen Direct Purchaser Litig.*, No. 20-cv-0827, 2021 WL

147166, at *6 (D. Minn. Jan. 15, 2021) (rejecting Rule 12(b)(6) statute of limitations argument

where defendants asserted articles triggered plaintiffs' duty to investigate because "articles were

not specific to the EpiPen").[6]

*Third*, defendants argue that plaintiffs had notice of their claims as of October 17, 2017,

when the EpiPen MDL plaintiffs filed their consolidated MDL consumer complaint.  This

consolidated complaint alleged that the MDL defendants—Mylan and Pfizer entities—had used

a pay for delay scheme to stop Teva's generic EpiPen.  And part of that scheme, the MDL

complaint alleged, involved Nuvigil.  Defendants argue that the 2017 EpiPen MDL complaint

provided more than enough information because this Nuvigil suit is an EpiPen MDL copycat that

repeats allegations from the MDL complaint against a new defendant.  Doc. 47 at 25.

Defendants emphasize that the "MDL suit involved the same legal theory, alleging the same

conspiracy between the same parties, on behalf of a similarly defined consumer class[.]"  Doc.

68 at 14.  Defendants also point out that the EpiPen MDL involved some of the same plaintiffs'

attorneys.  Doc. 47 at 25.  And, defendants note, the court discussed the allegations in the MDL

complaint in public opinions issued in August and October 2018.  *Id.*  Defendants again rely on

*In re Ciprofloxacin*, 261 F. Supp. 2d at 225, and *In re Niaspan*, 42 F. Supp. 3d at 748, where the

courts found plaintiffs' antitrust claims—based on a pay for delay theory—untimely because

defendants had disclosed publicly the material facts of the allegedly unlawful settlements.

---

[6]     The court also is persuaded by the Minnesota court's pragmatic perspective.  That court explained
that concluding plaintiffs had inquiry notice based on articles about the EpiPen "would have odd
consequences:  those who might be RICO plaintiffs would be expected to monitor scholarship and like
resources and promptly and thoroughly investigate a universe of possible circumstances when presented
with any reasoned suggestion that some aspect of the market is subject to abuse.  No authority supports
such a broad rule or duty."  *In re EpiPen Direct Purchaser Litig.*, 2021 WL 147166, at *6.  Likewise,
here, the court declines to hold that potential antitrust plaintiffs must monitor Congressional hearings and
any accompanying publicity, and then, promptly and thoroughly investigate the price of a drug never even
mentioned in those hearings.

But defendants' cases—*In re Ciprofloxacin* and *In re Niaspan*— don't apply to the discovery rule inquiry.  Those cases address whether plaintiffs could toll the statute of limitations under the fraudulent concealment doctrine.  In both *In re Ciprofloxacin* and *In re Niaspan*, plaintiffs lost because they failed to plead fraudulent concealment with the particularity required by Fed. R. Civ. P. 9.  *In re Ciprofloxacin*, 261 F. Supp. 2d at 226; *In re Niaspan*, 42 F. Supp. 3d at 748.  There's no particularity requirement with the discovery rule, however.  And the discovery rule addresses when a claim accrues; it's not a tolling doctrine.  So, in the discovery rule inquiry, defendants bear "the burden to show, based only on the facts in the Complaint, that the RICO claims were untimely."  *In re EpiPen Direct Purchaser Litig.*, 2021 WL 147166, at *7 n.10 (explaining difference in parties' burdens of proof between discovery rule and fraudulent concealment).

Without the authority of the fraudulent concealment cases, defendants' third argument collapses.  Defendants can't overcome our Circuit's long-standing precedent that the discovery rule presents a fact issue.  The court must obey our Circuit's directive that it's "settled law in the majority of circuits that the issue of when a plaintiff knew or with reasonable diligence should have known of a cause of action is a question of fact for the jury."  *Maughan*, 758 F.2d at 1387–88.  Defendants just haven't shouldered their burden to show that—as a matter of law—the EpiPen MDL complaint triggered plaintiffs' duty to investigate.  Plaintiffs allege that they "had no knowledge of the alleged conspiracy, or of facts sufficient to place them on inquiry notice of the claims set forth."  Doc. 42 at 46 (1st Am. Compl. ¶ 200).  And plaintiffs allege that "[i]nformation in the public domain was insufficient to place Plaintiffs . . . on inquiry notice of Teva's unlawful activity."  *Id.* (1st Am. Compl. ¶ 201).

In sum, if the court applied the injury-discovery rule to plaintiffs' RICO claim, then plaintiffs asserted it timely.  And, as explained below, if the court applied the injury-occurrence rule to plaintiffs' RICO claim, the claim still would survive defendants' Motion to Dismiss because plaintiffs have pleaded adequate grounds to toll the statute of limitations.

### 2. Tolling

Recall that plaintiffs' Sherman Act claim is untimely because that claim began to accrue when plaintiffs experienced their injury—that is, paying an inflated price for Nuvigil.  And, if the court applies the same injury-occurrence accrual rule to plaintiffs' RICO claim, then their RICO claim is untimely, too.  Our Circuit requires plaintiffs who file a lawsuit after the statute of limitations expires must shoulder "the burden . . . to identify a theory that allows them to overcome the statute of limitations and thereby render their claims timely."  *Herrera*, 32 F.4th at 992 (citation omitted).  Anticipating this challenge, plaintiffs have alleged grounds to toll the statute of limitations.

Plaintiffs invoke two separate tolling doctrines:  fraudulent concealment and equitable tolling.  These doctrines permit tolling of a statute of limitations when a plaintiff plausibly alleges that a defendant engaged in wrongful conduct preventing plaintiff from asserting the claims in a timely fashion.  *See Aldrich*, 627 F.2d at 1042 (explaining that "allegations, asserting affirmative conduct to conceal the fraud, are sufficient to invoke the doctrine of equitable tolling at [the Rule 12(b)(6) motion to dismiss] stage in the proceeding"); *see also In re Urethane Antitrust Litig.*, 683 F. Supp. 2d 1214, 1227–28 (D. Kan. 2010) (discussing "the rule for tolling based on fraudulent concealment and the discovery rule" and explaining these doctrines toll the statute of limitations until plaintiff "discovers (or should have discovered, through the exercise of due diligence) that it has an antitrust conspiracy claim").

Start with fraudulent concealment.  A plaintiff seeking to utilize the tolling powers of the fraudulent concealment doctrine "must show (1) the use of fraudulent means by the [defendants]; (2) successful concealment from plaintiffs; and (3) that plaintiffs did not know or by the exercise of due diligence could not have known that they might have had a cause of action."  *In re Urethane Antirust Litig.*, 913 F. Supp. 2d 1145, 1158 (D. Kan. 2012).  A "claim of fraudulent concealment to toll the statute of limitations is subject to dismissal if a plaintiff fails to plead the first element—*i.e.*, fraudulent means—with particularity as required by Rule 9(b)."  *In re Urethane Antitrust Litig.*, 409 F. Supp. 2d 1275, 1284 (D. Kan. 2006) (citation omitted).

Plaintiffs also invoke equitable tolling.  Our Circuit has explained that the "question of whether a plaintiff should have discovered the basis of his suit under the doctrine of equitable tolling does not lend itself to determination as a matter of law."  *Aldrich*, 627 F.2d at 1042.  And, at the pleading stage, a plaintiff's "allegations, asserting affirmative conduct to conceal the fraud, are sufficient to invoke the doctrine of equitable tolling at this stage in the proceeding."  *Id.* (reversing district court's Rule 12(b)(6) dismissal of securities act violations on statute of limitations grounds because complaint sufficiently alleged fraudulent concealment to toll statute of limitations and render claims timely).

Here, plaintiffs have shouldered their burden.  They allege facts capable of supporting a plausible finding or inference that fraudulent concealment and equitable tolling apply to toll the statute of limitations.  And tolling the statutes of limitations makes their antitrust claims and RICO claims—applying the injury-occurrence rule—timely.  Plaintiffs allege that "Teva took active steps to conceal its unlawful activities[.]"  Doc. 42 at 45 (1st Am. Compl. ¶ 197).  Specifically, plaintiffs allege that defendants and their co-conspirators "concealed their exchange of generic entry dates" and note that, in 2012, Mylan reported the two settlements to the

Department of Justice as unrelated.  *Id.*  As another example, plaintiffs allege that, "even though the two settlements were negotiated in conjunction and signed the same day (April 26, 2012), the conspirators announced the two settlements separately over the course of multiple days to conceal the fact that each settlement was consideration for the other."  *Id.* (emphasis omitted). Plaintiffs also allege that "Teva's anticompetitive agreements were self-concealing and Teva also actively concealed the existence of its illegal scheme, including through false or misleading representations."  *Id.* at 46 (1st Am. Compl. ¶ 203).  Plaintiffs emphasize that the settlement press release didn't include the actual settlement documents.  They allege the "conspirators . . . intentionally concealed the actual documents for the key settlement agreements and did everything possible to prevent crucial details of those documents from becoming public." *Id.*  Plaintiffs point out that the "parties to the two settlements kept the actual settlement documents confidential, resisted their production in subsequent litigation over the EpiPen, and then marked them CONFIDENTIAL, preventing members of the public from seeing them."  *Id.* at 45 (1st Am. Compl. ¶ 198).  And, plaintiffs aver, "it was not until mid-2021 that the facts that the two settlements were entered into simultaneously and that they were negotiated together as [part of a] package deal were made public in filings in the EpiPen[] MDL[.]"  *Id.* at 46 (1st Am. Compl. ¶ 203).

Defendants respond, arguing that plaintiffs fail to allege (1) an affirmative act of concealment and (2) due diligence with the particularity required by Rule 9(b).[7]  The court addresses these two arguments, in turn, below.

---

[7]       In their Motion to Dismiss (Doc. 47), defendants also argued that plaintiffs had failed to allege adequately that they had relied on an act of concealment.  Doc. 47 at 28.  Defendants' reply abandons this argument, so the court need not consider it.  *See In re FCC 11-161*, 753 F.3d 1015, 1100–01 (10th Cir. 2014) (rejecting petitioners' argument because their reply brief was silent on an issue and made no attempt to rebut the respondents' argument); *see also Cayetano-Castillo v. Lynch*, 630 F. App'x 788, 794 (10th Cir. 2015) (holding that an appellant, who does not respond to an argument in its reply brief,

### a. Plaintiffs plausibly have alleged an affirmative act of concealment.

Defendants argue that plaintiffs have failed to plead fraudulent concealment adequately because "the Amended Complaint does not plead any affirmative act of concealment."  Doc. 47 at 26.  Defendants aver that plaintiffs have alleged simply that defendants failed to disclose, and that's not enough to count as fraudulent concealment.  Doc. 68 at 17.  The court disagrees.  It concludes that plaintiffs plausibly have alleged that defendants and their co-conspirators acted affirmatively to conceal their exchange of generic entry dates.  The court outlines the relevant allegations, below.

The Amended Complaint alleges that the patent litigation settlement press releases didn't disclose the agreement at the heart of plaintiffs' claims:  that the conspirators swapped delayed generic entry for delayed generic entry.  Doc. 42 at 45 (1st Am. Compl. ¶ 197).  In contrast, in *In re Ciprofloxacin*, which defendants cite, the settlement press releases disclosed that one party had acknowledged the validity of the other party's patents and agreed to supply the brand name drug or pay the generic manufacturer.  261 F. Supp. 2d at 225.  *In re Ciprofloxacin* thus involved public disclosure of material facts, and plaintiffs plausibly have alleged that this kind of public disclosure didn't happen here.

Plaintiffs also allege that defendants actively concealed their conspiracy when Mylan reported the two patent litigation settlements to DOJ as unrelated.  Doc. 42 at 45 (1st Am. Compl. ¶ 197).  Plaintiffs allege that Mylan wrote the DOJ, telling it, "While Mylan does not

---

"waives, as a practical matter anyway, any objections not obvious to the court to specific points urged by the appellee'" because the court is not "required to do his work for him and dissect [the appellee's] plausible argument" (quoting *Hardy v. City Optical Inc.*, 39 F.3d 765, 771 (7th Cir. 1994)).

Defendants made a good decision when they abandoned this argument.  It's weak.  Our court has held that "the elements of [the fraudulent concealment] doctrine do not include reliance; rather, plaintiffs must show that they did not know or by the exercise of due diligence could not have known that they might have had a cause of action."  *In re Urethane Antitrust Litig.*, 913 F. Supp. 2d at 1164.

believe it is required to file the EpiPen Settlement in connection with the Nuvigil Settlement, it nonetheless files this agreement as a potentially 'related' agreement out of an abundance of caution." *Id.* Defendants respond that this allegation doesn't plausibly allege an affirmative act of concealment because it's "the exact opposite of fraudulent concealment; a mere statement by Mylan that it believed disclosure was optional did not plausibly conceal anything." Doc. 47 at 27 (emphasis omitted). But defendants' stretch of the facts pulls them too far. Plaintiffs allege that Mylan's equivocal statement to DOJ reported the two settlements—which plaintiffs allege are related—as unrelated. Reporting two related settlements as unrelated plausibly qualifies as an affirmative act of concealment by one of defendants' coconspirators. And, as plaintiffs point out, Mylan's disclosure was confidential. Doc. 63 at 26. The court can't say, as a matter of law, that a reasonable plaintiff would've looked at Mylan's statement—calling allegedly related settlements unrelated—and realized "that they might have a cause of action." *In re Urethane Antitrust Litig.*, 409 F. Supp. 2d at 1284. And calling allegedly related settlements unrelated is just what it sounds like it is—an affirmative act.

Plaintiffs also allege that defendants affirmatively concealed their conspiracy by "announc[ing] the two settlements separately over the course of multiple days to conceal the fact that each settlement was consideration for the other." Doc. 42 at 45 (1st Am. Compl. ¶ 197). Defendants argue this can't serve as a plausible affirmative act of concealment because the settlements were disclosed within a few days of one another, which should've signaled that the settlements were related. Again, defendants rely on *In re Ciprofloxacin*, where the parties disclosed more material facts to the public than the parties disclosed here. Doc. 47 at 27. The court again rejects this argument. Plaintiffs plausibly have alleged that defendants concealed a key fact—that the conspirators settled the two patent lawsuits on the same day—by issuing press

releases several days apart.  The court can't say, as a matter of law, that a reasonable plaintiff would've looked at the two press releases, suspected that the settlements were unlawfully related, and "known that they might have had a cause of action."  *In re Urethane Antitrust Litig.*, 409 F. Supp. 2d at 1284.  Issuing a press release is indeed an affirmative act.

In sum, the court concludes that plaintiffs plausibly have alleged that defendants actively concealed their wrongdoing.[8]  Defendants are free to attempt to persuade the jury that a reasonable plaintiff should've had notice of their claims from the press releases or Mylan's disclosure.  But, at this stage, the court must construe the Complaint's allegations in plaintiffs' favor.  And that construction won't abide defendants' argument.

One last affirmative act argument:  defendants argue that plaintiffs' fraudulent concealment allegations "contradict judicially noticeable facts."  Doc. 47 at 27.  Specifically, defendants point out that "as early as October 2017, the MDL plaintiffs, represented by several of the same lawyers, had already publicly alleged that the settlements were linked, and this Court repeated that allegation in public opinions across 2018."  *Id.*

As an initial matter, the court can't rely on the knowledge of plaintiffs' lawyers.  In *In re Magnesium Oxide Antitrust Litigation*, defendants argued that plaintiffs had inquiry notice of their claims because their counsel was on a related case that began six years earlier.  No. 10-5943 (DRD), 2012 WL 1150123, at *8 (D.N.J. Apr. 5, 2012).  The court declined to impute plaintiffs'

---

[8]  Plaintiffs allege that defendants actively concealed their fraud, but, as an alternative basis for tolling, plaintiffs also allege that defendants' "anticompetitive agreements were self-concealing[.]"  Doc. 42 at 46 (1st Am. Compl. ¶ 203).  Defendants argue that plaintiffs' tolling arguments fail because the Tenth Circuit never has applied a self-concealing standard.  Doc. 47 at 28.  A plaintiff can use the self-concealing conspiracy doctrine to "avoid the affirmative act requirement altogether[.]"  *In re Magnesium Oxide Antitrust Litig.*, No. 10-5943 (DRD), 2011 WL 5008090, at *21 (D.N.J. Oct. 20, 2011).  The court needn't address whether plaintiffs can utilize the self-concealing conspiracy doctrine because the court has concluded that plaintiffs plausibly have alleged affirmative acts of concealment.  *See In re Urethane Antitrust Litig.*, 913 F. Supp. 2d at 1158–59 (describing self-concealing standard as less demanding standard than affirmative acts standard).

counsel's knowledge onto plaintiffs themselves because there was "no indication of an attorney-client relationship before that time." *Id.* at *8 n.6. Similarly, here, there's no indication that these plaintiffs had a relationship with their attorneys in 2017.

Turning to the heart of defendants' judicially noticeable facts argument, the court must revisit the effect of the EpiPen MDL on plaintiffs' notice of their Nuvigil claims.[9] Defendants argue that plaintiffs' fraudulent concealment theory fails because the EpiPen MDL complaint— filed in our court in October 2017—"had already publicly alleged that the settlements were linked[.]" Doc. 47 at 27. The MDL complaint alleges that "part of the valuable consideration Teva received in exchange for dropping its meritorious challenge to the EpiPen patents included the compromise of another patent litigation between Teva and Mylan—this one relating to the blockbuster drug Nuvigil." Consolidated Class Action Complaint at 79, *In re EpiPen (Epinephrine Injection, USP) Marketing, Sales Practices and Antitrust Litigation*, No. 17-md-2785-DDC-TJJ (MDL Compl. ¶ 271). Indeed, the MDL complaint explicitly references the Nuvigil patent litigation and settlement. It provides, "The settlements, when viewed together, show both Teva and Mylan exchanging highly valuable delayed entries (in addition to other settlement consideration that is not publicly available) to settle their respective cases and protect their valuable monopolies." *Id.* at 80 (MDL Compl. ¶ 274). And the MDL complaint mentions that the Nuvigil "settlement delayed Mylan's market entry until June 2016." *Id.* (MDL Compl. ¶ 275). The MDL complaint continues,

> The Nuvigil settlement caught by surprise some of Teva's financial analysts that had been monitoring the situation. As one analyst noted during a Teva earnings call on May 9, 2012: "I was a little surprised to see you settle for generic entry on Nuvigil in 2016, especially with what you just said about the first positive bipolar

---

[9]   The court already has examined the effect of the EpiPen MDL on the timeliness of plaintiffs' claims in its accrual analysis. The court revisits it here because the burden has shifted. Defendants bore the burden in the accrual analysis, and plaintiffs bear the burden here to allege a plausible basis for tolling. *Herrera*, 32 F.4th at 992.

> study." However, the settlement of that action looks more rational (and more anticompetitive) when viewed in the context of the *quid pro quo* of the EpiPen settlement.

*Id.* (MDL Compl. ¶ 276). The MDL complaint found the Nuvigil settlement suspicious "because a bench trial had already been completed at the time of the Teva settlement, [so] it is unlikely that any reverse payment to Teva could be justified as preventing any significant litigation costs." *Id.* at 81 (MDL Compl. ¶ 278).

In a nutshell, defendants argue, plaintiffs have failed to plead fraudulent concealment plausibly because the EpiPen MDL complaint—a public document filed in 2017—put plaintiffs on inquiry notice of their claims. Although the "filing of related lawsuits can suffice to put plaintiffs on inquiry notice, where the alleged fraud is similar," *In re Initial Pub. Offering Sec. Litig.*, 341 F. Supp. 2d 328, 349 (S.D.N.Y. 2004), the "mere filing of a lawsuit 'is not *as a matter of law* tantamount to actual or constructive know[ledge] of their claim[,]'" *United Nat'l Records, Inc. v. MCA, Inc.*, 609 F. Supp. 33, 37 (N.D. Ill. 1984) (emphasis in original) (quoting *In re Beef Indus. Antitrust Litig.*, 600 F.2d 1148, 1171 (5th Cir. 1979)). Instead, class "members cannot be charged with knowledge of a potential claim 'unless they are aware of *some evidence* tending to support it.'" *Id.* (emphasis in original) (quoting *In re Beef Indus. Antitrust Litig.*, 600 F.2d at 1171). The court thus rejects defendants' arguments about the EpiPen MDL complaint for two reasons: (1) the complaint and subsequent court orders don't confer notice as a matter of law and (2) the fact-intensive nature of a fraudulent concealment dispute precludes resolution at the motion to dismiss stage. The court explains each, below.

*One*, the MDL complaint asserted allegations. That's not enough. "The mere filing of a similar lawsuit, without more, does not necessarily give 'good ground' because that suit might well be frivolous or baseless." *In re Beef Indus. Antitrust Litig.*, 600 F.2d at 1171.

> The filing by others of a similar lawsuit against the same defendants may in some circumstances suffice to give notice, but to rule that it does so [a]s a matter of law is to compel a person situated like these plaintiffs to file suit, on the pain of forfeiting his rights, regardless of whether his attorney believes that there is "good grounds to support it."

*Id.* (quoting Fed. R. Civ. P. 11). Critically, Teva wasn't a defendant in the EpiPen MDL. So, even assuming plaintiffs knew about the EpiPen MDL complaint, the "plaintiffs' knowledge of the [other] complaint . . . is not [a]s a matter of law tantamount to actual or constructive knowledge of their claim." *Id.*

Defendants argue that the "some circumstances [that] suffice to give notice" imagined by *In re Beef Industry*, 600 F.2d at 1171, present themselves here. Doc. 68 at 14. Defendants point out that the "MDL suit involved the same legal theory, alleging the same conspiracy between the same parties, on behalf of a similarly defined consumer class; was filed in this same Court; and was advanced by several of the same counsel." *Id.* The court, as explained above, ignores the argument about counsel. And none of the other things—legal theory, alleged conspiracy, and consumer class—can qualify as "some evidence tending to support" plaintiffs' claims. *In re Beef Indus. Antitrust Litig.*, 600 F.2d at 1171 (reversing district court's grant of summary judgment based on allegations in earlier complaint—even though complaint was public record and widely publicized—because "leap from the plaintiffs' knowledge of the [earlier] complaint to actual or constructive knowledge of their cause of action . . . involve[d] factual issues"). Plaintiffs needed "verification for the allegations" or "independent access . . . to any information, beyond the [other] complaint itself, that tended to verify their suspicions." *Id.* "The leap from the plaintiffs' knowledge of the [other] complaint to actual or constructive knowledge of their cause of action therefore involves factual issues." *Id.* And the court simply can't resolve those factual issues on a motion to dismiss.

Defendants argue that plaintiffs also should've received notice based on our court's public opinions in 2018. The court's Memorandum and Order addressing the EpiPen MDL's motion to dismiss mentioned the EpiPen complaint's allegations about Nuvigil and ultimately concluded that the EpiPen MDL consumer class plaintiffs had asserted plausible claims. *In re: EpiPen (Epinephrine Injection, USP) Marketing, Sales Practices & Antitrust Litig.*, 336 F. Supp. 3d 1256, 1280 (D. Kan. 2018). Yet the court doesn't agree with defendants that this Memorandum and Order could—as a matter of law—put reasonable plaintiffs on notice of their claims because it merely repeats the complaint's allegations about Nuvigil. Nothing more. And defendants don't cite a single case where a court concluded that a court order finding a complaint's allegations plausible boosted the complaint from mere allegations to some degree of verification for the allegations. The court declines to conclude that a reasonable plaintiff—as a matter of law—should understand the legal significance of a decision denying a Rule 12(b)(6) motion. Indeed, a Rule 12(b)(6) motion, by its very nature, doesn't involve much evidence beyond the complaint. The same reasoning applies to Magistrate Judge Teresa J. James's Memorandum and Order ordering Mylan to produce documents connected to Nuvigil. *In re EpiPen (Epinephrine Injection, USP) Marketing, Sales Practices & Antitrust Litig.*, No. 17-md-2785-DDC-TJJ, 2018 WL 4854027, at *3 (D. Kan. Oct. 5, 2018). The Memorandum and Order provides no evidentiary support to a claim, nor can the court conclude objectively that a reasonable plaintiff should've read this Memorandum and Order and understood its significance.

*Two*, the relevant legal standard presents too onerous a barrier for defendants to shoulder. Our Circuit has explained that when "there is a dispute" about "the existence of fraudulent concealment, the question is one for the jury." *King & King Enters. v. Champlin Petrol. Co.*, 657 F.2d 1147, 1156 (10th Cir. 1981). And other district courts have held that "'in the antitrust

conspiracy context, it is generally inappropriate to resolve the fact-intensive allegations of fraudulent concealment at the motion to dismiss stage[.]'" *Thompson v. 1-800 Contacts, Inc.*, No. 2:16-CV-1183-TC, 2018 WL 2271024, at *10 (D. Utah May 17, 2018) (quoting *In re Rubber Chems. Antitrust Litig.*, 504 F. Supp. 2d 777, 789 (N.D. Cal. 2007)); *see also In re Mercedes-Benz Anti-Trust Litig.*, 157 F. Supp. 2d 355, 373 (D.N.J. 2001) ("[A]ny serious consideration of [the diligence requirement in the fraudulent concealment analysis] would take the Court well outside the boundaries of the pleading and beyond that which is even arguably before the Court on this motion to dismiss.").

It's evident. A factual dispute exists here. Plaintiffs possibly possess either actual knowledge or constructive knowledge of their claims. Plaintiffs plainly allege they lacked actual knowledge. Despite the MDL complaint's filing in 2017, plaintiffs allege they "had no knowledge of the alleged conspiracy, or of facts sufficient to place them on inquiry notice of the claims" because "[i]nformation in the public domain was insufficient" and plaintiffs "had no means of obtaining any facts or information concerning Teva's unlawful, anticompetitive, unfair, and deceptive activities[.]" Doc. 42 at 46 (1st Am. Compl. ¶¶ 200–01). And the court can't impute constructive knowledge to them without a factual inquiry. To be sure, public documents may suffice to charge plaintiffs with constructive knowledge. *Thompson*, 2018 WL 2271024, at *13. But the court also must consider a reasonable plaintiff's sophistication and access to information before it can charge plaintiffs with knowledge of the EpiPen MDL complaint. *Id.* This would require the court to delve into and resolve factual issues that it properly can't reach at this stage of the litigation. It would stretch the motion to dismiss standard and the First Amended Complaint's allegations too taut to hold—as a matter of law—that a reasonable plaintiff should have seen the EpiPen MDL complaint, understood how Nuvigil fit into the

alleged conspiracy, and thoroughly investigated the truth of the complaint's allegations. Constructive knowledge is a legal fiction, and the court won't pretend that a reasonable plaintiff must monitor, understand, and investigate the complicated universe of antitrust lawsuits in the pharmaceutical industry. *See In re Mercedes-Benz Anti-Trust Litig.*, 157 F. Supp. 2d at 373 ("[O]nly by operation of a legal fiction could the filing of a private lawsuit by an unrelated party in a different vicinage put consumers on notice as a matter of law that a price-fixing conspiracy was afoot."). And so, the court rejects defendants' arguments based on the EpiPen MDL complaint.

In sum, the court concludes that plaintiffs plausibly have alleged that defendants acted affirmatively to conceal their fraud.

> **b.    Plaintiffs plausibly have alleged that they exercised due diligence in investigating their claims.**

Defendants also argue that plaintiffs' allegations fail to meet the third element of fraudulent concealment tolling: "that plaintiffs did not know or by the exercise of due diligence could not have known that they might have had a cause of action." *In re Urethane Antitrust Litig.*, 913 F. Supp. 2d at 1158. Defendants aver that, even if they concealed their actions, plaintiffs "'knew, or at the very least should have known, the operative facts that are the basis of their cause of action' well over four years ago." Doc. 47 at 28 (quoting *In re Ciprofloxacin*, 261 F. Supp. 2d at 224).

Plaintiffs respond that they "did not know, and in the exercise of reasonable diligence could not have discovered, the misconduct giving rise to their injuries until at least June 2021." Doc. 63 at 24. The Amended Complaint notes that "unlike traditional settlement negotiations in litigation, the EpiPen and Nuvigil package settlement was negotiated over the phone and no proposals were exchanged in writing, indicating that Mylan and Teva did not want to leave a

paper trail for their quid pro quo deal." Doc. 42 at 46 (1st Am. Compl. ¶ 204). And plaintiffs allege that they "exercised appropriate due diligence under the circumstances. Thus, Plaintiffs lacked the ability to discover that the drug prices [they were] paying were higher than they should have been because of anticompetitive, fraudulent, or otherwise deceptive conduct." *Id.* at 47 (1st Am. Compl. ¶ 205) (emphasis omitted).

As mentioned already, arguably in ad nauseum fashion, the court concludes that the public documents cited by defendants—the 2017 EpiPen MDL complaint, the 2018 court orders—failed to place plaintiffs on notice of their claims as a matter of law. "The issue [of plaintiffs' diligence] is the classic one of objective reasonableness." *In re Mercedes-Benz Anti-Trust Litig.*, 157 F. Supp. 2d at 373. And "the mere cumulation of 'public' information is not sufficient to show, as a matter of law, that the plaintiffs' claim was untimely." *Maughan*, 758 F.2d at 1389 (reversing district court's grant of summary judgment on basis that claims were untimely because the "question of when plaintiffs knew or should have known of the facts constituting their cause of action present[ed] a genuine issue of material fact"). At best, defendants have shown that "the materials on file might support an inference that the plaintiffs would have discovered adequate support before [December 2018] had they been reasonably diligent. The inference, however, is not so compelling as to entitle the defendants to" dismissal. *In re Beef Indus. Antitrust Litig.*, 600 F.2d at 1171.

Like the Fifth Circuit in *In re Beef Industry Antitrust Litigation*, the court must "emphasize that this ruling is dictated by the posture of the question[.]" *Id.* To assess plaintiffs' diligence would "involve assessing the factual circumstances surrounding [the EpiPen MDL] and whether those circumstances would have put a reasonably diligent plaintiff on notice of a price-fixing conspiracy." *In re Mercedes-Benz Anti-Trust Litig.*, 157 F. Supp. 2d at 373. The Rule 12

standard simply doesn't authorize the court to assess those factual circumstances on a motion to dismiss. The court thus concludes that plaintiffs' diligence in discovering their claims presents a fact issue. It thus declines to dismiss their claims as untimely.

With that conclusion, the court holds that plaintiffs have shouldered their burden to "establish[] a factual basis for tolling the statute." *Aldrich*, 627 F.2d at 1041 n.4 (citations omitted). As a result, the court declines to dismiss plaintiffs' Sherman Act claim as untimely. And, if the court applied the injury-occurrence rule to plaintiffs' RICO claim, the court also would decline to dismiss that claim as untimely. Finally, the court completes the timeliness analysis by applying precedent to the state law claims, below.

### 3.    State Law Claims

Plaintiffs also bring claims under state law. Count V is a "Conspiracy and Combination in Restraint of Trade Under State Law Regarding Nuvigil" claim brought under the laws of 32 states, the District of Columbia, and Puerto Rico. Doc. 42 at 55–58 (1st Am. Compl. ¶¶ 250– 60). Count VI is a "Monopolization and Monopolistic Scheme Under State Law Regarding Nuvigil" claim brought under the laws of the same 34 jurisdictions. *Id.* at 58–61 (1st Am. Compl. ¶¶ 261–67). Defendants ask the court to dismiss most of these state law claims as untimely.

Some states[10] apply the injury-occurrence rule. *See* Doc. 47-2 (Defs.' Ex. 1). Some states apply the injury-discovery rule. *Id.* As shown above, no matter which rule the court applies, plaintiffs plausibly have alleged that their claims are timely. If the court applies the injury-occurrence rule, plaintiffs plausibly have alleged equitable tolling and fraudulent

---

[10]    From here on out, the court uses the term "states" to refer to all 32 states invoked in the First Amended Complaint, the District of Columbia, and Puerto Rico. The court realizes, of course, that the District of Columbia and Puerto Rico aren't states, but that distinction doesn't matter to the court's analysis.

concealment and rendered those claims timely.  And if the court applies the injury-discovery

rule, the claims still will qualify as timely.  The court thus rejects defendants' argument that

plaintiff's state law claims are untimely.

### 4.    Statute of Limitations Conclusion

In sum, the court denies defendants' Motion to Dismiss plaintiffs' claims as barred by the

statute of limitations.  The court pauses here briefly to suggest its interest in targeted discovery.

The court is concerned about the inefficiencies of kicking the timeliness can down the road.  And

the court must abide Fed. R. Civ. P. 1's directive to "secure the just, speedy, and inexpensive

determination of every action and proceeding."  Indeed, the Supreme Court observed in *Twombly*

that "proceeding to antitrust discovery can be expensive."  550 U.S. at 558.

The court thus suggests that the parties consider initial discovery dedicated solely to the

issue of timeliness because it's a pivotal issue.  *See* Manual for Complex Litigation (Fourth)

§ 11.422 ("For effective discovery control, initial discovery should focus on matters—witnesses,

documents, information—that appear pivotal.  As the litigation proceeds, this initial discovery

may render other discovery unnecessary[.]"); *Zahedi v. Miramax, LLC*, No. CV 20-4512-DMG,

2021 WL 3260603, at *2 (C.D. Cal. Mar. 24, 2021) (bifurcating discovery into timeliness and

ownership issues, followed by damages, because "bifurcated discovery would promote

convenience, efficiency, and judicial economy" where case was in early stages).  The court

understands that "bifurcation is generally discouraged in the absence of a compelling reason."

*Atl. Richfield Co. v. NL Indus., Inc.*, No. 20-cv-00234-PAB-KLM, 2020 WL 12293066, at *1 (D.

Colo. Dec. 1, 2020) (collecting authorities).  The court raises this issue now and entrusts to Judge

James the decision whether a bifurcated approach to discovery and, possibly, even trial will

produce real efficiencies—or not.  She has the command of the case in its pretrial stages and thus

sits in the best position to evaluate whether this case's circumstances will qualify as a compelling reason to address timeliness issues first.

The court next considers defendants' Motion to Dismiss arguments that plaintiffs fail to state a claim under Fed. R. Civ. P. 12(b)(6). It begins with plaintiffs' Sherman Act claim.

### B.        Sherman Act

Defendants argue that plaintiffs' Count IV fails to state a claim under sections 1 and 2 of the Sherman Act because the EpiPen patent settlement and the Nuvigil patent settlement were independent and lawful settlements. Doc. 47 at 31–34. Defendants acknowledge that the court already has rejected this argument in both the EpiPen MDL and a related case. *Id.* at 33. But, defendants argue, the court should reconsider those rulings in light of the Seventh Circuit's decision in *Mayor & City Council of Baltimore v. AbbVie Inc.*, 42 F.4th 709 (7th Cir. 2022). *Id.* at 33–34. As explained below, defendants' argument, though interesting, doesn't persuade the court. The court begins by explaining how a reverse payment settlement may implicate the antitrust laws. Then, it recounts defendants' argument why the settlements at issue don't violate antitrust laws before explaining the court's previous rejection of this argument. Next, the court considers the *AbbVie* decision and explains why, in the end, *AbbVie* doesn't convince the court to change its mind. Finally, the court explains why it rejects defendants' other persuasive authority.

As already explained, a reverse payment settlement refers to an agreement by a brand-name manufacturer (and patent holder) to compensate a generic manufacturer (and alleged patent infringer) in exchange for settling patent infringement litigation, thus delaying the generic's entry into the market. *In re Nexium (Esomeprazole) Antitrust Litig.*, 842 F.3d 34, 41 (1st Cir. 2016) (citation omitted). In *Actavis*, the Court held that "reverse payment settlements . . . can sometimes violate the antitrust laws." *FTC v. Actavis, Inc.*, 570 U.S. 136, 141 (2013). While

41

this conclusion might sound like it reveals little, the case was a turning point.  Before *Actavis*,

some Circuits had held, in a nutshell, that patent holders could settle patent litigation as they saw

fit because the patentee had a right to exclude others from the market.  Under this theory, courts

didn't need to apply antitrust scrutiny to reverse payment settlements because "'absent sham

litigation or fraud in obtaining the patent, a reverse payment settlement is immune from antitrust

attack so long as its anticompetitive effects fall within the scope of the exclusionary potential of

the patent.'"  *Id.* at 146 (quoting *FTC v. Watson Pharms., Inc.*, 677 F.3d 1298, 1312 (11th Cir.

2012)).  *Actavis* rejected the idea that a patent "can immunize the [reverse payment] agreement

from antitrust attack."  *Id.* at 147.  The Supreme Court thus held that a patent settlement

involving a "large, unjustified reverse payment" can violate the antitrust laws if its "objective is

to maintain supracompetitive prices to be shared among the patentee and the challenger rather

than face what might have been a competitive market" because that objective is "the very

anticompetitive consequence that underlies the claim of antitrust unlawfulness."  *Id.* at 157–58.

　　*Actavis* provided some guidance for courts to use to determine when a reverse payment

settlement violates the antitrust laws.  And it exempted "commonplace forms" of settlement from

scrutiny.  *Id.* at 152.  In defendants' view, *Actavis* identified only one type of problematic reverse

payment settlement:  "'a large, unjustified reverse payment'—*i.e.*, where the patentee 'pay[s] the

alleged infringer, rather than the other way around[.]'"  Doc. 47 at 31 (quoting *Actavis*, 570 U.S.

at 140–41, 158).  Defendants train their focus on the "large, unjustified reverse payment"

language in *Actavis*.  They point out that *Actavis* explicitly blessed parties who settle patent

litigation "by allowing the generic manufacturer to enter the patentee's market prior to the

patent's expiration, without the patentee paying the challenger to stay out prior to that point."

*Actavis*, 570 U.S. at 158.  Defendants argue that the lawful settlement imagined by *Actavis* is

exactly the one plaintiffs allege here. Specifically, in the Nuvigil patent litigation, Teva allowed Mylan to enter the Nuvigil market with a generic before the Nuvigil patent expired. And Teva didn't pay Mylan anything. Meanwhile, in the EpiPen patent litigation, Pfizer and Mylan allowed Teva to enter the EpiPen market with a generic EAI before the EpiPen patent expired and Pfizer. And Mylan didn't pay Teva anything.

This court and others already have rejected defendants' truncated view of the settlements at issue here. A "reverse payment underlying an *Actavis* antitrust claim need not be in cash form." *In re Lipitor Antitrust Litig.*, 868 F.3d 231, 252 (3d Cir. 2017) (citing *King Drug Co. of Florence, Inc. v. Smithkline Beecham Corp.*, 791 F.3d 388, 403–09 (3d Cir. 2015)). A "reverse payment's legality depends mainly on its economic substance, not its form." *FTC v. AbbVie Inc.*, 976 F.3d 327, 356 (3d Cir. 2020). Indeed, "courts have held that pay-for-delay settlements don't require a monetary payment in the actual settlement agreement when other evidence suggests that the parties to the litigation exchanged some form of consideration in separate, side agreements." *In re EpiPen (Epinephrine Injection, USP) Marketing, Sales Practices & Antitrust Litig.*, 545 F. Supp. 3d 922, 993 (D. Kan. 2021) (collecting cases). As the court explained in the EpiPen MDL,

> Here, like the scenarios in other lawsuits, plaintiffs allege that defendants settled the EpiPen case in exchange for the pecuniary value that the Nuvigil settlement offered Teva. Even though plaintiffs haven't provided a case where a court permitted a generic delay claim premised on a theory that the parties traded settlements in two cases, it would make little sense for the court to preclude this theory simply because the value traded in the settlement didn't include a monetary payment. If the court were to reach that conclusion, the parties to an unlawful reverse payment settlement could avoid antitrust liability so long as they crafted their agreements as exchanging something of value that was delivered by something other than a monetary payment. Nothing in the case law or related antitrust literature embraces defendants' view that money—and money alone—can support reverse payment liabilities.

*Id.* at 994.  Now, defendants ask the court to reconsider its reasoning in light of the Seventh

Circuit's *AbbVie* decision.

In *AbbVie*, the Seventh Circuit addressed antitrust claims brought by indirect purchasers

of the drug/biologic Humira.  42 F.4th at 711.  Defendant AbbVie owned the patent for Humira.

*Id.*  Plaintiffs argued that AbbVie settled its Humira patent litigation with "terms of the

settlements [that] established a cartel among AbbVie and the potential [biosimilar[11]] entrants."

*Id.* at 714.  AbbVie's Humira patent litigation settlement allowed biosimilar drugs to enter the

U.S. market during 2023, though many of AbbVie's Humira patents extended beyond 2023.  *Id.*

Plaintiffs didn't have a problem with this particular settlement.  *Id.*  Instead, plaintiffs' reverse

settlement theory asserted that AbbVie (and affiliates) had settled litigation in the European

Union in exchange for the U.S. settlement.  *Id.*  Plaintiffs claimed that AbbVie had settled its

E.U. litigation with an October 2018 entry date, "gift[ing] the biosimilar makers with 4+ years of

profits in Europe, in exchange for their agreement not to enter the U.S. market until 2023."  *Id.*

The district court rejected plaintiffs' theory because in "each [settlement] AbbVie agreed to entry

before the last patents expired and didn't pay anyone to delay entry."  *Id.* at 715.  The Seventh

Circuit affirmed.  *Id.*

The Circuit explained its reasoning this way:  "0 + 0 = 0."  *Id.*  That is, AbbVie's

settlement in the U.S. was "normal . . . without any payment to the entrants, a settlement of the

kind that *Actavis* says is not problematic."  *Id.* (citing *Actavis*, 570 U.S. at 152).  And in "Europe,

AbbVie and the potential entrants struck the same kind of deal[.]"  *Id.*  Defendants ask the court

to apply this reasoning here because plaintiffs have alleged a similar 0 + 0 situation.  Putting it

another way, each party settled each patent litigation with a traditional arrangement:  the brand

---

[11]      Humira is a biologic, not a synthetic substance.  *AbbVie*, 42 F.4th at 712.  Drugs that compete
with a biologic are called "biosimilars" instead of "generics."  *Id.*

name manufacturer agreed to let the generic enter the market before its patent expired and the generic manufacturer agreed to a market entry date later than what it would have achieved had it won the patent litigation. While the court appreciates the reasoning of both the *AbbVie* district court and the Seventh Circuit, the court isn't persuaded that it applies here for three distinct reasons.

*First*, the reverse payment alleged in *AbbVie* was implausible given the settlements' unique complexities. In *AbbVie*, the Seventh Circuit explained that neither the U.S. nor E.U. settlement could qualify as an illegal reverse payment because "three of the potential U.S. entrants . . . d[id] not plan to sell in Europe yet agreed to 2023 dates for entry in the United States." *Id.* That is, the parties to the U.S. and E.U. settlements weren't the same. So, defendant AbbVie couldn't have swapped a 2023 U.S. entry date in exchange for a 2018 E.U. entry date. *Id.* Here, in contrast, the reverse payment alleged is much simpler: Teva exchanged Nuvigil generic delay for EpiPen generic delay. Plaintiffs thus have alleged a far simpler and more plausible reverse settlement than the *AbbVie* plaintiffs alleged.

*Second*, the E.U. settlement at issue in *AbbVie* was all but unavoidable given the E.U.'s market structure and Humira's unique conditions. "Each member state in the E.U. has its own patent law, and AbbVie held patents that were stronger in some nations than in others or had different expiration dates. Moreover, some entry in 2018 was inevitable[.]" *Id.* Humira was approved to treat nine medical conditions but, by 2018, AbbVie would have exclusive rights to just three of those nine conditions. *Id.* Because of the many different patent laws applied in the E.U. and AbbVie's rights under each of them, "entry of biosimilar drugs was inevitable, and AbbVie had to negotiate for terms." *Id.* Not so here. Entry of generic Nuvigil and EpiPen wasn't inevitable—it depended on the outcome of the patent litigation. And

plaintiffs plausibly allege that the parties concluded their patent litigation with an illegal reverse payment, as the court recounts below.

The relevant EpiPen patents expire in September 2025.  Doc. 42 at 22 (1st Am. Compl. ¶ 78).  Plaintiffs have alleged the patents were weak so, rather than lose the 2012 patent litigation bench trial and lose their monopoly 12 or 13 years before it ended, Mylan and Pfizer paid Teva to stay out of the EAI market until 2015—a classic reverse payment.  Mylan and Pfizer compensated Teva—not with money, but in the form of continued monopolistic Nuvigil profits achieved through settlement of the Nuvigil patent litigation.  There, Teva's Nuvigil patents were set to expire in 2024, but Teva agreed to allow Mylan to launch generic Nuvigil in 2016 and 2019.  *Id.* at 34 (1st Am. Compl. ¶ 152).  Again, plaintiffs have alleged a classic reverse payment:  Teva paid Mylan to stay out of the Nuvigil market.  And Teva paid Mylan the same way Mylan paid Teva—not with money but in the form of continued monopolistic profits.  This case isn't like *AbbVie*, one where—no matter what the alleged conspirators did—a generic product inevitably was coming to market, forcing the patent holder to negotiate terms for Humira's three remaining patented uses.  To the contrary, plaintiffs allege that defendants, Mylan, and Pfizer had an opportunity to keep a generic out of the market completely—and they took it.  So, unlike *AbbVie*, plaintiffs have alleged a plausible reverse payment.

*Last*, defendants invoke *AbbVie*'s reasoning about opportunity costs, but it doesn't fit this case.  In *AbbVie*, plaintiffs alleged a reverse payment based on the E.U. litigation because "by leaving money on the table in Europe, AbbVie effectively paid the potential entrants for delay in the United States."  42 F.4th at 715.  The Seventh Circuit pointed out that in *Actavis*, the Court explicitly had rejected the idea that an opportunity cost could qualify as a reverse payment.  *Id.* Justice Breyer gave the following hypothetical in *Actavis*:

> [W]hen Company A sues Company B for patent infringement and demands, say, $100 million in damages, it is not uncommon for B (the defendant) to pay A (the plaintiff) some amount less than the full demand as part of the settlement—$40 million, for example.  The cited authorities also indicate that if B has a counterclaim for damages against A, the original infringement plaintiff, A might end up paying B to settle B's counterclaim.  Insofar as the dissent urges that settlements taking these commonplace forms have not been thought for that reason alone subject to antitrust liability, we agree, and do not intend to alter that understanding.  But the dissent appears also to suggest that reverse payment settlements—*e.g.*, in which A, the plaintiff, pays money to defendant B purely so B will give up the patent fight—should be viewed for antitrust purposes in the same light as these familiar settlement forms.  We cannot agree.  In the traditional examples cited above, a party with a claim (or counterclaim) for damages receives a sum equal to or less than the value of its claim.  In reverse payment settlements, in contrast, a party with no claim for damages (something that is usually true of a paragraph IV litigation defendant) walks away with money simply so it will stay away from the patentee's market.  That, we think, is something quite different.

570 U.S. at 151–52 (internal citations omitted).  To say it another way, the $60 million left on the table by Company A is the opportunity cost.  The Court rejected the idea that this $60 million—the amount compromised away by the settling patentee—could qualify as an implicit reverse payment to Company B, the generic manufacturer.  So, in *AbbVie*, the Seventh Circuit rejected plaintiffs' theory that the money AbbVie left on the table in its E.U. settlements qualified as a reverse payment.  42 F.4th at 716.  Instead, that money left behind on the table was an opportunity cost.

Defendants argue that plaintiffs here similarly have alleged a settlement that merely relies on opportunity costs.  They characterize plaintiffs' theory this way:  "Teva 'paid' Mylan for Nuvigil by agreeing to an early-entry license for EpiPen, on the theory that Teva supposedly left money on the table by not getting an even earlier date."  Doc. 68 at 19 (internal brackets and quotation marks omitted) (quoting *AbbVie*, 42 F.4th at 715).  That is, Teva paid Mylan for Nuvigil by not releasing its generic EpiPen earlier and leaving those potential profits on the table.  Defendants characterize this as trading a foregone opportunity, but the court views this

47

alleged exchange differently:  trading an extended monopoly on one drug for an extended monopoly on another drug.

In *AbbVie*, plaintiffs premised their allegations of reverse payment on different entry dates for the *same* drug.  And, because AbbVie agreed to an earlier biosimilar entry date for Humira in the E.U., plaintiffs alleged that AbbVie had left money on the table in the E.U.  Plaintiffs lost because the Seventh Circuit found it "too speculative to treat the different entry dates as some kind of 'reverse payment' rather than a normal response to a different distribution of legal rights under different patent systems."  42 F.4th at 716.

Here, the allegations asserting plaintiffs' theory of a reverse payment are less speculative and so, plaintiffs argue, "*AbbVie* is distinguishable on the facts and the law."  Doc. 63 at 35.  Plaintiffs allege the classic reverse payment described in *Actavis*:  the patentee—Teva—paid the alleged infringer—Mylan—millions of dollars in EpiPen revenue to stay out of the Nuvigil market.  And, in exchange, Teva agreed to stay out of the EpiPen market.  To be sure, this theory hypothesizes Teva left money on the table when it agreed to stay out of the EpiPen market.  And likewise, it theorizes that Mylan left money on the table when it agreed to stay out of the Nuvigil market.  Defendants thus are correct about this much:  the settlements involved an opportunity cost for all involved.  But that opportunity cost isn't what the alleged patent infringer's payment represents.  In the EpiPen patent litigation, Teva gave up its potential generic profits from a generic EpiPen, but Pfizer and Mylan gained continued EpiPen monopoly profits.  The latter—the patentee's monopoly profits—is the proper measure to use to detect a plausible reverse payment.  The court explains why, below.

The question in a reverse payment settlement is simple:  Did the patent infringer receive a large, unjustified payment as compensation for getting out of the way so the patent holder's

supracompetitive prices would continue?  In the case of the Nuvigil patent litigation, the alleged patent infringer was Mylan.  In the court's view, the proper way to evaluate what Teva paid Mylan is the value of the payment to Mylan.  That's the difference between defendants' view and plaintiffs' view:  defendants want the court to measure the reverse payment in terms of what Teva gave up, not what Mylan—the alleged patent infringer—gained.  And those are very different numbers.  One doesn't need a robust factual record to conclude that plaintiffs' factual allegations provide a basis to draw a reasonable inference that Teva's potential profits on a generic EpiPen were less than Mylan's potential profits from maintaining its monopoly on brand name EpiPen.

Some numbers suss out the premise.  Imagine Teva projected that, if it defeated Pfizer's EpiPen patents in the 2012 bench trial, then Teva would make $100 million on a 2013 entry of its generic EpiPen.  But Pfizer and Mylan held the patent rights to brand name EpiPen.  So, to them, the value of maintaining their EpiPen monopoly in 2013 is $1 billion.  The parties then agree to settle both the Nuvigil and EpiPen patent litigation, and Teva agrees to delay its generic EpiPen to 2014 in exchange for Mylan staying out of the Nuvigil market.  What payment did Mylan receive in this scenario?  Was it the $100 million Teva would've made on its generic EpiPen?  Or was it the $1 billion Mylan stood to make from sales at continued monopolistic prices on its brand name EpiPen?  In the court's view, it's $1 billion.  The $100 million represents Teva's opportunity cost.  Why would Mylan—a sophisticated, rational market actor—value its EpiPen monopoly in terms of Teva's opportunity cost?

Add in some Nuvigil numbers.  Imagine Mylan estimated that its generic Nuvigil would earn it $50 million in 2013.  Teva, however, stands to earn $100 million from its branded Nuvigil monopoly in 2013.  The parties then settle, and Mylan agrees to delay its generic Nuvigil in

exchange for Teva staying out of the EpiPen market.  What did Teva receive?  In the court's judgment, it's the $100 million worth of monopoly profits.

Put the two together.  Under plaintiffs' theory here, the parties didn't trade "foregone earning opportunit[ies]."  *AbbVie*, 42 F.4th at 715.  Instead, plaintiffs allege that the parties traded one monopoly for another.  That's not *AbbVie*.  Indeed, the difference between the settlement's value to the generic manufacturer and the settlement's value to the brand name manufacturer demonstrates why *AbbVie* doesn't apply here.  *AbbVie* presented no such difference.  Though *AbbVie* involved two settlements, the settlements involved just one drug and one brand name manufacturer.  Plaintiffs thus are correct.  *AbbVie* is different.

At bottom, the court remains mindful of the Supreme Court's concern in *Actavis*:  Did the reverse payment settlement seek to eliminate the risk of patent invalidity or noninfringement by making a "large and unjustified" payment?  570 U.S. at 158.  And plaintiffs have alleged facts plausibly alleging the settlements did just that.  Plaintiffs allege one written communication showing Ms. Bresch of Mylan had called Mr. Marth of Teva, asking him what "exactly did we propose re epi and nuvigil?"  Doc. 42 at 24 (1st Am. Compl. ¶ 88).  Plaintiffs also allege that an email said, "2014 for epi and 2018 for nuvigil.  No months specified."  *Id.*  Plaintiffs thus have alleged facts that make their economic theory plausible.

The court must heed the Supreme Court's directive to apply antitrust scrutiny to reverse payments that "seek[] to prevent the risk of competition" by "maintain[ing] supracompetitive prices to be shared among the patentee and challenger rather than face what might have been a competitive market—the very anticompetitive consequence that underlies a claim of antitrust unlawfulness."  *Actavis*, 570 U.S. at 157.  *Actavis* simply doesn't support the rigid approach—

looking solely at generic profits given up rather than acknowledging monopoly profits received—which defendants advance.

One last argument to address:  Defendants argue that the FTC's approach to *Actavis* forecloses plaintiffs' reverse payment theory.  Defendants cite an FTC Consent Order.  *See* Doc. 47-4 (Defs.' Ex. 3).  In that Consent Order, the FTC defined a prohibited reverse payment or, as the Consent Order calls it, a "Payment by the NDA Party to the Generic Party."  *Id.* at 10. Defendants direct the court to the exceptions, one of which provides that a "Payment by the NDA Party to the Generic Party does not include . . . an agreement to settle or resolve a different litigation claim, so long as that separate agreement independently complies with the terms of this Revised Order."  *Id.* at 10–11.  Defendants argue that "is what Plaintiffs have alleged here:  that the parties settled the EpiPen and Nuvigil patent litigations using 'agreement[s] to settle or resolve a different litigation claim.'"  Doc. 47 at 34 (quoting Doc. 47-4 at 11 (Defs.' Ex. 3)).

The court doesn't find defendants' persuasive authority persuasive.  As plaintiffs point out, they don't allege separate agreements.  Instead, they allege "that the Nuvigil for EpiPen *quid pro quo* was one unified trade."  Doc. 63 at 38.  To be sure, plaintiffs allege that the conspirators executed two separate agreements.  But at the heart of plaintiffs' claims lies a third, undisclosed agreement:  one settlement for another.

The court thus concludes that Count IV alleges a plausible Sherman Act claim, undisturbed by the *AbbVie* holding.[12]  The court doesn't know yet whether plaintiffs can muster enough proof to convince a factfinder of plaintiffs' view of the alleged unified exchange.  But it can't say that Count IV's antitrust claim is an implausible one.  The court next evaluates plaintiffs' RICO claim.

---

[12]      Because the court rejects defendants' arguments for dismissal on their own merit, the court need not consider plaintiffs' argument that they've alleged a horizontal market allocation agreement.

C.      RICO

Next, the court considers whether plaintiffs have stated a plausible RICO claim against

defendants.  Subsection 1962(c) of RICO makes it:

> unlawful for any person employed by or associated with any enterprise engaged
> in, or the activities of which affect, interstate or foreign commerce, to conduct or
> participate, directly or indirectly, in the conduct of such enterprise's affairs
> through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c).  Subsection 1962(d) makes it "unlawful for any person to conspire to

violate" subsection 1962(c).  *Id.* § 1962(d).  Plaintiffs' Count VII pursues a RICO claim against

defendants under both subsection (c) and subsection (d) of this provision.  Doc. 42 at 61 (1st Am.

Compl. ¶ 269).

When addressing plaintiffs' RICO claim, the court remains mindful that "RICO is to be

read broadly."  *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 497 (1985).  "To successfully state

a RICO claim, a plaintiff must allege four elements:  (1) conduct (2) of an enterprise (3) through

a pattern (4) of racketeering activity."  *Robbins v. Wilkie*, 300 F.3d 1208, 1210 (10th Cir. 2002)

(citations and internal quotation marks omitted).  And to have standing to assert a RICO claim,

the plaintiff must allege that the RICO violation proximately caused plaintiff's injuries.  *Bixler v.

Foster*, 596 F.3d 751, 756 (10th Cir. 2010).  Defendants argue that plaintiffs' RICO claim here

fails because the First Amended Complaint fails to allege causation.  The court agrees.

To state a plausible RICO claim, a plaintiff must allege that he was a "person injured in

his business or property by reason of a violation of section 1962 of this chapter."  18 U.S.C.

§ 1964(c).  The Supreme Court has interpreted the "by reason of" language to require a RICO

plaintiff's damages to "flow from the commission of the predicate acts."  *Sedima*, 473 U.S. at

497; *see also Hemi Grp., LLC v. City of N.Y.*, 559 U.S. 1, 13 (2010) ("[T]he compensable injury

flowing from a [RICO] violation . . . necessarily is the harm caused by [the] predicate acts."

(citations and internal quotation marks omitted)).  So, "to state a claim under civil RICO, the plaintiff is required to show that a RICO predicate offense 'not only was a "but for" cause of his injury, but was the proximate cause as well.'"  *Hemi Grp.*, 559 U.S. at 9 (quoting *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992)).

Defendants' causation argument also raises reliance issues.  "Although reliance is not an explicit element of a civil RICO claim, it frequently serves as a proxy for both legal and factual causation."  *CGC Holding Co. v. Broad & Cassel*, 773 F.3d 1076, 1088 (10th Cir. 2014) (citation omitted).  The Supreme Court has explained that a RICO plaintiff need not establish "first-party reliance" to satisfy the causation requirement.  *Bridge v. Phx. Bond & Indem. Co.*, 553 U.S. 639, 657–58 (2008).  Yet "a RICO plaintiff who alleges injury 'by reason of' a pattern of mail fraud" likely can't "prevail without showing that *someone* relied on the defendant's misrepresentations."  *Id.* at 658 (emphasis in original).  The Supreme Court has observed that in "most cases, the plaintiff will not be able to establish even but-for causation if no one relied on the misrepresentation."  *Id.*; *Painters & Allied Trades Dist. Council 32 Health Care Fund v. Takeda Pharms. Co. Ltd.*, 943 F.3d 1243, 1259 (9th Cir. 2019) (explaining that RICO plaintiffs must prove, at minimum, indirect reliance "because, logically, a plaintiff cannot even establish but-for causation if *no one* relied on the defendant's alleged misrepresentation" (emphasis in original)).

Here, defendants argue that plaintiffs have failed to allege causation plausibly. Defendants' argument relies heavily on the court's RICO analysis in its EpiPen MDL summary judgment order.  So, the court takes a brief detour to recount that order's substance.

The EpiPen plaintiffs brought a RICO claim.  Relevant here, plaintiffs alleged that defendants had committed mail fraud and wire fraud by making

fraudulent statements or omissions through the mail and wires to further their pricing scheme including:  (1) issuing a fraudulent press release on August 24, 2011, that announced Mylan no longer would sell individual EpiPens in the United States in an effort to align with medical guidelines; (2) issuing a press release in April 2012, announcing the settlement of the EpiPen patent litigation with Teva; and (3) using telephone calls and email to effectuate their exclusive rebate contracts.

*In re EpiPen*, 545 F. Supp. 3d at 1024.  The court granted summary judgment against the EpiPen MDL plaintiffs' RICO claim for two reasons.

*First*, plaintiffs had failed to create a triable issue of but-for causation.  *Id.* at 1026–27. Plaintiffs relied on defendants' public misstatements about the patent litigation, particularly Mylan and Pfizer's April 26, 2012, press release announcing the EpiPen settlement.  *Id.* at 1028. But the EpiPen plaintiffs didn't "seek any damages caused by any purported public misstatements about patent litigation settlements."  *Id.*  Instead, plaintiffs' damages were the higher prices they paid for EpiPens because the reverse payment settlement delayed generic entry.  *Id.*  And, critically, "plaintiffs would have sustained the same purported damages with or without defendants' press release announcing the EpiPen patent litigation settlement."  *Id.* Plaintiffs tried to save their RICO claim by arguing that "the false press release about the EpiPen settlement was integral to defendants' fraudulent pricing scheme because it provided the essential cover for their scheme to stifle competition."  *Id.* at 1028–29 (citation, quotation marks, and brackets omitted).  The court rejected this argument because the "summary judgment record simply [didn't] include any facts from which a jury could find or infer that the press release provided necessary cover for defendants to proceed with their scheme to delay generic competition."  *Id.* at 1029 (quotation marks omitted).

*Second*, plaintiffs had failed to create a triable issue of reliance.  The EpiPen "plaintiffs present[ed] no evidence that anyone—not plaintiffs, not physicians, not third-[party] payors, nor anyone else in the supply chain—relied on defendants' alleged misstatements or omissions[.]"

*Id.* at 1030.  None of the named plaintiffs testified that they'd read the press release or relied on any of the EpiPen defendants' statements.  *Id.*

Defendants argue that the court's summary judgment reasoning in EpiPen "applies with full force here, because Plaintiffs' RICO claim essentially recycles the same causation theory that this Court rejected."  Doc. 47 at 37.  Plaintiffs assert that their "allegations here go beyond those raised by the EpiPen MDL plaintiffs."  Doc. 63 at 45.  And plaintiffs also point out the obvious:  the motion here is a motion to dismiss, and the EpiPen Order decided a motion for summary judgment.  Nonetheless, defendants argue, plaintiffs fail to allege causation plausibly.  The court agrees with them.

The court begins its causation analysis by defining the action at the beginning of the causal chain:  the RICO predicate offense.  The civil RICO "statute defines 'racketeering activity' to encompass dozens of state and federal offenses, known in RICO parlance as predicates."  *Safe Streets All. v. Hickenlooper*, 859 F.3d 865, 882 (10th Cir. 2017).  Plaintiffs' RICO predicates in this action are wire fraud and mail fraud.  *See* 18 U.S.C. § 1961(1)(B) (defining "racketeering activity" to include violations of 18 U.S.C. § 1343—the wire fraud statute—and 18 U.S.C. § 1341—the mail fraud statute).  Plaintiffs assert that "Teva, Mylan, and Pfizer used the wires to plan and execute their collusive settlements, engage in clandestine emails and telephone calls to camouflage their market allocation agreement, and pass off the EpiPen and Nuvigil Settlements as separate, arm's-length, and legitimate agreements."  Doc. 63 at 40.  And plaintiffs argue that "each email and each phone call in furtherance of [defendants'] scheme is a separate predicate act."  *Id.* at 39 (emphasis omitted).

Plaintiffs argue that they've alleged causation plausibly enough because they "specifically allege that deceptive wires (emails, telephone calls, electronic filings, submissions

to regulators) were sent to several parties who relied on the legitimacy of the Nuvigil and EpiPen settlements." Doc. 63 at 43. Not quite. To support this argument, plaintiffs cite three passages in their complaint: ¶¶ 285, 321, and 338. *Id.* The court examines each, in turn, below, and— spoiling the result—its examination doesn't locate any allegations of wires sent to parties who allegedly relied on the settlements' legitimacy.

Start with ¶ 285. This paragraph alleges:

> At all relevant times, Defendants, the Mylan entities, and the Pfizer entities operated as an association-in-fact enterprise, which was formed to engage in a scheme to defraud payers, consumers, regulators, and the courts regarding the availability of generic alternatives in the EAI and armodafinil markets and their successful efforts to suppress that generic competition.

Doc. 42 at 64 (1st Am. Compl. ¶ 285). But this paragraph doesn't allege anything about causation or reliance. Defendants accurately characterize this allegation as a "boilerplate allegation" defining the RICO enterprise. Doc. 68 at 21. So, it can't help plaintiffs' RICO claim survive defendants' causation and reliance arguments.

Next, the court considers ¶ 321. It alleges:

> Had Teva's press release accurately informed payers, regulators, prosecutors, the FDA, the DOJ, the FTC, the federal courts, and the media the full truth underlying the two settlement agreements and how they had been obtained, Teva's press release would have triggered a backlash that would have stopped the scheme to defraud from proceeding or would have limited it.

Doc. 42 at 73 (1st Am. Compl. ¶ 321). This paragraph doesn't help plaintiffs' RICO claim, either. Plaintiffs have "expressly disclaimed" the Nuvigil press release "as a basis for causation[.]" Doc. 63 at 43. Instead, plaintiffs included allegations about the Nuvigil press release "only to provide evidence as Teva's fraudulent scienter[.]" *Id.*

This conclusion leaves just one more passage: ¶ 338. This paragraph contains plaintiffs' but-for causation theory:

But-for causation exists because if Teva, Pfizer, and Mylan had disclosed publicly everything they said in all their internal, secret communications, their scheme to defraud would not have succeeded because:

> a. the federal courts would have invalidated their fraudulent settlement agreements;
>
> b.  the DOJ would have flagged and investigated their secret deal;
>
> c. the FTC would have flagged and investigated their secret deal;
>
> d. the FDA would have flagged and investigated their secret deal;
>
> e. Congress would have asked Ms. Bresch and others about it at the 2016 hearing or held a hearing much earlier, had Teva, Mylan, and Pfizer not concealed their scheme to block generic competition; and/or
>
> f. American payers and the media would have backlashed and stopped Teva, Mylan, and Pfizer in their tracks.

Doc. 42 at 77 (1st Am. Compl. ¶ 338).[13]

---

[13]    Later in their brief, plaintiffs cite the Amended Complaint's allegation about Mylan's 2012 submission of the two settlements to the FTC.  Doc. 63 at 45 (citing Doc. 42 at 37 (1st Am. Compl. ¶ 166)).  Plaintiffs never refer to this submission as a RICO predicate act.  And for good reason:  they never allege that they saw or relied on this submission.  So, plaintiffs can't allege plausibly that, but for Mylan's 2012 submission of the two settlements to the FTC, plaintiffs wouldn't have been harmed.

Instead, plaintiffs cite this allegation to show that it's plausible that the FTC would've investigated defendants, had defendants, Mylan, and Pfizer fully disclosed everything about the Nuvigil settlement.  Doc. 63 at 45.  The Amended Complaint alleges:

> Mylan's representation to the FTC in 2012 that it was not required to file the settlements together and that it only did so "out of an abundance of caution" was intended to prevent and/or delay any subsequent investigation into the agreements.  The FTC's landmark settlement with Teva and Cephalon over the illegal monopolization of the sleep-disorder market with Provigil indicates that, had Mylan accurately represented that the two settlements were in fact negotiated as a package deal, the resulting FTC investigation and additional scrutiny likely would have prevented the deal from being approved and led to generic EpiPen and Nuvigil entry much, much sooner than ultimately occurred.

Doc. 42 at 37 (1st Am. Compl. ¶ 166).  This allegation faces the same problem as the others.  Plaintiffs have pleaded internal communications as the relevant RICO predicate acts, not an amorphous scheme.  The Provigil settlement thus doesn't nudge plaintiffs' allegations about the internal communications alleged here into the plausibility zone.

Plaintiffs' but-for causation theory appears to depend on defendants' failure to disclose. But that's not the RICO predicate act they've pleaded. Instead, the alleged RICO predicate acts are the underlying emails and phone calls that constitute wire fraud and mail fraud. Plaintiffs thus fail to plead any plausible causal connection between the RICO predicate acts—emails and telephone calls—and plaintiffs' injury. So, plaintiffs' RICO but-for causation theory boils down to this: if defendants had told someone about the scheme, then someone would have investigated the scheme and, somehow, stopped the scheme. This is a textbook form of "mere[ ] possibility or speculation[.]" *In re Urethane Antitrust Litig.*, 663 F. Supp. 2d at 1074. The court's conclusion is bolstered by the absence of any allegations that anyone received the internal communications and relied on them.

Reliance "frequently serves as a proxy for both legal and factual causation." *CGC Holding*, 773 F.3d at 1088. As our Circuit has explained, "causation is often lacking where plaintiffs cannot prove that they relied on defendants' alleged misconduct." *Id.* at 1089. Plaintiffs' but-for causation theory asserts that had the government or consumers known about these internal, secret communications, then someone would've investigated and stopped defendants, Mylan, and Pfizer. Doc. 42 at 77 (1st Am. Compl. ¶ 338). Nowhere do plaintiffs allege that anyone actually received these internal communications and relied on them.

Plaintiffs' legal authority doesn't help them, either. Plaintiffs aver that they've met the Supreme Court's standard as laid out in *Bridge*. Doc. 63 at 43. In *Bridge*, plaintiffs were bidders for valuable property liens at a county auction. 553 U.S. at 642. The county had a rule that required auction bidders to: (i) submit bids in their own name, rather than using agents or employees and (ii) submit an affidavit that it had complied with this rule. *Id.* at 643. Plaintiffs argued that defendants had violated this rule and submitted false affidavits and, as a result, they

won a disproportionate share of bids.  *Id.* at 643–44.  Plaintiffs brought a RICO claim, arguing

that defendants had "devised a scheme to defraud when they agreed to submit false attestations

of compliance" with the auction rules to the county.  *Id.* at 647–48.  And, plaintiffs alleged,

defendants used the mail to send notices and each mail constituted mail fraud.  *Id.* at 648.

Defendants argued that plaintiffs' RICO claim failed because plaintiffs themselves never had

relied on the misrepresentations:  defendants' affidavits that they'd complied with the county's

rule.  *Id.*  The Court disagreed.  It declined to make reliance an element of a civil RICO claim.

*Id.* at 649–50.  The Court explained that plaintiffs' injury—their loss of valuable liens—was a

direct result of defendants' fraud because someone—the county having the auction—had relied

on defendants' misrepresentation.  *Id.* at 658–59.

      Here, plaintiffs fail to allege that anyone relied on defendants' alleged wire fraud.

Plaintiffs now try to apply *Bridge* here:  "if courts and regulators tasked with overseeing reverse

payment settlements 'had not accepted [Defendants'] false attestations of compliance [with

antitrust rules], and as a result had not permitted [Teva to maintain its Nuvigil brand monopoly,

Plaintiffs'] injury would never have materialized."  Doc. 63 at 43–44 (brackets in original)

(quoting *Bridge*, 553 U.S. at 658).  But plaintiffs never allege how, exactly, defendants submitted

"'false attestations of compliance [with antitrust rules.]'"  *Id.* (brackets in original) (quoting

*Bridge*, 553 U.S. at 658).  Nor do they allege whom, exactly, defendants submitted those false

attestations to.  And plaintiffs don't allege any kind of rule like the *Bridge* county auction rule,

which required defendants to make an affirmative representation.[14]  Plaintiffs' theory also fails

for the fundamental reason that "false attestations of compliance" aren't the RICO predicate acts

---

[14]    Plaintiffs' reliance on *Clinton v. Security Benefit Life Ins. Co.*, 63 F.4th 1264 (10th Cir. 2023) is
misplaced for a similar reason.  In *Clinton*, causation simply wasn't at issue.  There, plaintiffs' RICO
theory relied on misleading documents—marketing materials and signed "Statements of
Understanding"—provided to plaintiffs.  *Id.* at 1272.  Plaintiffs haven't alleged anything of the sort here.

that plaintiffs use in their RICO claim.  Instead, plaintiffs rely on the internal communications between defendants, Mylan, and Pfizer.[15]

 "Put simply, causation is often lacking where plaintiffs cannot prove that they relied on defendants' alleged misconduct." *CGC Holding*, 773 F.3d at 1089.  Plaintiffs here have failed to allege plausibly that they relied on defendants' alleged wire fraud and mail fraud.

In sum, the court grants defendants' request to dismiss plaintiffs' RICO claims under both subsections 1962 (c) and (d).[16]  With the federal claims addressed, the court turns next to defendants' arguments for dismissal of plaintiffs' state law claims.

### D.    State Law Claims

Plaintiffs assert two state law counts:  Count V for Conspiracy and Combination in Restraint of Trade, Doc. 42 at 55–58 (1st Am. Compl. ¶¶ 250–60) and Count VI for Monopolization and Monopolistic Scheme, *Id.* at 58–61 (1st Am. Compl. ¶¶ 261–67).  Plaintiffs bring these claims under the laws of 34 states.  Defendants argue that plaintiffs lack standing to assert claims in 22 of those states because they haven't alleged any Nuvigil purchases in any of

---

[15]    No court has held that a reverse payment settlement supports a RICO claim.  And plaintiffs haven't persuaded the court that it should become the first.  Plaintiffs argue that defendants appear "to claim that a generic suppression scheme is immune from RICO because such a scheme was not previously been litigated.  Not true.  The Ranbaxy Generic MDL certified and later settled RICO and antitrust claims side by side based on a scheme to defraud by delaying generic competition of three brand drugs."  Doc. 63 at 41 (first citing *In re Ranbaxy Generic Drug Application Antitrust Litig.*, No. 19-md-02878-NMG, 2019 WL 6341298, at *12 (D. Mass Nov. 27, 2019); then citing *In re Ranbaxy Generic Drug Application Antitrust Litig.*, 338 F.R.D. 294, 304–09 (D. Mass. 2021)).  But, as defendants point out, the *Ranbaxy* plaintiffs based their RICO claims on Ranbaxy's ANDAs for various generic drugs, submitted to the FDA.  *In re Ranbaxy*, 2019 WL 6341298, at *2.  Specifically, the *Ranbaxy* plaintiffs alleged "that Ranbaxy violated RICO . . . by submitting multiple ANDAs with missing, incorrect or fraudulent information, thereby wrongfully acquiring exclusivity periods and delaying the market entry of generic drugs."  *Id.  Ranbaxy* thus fits neatly within *Bridge*:  someone—the FDA—relied on the defendant's RICO predicate acts.  Plaintiffs' theory here doesn't fit neatly within *Bridge*—indeed, it doesn't fit at all.  *Ranbaxy* just doesn't help them.

[16]    Because the court dismisses plaintiffs' RICO claim for failure to allege plausible causation, the court need not address defendants' other dismissal arguments.

those states.  Defendants also argue that plaintiffs' claims fail for state-specific reasons.  The court takes up defendants' arguments below, starting with standing.

### 1.     Standing

Defendants argue that the court should dismiss plaintiffs' state law claims asserted under the laws of 22 states because no named plaintiff resides in, does business in, or has any connection to these states.  Doc. 47 at 45.  As the court explained in the EpiPen MDL, "'several courts, including other district courts in the Tenth Circuit, have determined that the plaintiffs in a putative class action may only assert a state law claim if a named plaintiff resides in, does business in, or has some other connection to that state.'"  *In re:  EpiPen*, 336 F. Supp. 3d at 1310 (brackets omitted) (quoting *Roco, Inc. v. EOG Res., Inc.*, No. 14-1065-JAR-KMH, 2014 WL 5430251, at *3 (D. Kan. Oct. 24, 2014)).  Plaintiffs don't dispute that they lack standing to bring state law claims in states where they haven't alleged any contacts.  *See generally* Doc. 63.  The court thus agrees with defendants and concludes that the named plaintiffs lack standing to assert claims under the laws of the following states:  Arkansas, Connecticut, Iowa, Kansas, Maine, Michigan, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Dakota, Puerto Rico, Rhode Island, South Dakota, Tennessee, Utah,[17] Vermont, and Wisconsin.  *See* Doc. 47-5 (Defs.' Ex. 4).

### 2.     Intrastate Connection:  District of Columbia, Maryland, North Carolina, and West Virginia[18]

---

[17]     Defendants also argue that the court should dismiss plaintiffs' claims under Utah law because the claims aren't brought by a Utah citizen, as Utah law requires.  Doc. 47 at 47.  The court has concluded that plaintiffs lack standing to bring their claims under Utah law.  And plaintiffs explicitly have agreed to dismiss their Utah claim.  Doc. 63 at 50.  So, the court need not consider defendants' alternative argument for dismissal.

[18]     Defendants initially made this argument for the laws of eight states.  Of those eight, the court dismissed plaintiffs' claims under four—Kansas, Michigan, New York, and Tennessee—for lack of standing.  *See above* § III.D.1.  So, the court need not consider those four states to decide the current issue.

Defendants argue that plaintiffs have failed to plead intrastate effects for their claims under the laws of the District of Columbia, Maryland, North Carolina, and West Virginia. Each of these four states' antitrust laws requires an antitrust plaintiff to allege that defendants' actions had a substantial effect on intrastate commerce. *See Miami Prods. & Chem. Co. v. Olin Corp.*, 546 F. Supp. 3d 223, 242–43 (W.D.N.Y. 2021) (considering intrastate connection argument under antitrust laws of, among others, the District of Columbia, Maryland, North Carolina, and West Virginia). Defendants argue that these states "require allegations of conduct occurring solely or primarily in-state" and plaintiffs have failed to meet this standard because "[m]erely alleging that a plaintiff purchased a product at a purportedly anticompetitive price inside the state is not enough." Doc. 47 at 46. Plaintiffs don't dispute that they lack allegations of the type defendants seek. Rather, plaintiffs argue that "many courts have found allegations that prices were affected or sales occurred within the listed states are sufficient to allege intrastate effect[.]" Doc. 63 at 49. Putting it another way, plaintiffs contend that it's enough to allege that they paid supracompetitive prices in these four states. *Id.* The court agrees with plaintiffs.

"Several courts have found that the 'intrastate effects' requirement is met at the pleading stage by allegations . . . claiming that the anticompetitive conduct caused supracompetitive price effects nationwide." *In re Packaged Ice Antitrust Litig.*, 779 F. Supp. 2d 642, 664 (E.D. Mich. 2011) (collecting cases). Federal "courts have distinguished between pleadings in which a plaintiff has alleged intrastate conduct along with conduct throughout the United States, and pleadings that do not contain specific allegations of intrastate conduct along with allegations of conduct throughout the United States." *Miami Prods*, 546 F. Supp. 3d at 243 (citation, internal quotation marks, and brackets omitted). And "courts have held allegations under state antitrust statutes insufficient where the complaint alleges only that the conspiracy affects interstate

commerce without describing the effects in a particular state or in discretely identifiable states." *Jones v. Micron Tech. Inc.*, 400 F. Supp. 3d 897, 924 (N.D. Cal. 2019).

Defendants rely on *Jones*. Doc. 68 at 26. In that case, plaintiffs merely alleged a national conspiracy that resulted in inflated prices for defendant's product nationwide. 400 F. Supp. 3d at 924. Plaintiffs didn't even allege that they'd purchased the product in the relevant states. *Id.* The court faulted plaintiffs for failing to differentiate between the particular states where plaintiffs and consumers had paid the artificially high prices. *Id.* The *Jones* court thus concluded that plaintiffs had failed to state a claim under the state antitrust statutes because they "solely describe[d] interstate effects, and the Complaint [was] devoid of any allegations concerning effects within these particular states." *Id.* at 925.

Not so here. Plaintiffs have alleged more than merely a nationwide conspiracy. They have differentiated between the particular states and have alleged that they purchased Nuvigil in the four states at issue. Doc. 42 at 5–6 (1st Am. Compl. ¶¶ 7, 10, 11). It's the court's view that these allegations suffice for now. *See Miami Prods.*, 546 F. Supp. 3d at 243 (concluding plaintiffs had sufficiently alleged intrastate effects where they specifically alleged that defendant made sales of the product in that state).

### 3. *Illinois Brick*: Illinois[19]

Defendants next argue that plaintiffs are indirect purchasers who cannot assert claims for relief under Illinois's antitrust laws. Doc. 47 at 46–47. Defendants assert that Illinois follows the Supreme Court's rule in *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977) and Illinois thus bars indirect purchaser claims.

---

[19] Defendants initially made this argument for two states: Missouri and Illinois. Doc. 47 at 46. The court since has dismissed plaintiffs' claims under Missouri law for lack of standing. *See above* § III.D.1. So, the court addresses just Illinois law.

In *Illinois Brick*, the Supreme Court held that only direct purchasers may bring claims for damages under the federal antitrust laws.  431 U.S. at 737.  To avoid the *Illinois Brick* rule, some states have passed "repealer" statutes allowing indirect purchasers to recover under state antitrust laws.  *See In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 818 (N.D. Ill. 2017).  Here, according to defendants, Illinois law still follows the rule barring indirect purchaser claims, consistent with *Illinois Brick*'s rule.

The Illinois Antitrust Act provides:  "[N]o person shall be authorized to maintain a class action in any court of this State for indirect purchasers asserting claims under this Act, with the sole exception of this State's Attorney General[.]"  740 Ill. Comp. Stat. § 10/7(2); *see also In re Flonase Antitrust Litig.*, 692 F. Supp. 2d 524, 539 (E.D. Pa. 2010) (prohibiting plaintiffs from asserting class action claims under the Illinois Antitrust Act because "the Act does not provide relief to indirect purchasers through class actions").  But several courts, including ours, "have concluded that the class action prohibition in the Illinois Antitrust Act is procedural in nature and that Rule 23 applies to determine whether a claim may be brought as a class action."  *In re: EpiPen*, 336 F. Supp. 3d at 1311.  Because "the availability of the class action procedure does not change the substantive rights or remedies available to plaintiffs under Illinois law, courts"— including this one—"have refused to dismiss Illinois Antitrust Act claims on the basis of . . . Illinois's class action bar."  *Id.* at 1311–12 (citation, brackets, and internal quotation marks omitted) (collecting cases).  The court thus concludes that plaintiffs' Illinois antitrust claim survives dismissal.

### 4.    Notice:  Arizona and Hawaii[20]

---

[20]    Defendants initially made this argument for four states:  Arizona, Hawaii, Nevada, and Utah.  Doc. 47 at 47.  The court since has dismissed plaintiffs' claims under Nevada and Utah law for lack of standing.  *See above* § III.D.1.  The court's notice analysis thus addresses solely Arizona and Hawaii.

Defendants next argue that the court should dismiss plaintiffs' antitrust claims under Arizona and Hawaii law because plaintiffs failed to comply with those states' notice requirements.  Arizona's Antitrust Act requires a "person filing a complaint . . . for any violation of" the Antitrust Act to "simultaneously with the filing of the pleading . . . in the federal court, serve a copy of the complaint . . . on the attorney general."  Ariz. Rev. Stat. Ann. § 44-1415(A).  Hawaii allows for filing an antitrust class action "on behalf of indirect purchasers by a person other than the attorney general" if a "filed copy of the complaint and all relevant supporting and exculpatory materials . . . [is] served on the attorney general not later than seven days after filing of the complaint."  Haw. Rev. Stat. § 480-13.3(a)(1).

Defendants correctly point out that the Amended Complaint fails to allege that plaintiffs complied with these notice requirements.  *See generally* Doc. 42 (1st Am. Compl.).  But plaintiffs respond that they "did in fact send notice" to the Attorneys General of Arizona and Hawaii.  Doc. 63-1 at 2 (Chase Decl. ¶ 4).  Defendants reply that plaintiffs sent these notices too late.  Doc. 68 at 26.  Plaintiffs filed this lawsuit on December 2, 2022.  *See* Doc. 1.  And plaintiffs' mailings to the Attorneys General are dated January 4, 2023.  *See* Doc. 63-1 at 5 (Chase Decl. Ex. A); Doc. 63-1 at 7 (Chase Decl. Ex. B).  Plaintiffs thus failed to comply with Arizona and Hawaii's notice statutes.  So, the court must decide what to do about it.

District courts are split whether a plaintiff's failure to comply with these state notice requirements warrants dismissal.  *See In re Generic Pharms. Pricing Antitrust Litig.*, 368 F. Supp. 3d 814, 835 (E.D. Pa. 2019) (describing split).  Federal courts sitting in diversity apply state substantive law and federal procedural law.  *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938); *see also Corman v. JWS of N.M., Inc.*, 356 F. Supp. 3d 1148, 1172 (D.N.M. 2018) ("Ascertaining state law under jurisdiction supplemental to a federal question implicates the

same principles articulated following *Erie*[.]").  So, the court must decide whether Arizona and Hawaii's notice requirements are procedural or substantive.  If they're substantive, the court must apply them.

"Of course, distinguishing between procedural and substantive law is not always a simple task."  *Los Lobos Renewable Power, LLC v. Americulture, Inc.*, 885 F.3d 659, 668 (10th Cir. 2018).  "Classification of a law as 'substantive' or 'procedural' for *Erie* purposes is sometimes a challenging endeavor."  *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996).  "A state procedural rule, though undeniably procedural in the ordinary sense of the term, may exist to influence substantive outcomes, and may in some instances become so bound up with the state-created right or remedy that it defines the scope of that substantive right or remedy."  *Shady Grove Orthopedic Assoc., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 419–20 (2010) (Stevens, J., concurring) (citation and internal quotation marks omitted).

There's just "no consensus regarding whether the [Arizona and Hawaii] notice requirements are 'substantive' or 'procedural.'"  *In re Generic Pharms. Pricing*, 368 F. Supp. 3d at 835.  Defendants argue, predictably, that plaintiffs' failure is grounds for dismissal, and they cite *In re Asacol Antitrust Litigation*, No. 15-cv-12730-DJC, 2016 WL 4083333, at *14–15 (D. Mass. July 20, 2016).  In that case, the court dismissed plaintiffs' claims under Arizona and Hawaii law for failing to comply with the relevant notice provisions.  *Id.*  *In re Asacol* concluded that no federal law addressed notice of antitrust-related lawsuits.  *Id.* at *15.  *In re Asacol* also concluded that "to decline to apply these [state] laws in federal court would encourage forum shopping and inequitable administration of laws."  *Id.*  Naturally, plaintiffs see things differently.  They argue that these "notice provisions 'do not alter the substantive elements of Plaintiffs'

66

claims and are not a pleading requirement,'" so the court shouldn't dismiss.  Doc. 63 at 50–51

(quoting *In re Generic Pharms. Pricing*, 368 F. Supp. 3d at 834–35).

While the issue is muddled, plaintiffs, on balance, have the better of it.  The court agrees

with *In re Generic Pharmaceuticals Pricing*:  "Regardless of whether the relevant notice

provisions are substantive or procedural, they do not alter the substantive elements of Plaintiffs'

claims and are not a pleading requirement for the Complaints."  368 F. Supp. 3d at 835.  The

court thus concludes that plaintiffs' failure to comply with the notice provisions of Arizona and

Hawaii antitrust law does not warrant dismissal.

### 5.  Deception:  California, Florida, Hawaii, and Pennsylvania

Defendants argue that the court should dismiss plaintiffs' claims under California,

Florida, Hawaii, and Pennsylvania consumer protection laws for failing to meet the pleading

requirements of Fed. R. Civ. P. 9(b).  Doc. 47 at 48.  Defendants argue that plaintiffs' state

consumer protections claims are based on fraud, so plaintiffs must plead these claims with the

required particularity.  *Id.*  Plaintiffs disagree with the way defendants frame their claims.  Doc.

63 at 51.  Plaintiffs assert that their theory is one of unfair and anticompetitive conduct—not

fraud—so they need not meet the particularity requirements of Fed. R. Civ. P. 9(b).  *Id.*  The

court agrees with plaintiffs.

Though plaintiffs' Amended Complaint invokes fraud on occasion, "the use of those

terms does not necessarily mean that Plaintiffs' state consumer-protection claims are predicated

on fraud."  *Blue Cross & Blue Shield of Vt. V. Teva Pharm. Indus., Ltd.*, No. 5:22-cv-159, 2024

WL 323775, at *40 (D. Vt. Jan. 22, 2024) (collecting cases).  "In the court's view, the central

allegations in the complaint are of unfair or anticompetitive conduct, not fraud."  *Id.* at *41.

Take plaintiffs' California claim here as example.  Plaintiffs bring their California law

claims under California's Unfair Competition Law and Cartwright Act.  Doc. 42 at 57, 59 (1st

Am. Compl. ¶¶ 258.c., 266.c.).  California's Unfair Competition Law (UCL) proscribes "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising[.]"  Cal. Bus. & Prof. Code § 17200.  Plaintiffs characterize their claim as one based on unfair—not fraudulent—business practices.  Doc. 63 at 51 ("Plaintiffs allege that Teva engaged in unfair competition or unfair or unconscionable acts or practices[.]").  And, according to plaintiffs, a UCL claim premised on unfair business practices doesn't require that plaintiffs plead reliance.  *Id.*  To be sure, the substance of the claim matters more than the label plaintiffs attach.  Nonetheless, plaintiffs have the better end of this dispute as well.

This case resembles the case plaintiffs cite to support their view:  *In re Ditropan XL Antitrust Litigation*, 529 F. Supp. 2d 1098 (N.D. Cal. 2007).  There, a class of indirect purchasers of the drug Ditropan XL sued the brand name manufacturer, alleging that defendants had filed a baseless complaint to preclude generic competition.  *Id.* at 1100.  Plaintiffs brought a claim under the UCL, and defendants argued for dismissal because plaintiffs had failed to allege that they relied on any of defendants' misconduct.  The court declined to dismiss plaintiffs' UCL claim because plaintiffs sufficiently alleged a claim under the unfair prong:  defendants had filed a baseless complaint to preclude generic competition and unfairly maintained their monopoly by delaying the generic.  *Id.* at 1106.  *In re Ditropan XL* thus closely resembles this case.

Defendants' authority, on the other hand, doesn't.  Defendants rely on *Romero v. Flowers Bakeries, LLC*, No. 14-cv-5189-BLF, 2015 WL 2125004 (N.D. Cal. 2015).  There, plaintiffs brought a UCL claim based on defendants' mislabeling of their bread products.  *Id.* at *1.  The court dismissed the claim because plaintiffs had failed to plead with particularity.  *Id.* at *3–4.  Indeed, *Romero*'s plaintiffs had failed to plead any particular misrepresentations on defendants' products and failed to plead reliance on those misrepresentations.  *Id.* at *4.  So, the court

dismissed, explaining, "[a]ctual reliance is a required element of standing to pursue claims under the California consumer protection statutes[.]"  *Id.*

This case and its legal theories more nearly resemble *In re Ditropan XL* than *Romero*. The court thus concludes that plaintiffs' state consumer protection claims "are not intertwined [with] any explicit claims of fraud."  *In re Pork Antitrust Litig.*, 495 F. Supp. 3d at 780 (concluding plaintiffs' consumer-protection claims were not subject to Fed. R. Civ. P. 9(b) because claims primarily involved anticompetitive behavior).  As a result, the court declines to dismiss plaintiffs' California, Florida, Hawaii, and Pennsylvania claims for failing to comply with Fed. R. Civ. P. 9(b).

### 6.    Nexus:  California and Florida[21]

Defendants argue that the court should dismiss plaintiffs' California and Florida consumer protection claims "for lack of sufficient intrastate conduct or significant nexus."  Doc. 47 at 48.  Plaintiff fails to respond to this argument.  *See generally* Doc. 63.  The court thus considers plaintiffs' California and Florida claims abandoned.  *See Hinsdale v. City of Liberal, Kan.*, 19 F. App'x 749, 768–69 (10th Cir. 2001) (affirming district court's dismissal of plaintiff's equal protection claim after it concluded that plaintiff had abandoned the claim because plaintiff hadn't addressed it in his memorandum); *see also C.T. v. Liberal Sch. Dist.*, 562 F. Supp. 2d 1324, 1337 (D. Kan. 2008) (concluding that plaintiff had abandoned his retaliation claim by not responding to defendant's motion for summary judgment against the claim and granting summary judgment on that claim).  The court nonetheless addresses the merits of defendants' argument for California, then Florida.

---

[21]    Defendants' Motion to Dismiss initially applies this argument to three states:  California, Florida, and New Hampshire.  Doc. 47 at 48.  Above, the court dismissed plaintiffs' New Hampshire claims for lack of standing, § III.D.1.  So, the court need only address defendants' nexus argument about California and Florida.

"California law embodies a presumption against the extraterritorial application of its statutes." *Churchill Vill., LLC v. Gen. Elec. Co.*, 169 F. Supp. 2d 1119, 1126 (N.D. Cal. 2000). And California's UCL "does not support claims by non-California residents where none of the alleged misconduct or injuries occurred in California." *Id.* It's not enough that defendants sold Nuvigil in California. A "defendant's in-state sales alone cannot properly be considered sufficient to establish a nexus with California." *Id.* at 1127. The court thus agrees with defendants that plaintiffs haven't pleaded a sufficient nexus with California.

Plaintiffs bring their Florida claims under Florida's Deceptive and Unfair Trade Practices Act (FDUTPA). Doc. 42 at 57, 59 (1st Am. Compl. ¶¶ 258.f., 266.f.). The FDUTPA "seeks to prohibit unfair, deceptive and/or unconscionable practices which have transpired within the territorial boundaries of" Florida. *Millennium Commc'ns & Fulfillment, Inc. v. Off. of the Att'y Gen.*, 761 So.2d 1256, 1262 (Fla. Dist. Ct. App. 2000). That doesn't mean that the FDUTPA applies just to Florida residents. *Id.* at 1262–63. But plaintiffs must allege sufficient contacts with Florida to warrant application of Florida law. *See Renaissance Cruises, Inc. v. Glassman*, 738 So.2d 436, 439 (Fla. Dist. Ct. App. 1999). Here, plaintiffs allege that plaintiff Anne Arundel County paid for Nuvigil in Florida. Doc. 42 at 6 (1st Am. Compl. ¶ 11). That's the only alleged contact with Florida. Just a sale is not enough "because the claims of non-resident consumers would require the application of consumer protection laws from each of the states where the deceptive trade practice occurred and the non-resident claimants suffered injury." *Hutson v. Rexall Sundown, Inc.*, 837 So.2d 1090, 1094 (Fla. Dist. Ct. App. 2003). The court thus dismisses plaintiffs' Florida claims.

### E.   Leave to Amend

In their response, plaintiffs ask for leave to amend if "the Court finds that Plaintiffs did not sufficiently plead any of their claims[.]" Doc. 63 at 51. The court denies plaintiffs' request.

A "request for leave to amend included in a brief in opposition to a motion to dismiss is improper; rather, leave to amend must be sought by a written motion." *Davison Design & Dev., Inc. v. LeadVision Media, LLC*, 2014 WL 12844157, at \*5 (W.D. Okla. July 30, 2014) (citing *Garman v. Campbell Cnty. Sch. Dist. No. 1*, 630 F.3d 977, 986 (10th Cir. 2010)).

## IV.     Conclusion

For reasons explained, the court grants defendants' Motion to Dismiss (Doc. 47) in part. The court dismisses:

- Plaintiffs' RICO claim (Count VII) for failure to state a claim;

- Plaintiffs' state law claims (Count V; Count VI) under the laws of Arkansas, Connecticut, Iowa, Kansas, Maine, Michigan, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Dakota, Puerto Rico, Rhode Island, South Dakota, Tennessee, Utah, Vermont, and Wisconsin for lack of standing;

- Plaintiffs' state law claims (Count V; Count VI) under the laws of California and Florida as abandoned.

In all other respects, the court denies defendants' Motion to Dismiss (Doc. 47).

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendants' Motion to Dismiss (Doc. 47) is granted in part and denied in part.

**IT IS FURTHER ORDERED THAT** defendant William S. Marth's Motion to Dismiss (Doc. 49) is denied as moot.

**IT IS FURTHER ORDERED THAT** defendants' Motion for Hearing (Doc. 50) is denied.

**IT IS SO ORDERED.**

Dated this 26th day of March, 2024, at Kansas City, Kansas.

s/ Daniel D. Crabtree
Daniel D. Crabtree
United States District Judge