UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| DENA BURGE, LEIGH HOCKETT, JORDAN FURLAN, CRISTINE RIDEY, PATRICIA SAWCZUK, and ANNE ARUNDEL COUNTY, individually and on behalf of all others similarly situated, | |
| Plaintiffs, | Case No. 22-cv-2501-DDC-TJJ |
| v. | |
| TEVA PHARMACEUTICAL INDUSTRIES, LTD., TEVA PHARMACEUTICALS USA, INC., TEVA PARENTERAL MEDICINES, INC., TEVA NEUROSCIENCE, INC., TEVA SALES & MARKETING, INC., and CEPHALON, INC., | |
| Defendants. | |

## MEMORANDUM AND ORDER

This matter is before the Court on Plaintiffs' Motion to Compel Regarding Teva Defendants' Privilege Log (ECF No. 177) and Defendants' Motion to Compel Regarding Plaintiffs' Privilege Logs (ECF No. 187). The parties challenge several entries on each other's Phase I discovery privilege logs and request the Court compel the production of the challenged documents and/or conduct an *in camera* review. On July 9, 2025, the Court held an in-person hearing at which the parties provided additional information in response to the Court's questions concerning their privilege logs and issues raised in their motions. On July 16, 2025, the parties further clarified the issues and identified privilege log entries no longer in dispute. The Court's rulings with respect to the remaining issues are explained below. Plaintiffs' motion is granted in part and denied in part. Defendants' motion is denied.

## I.    Nature of the Case and Discovery Dispute Background

Plaintiffs—representing a proposed class—allege Defendants and their co-conspirators entered an unlawful reverse payment settlement and conspired to safeguard their monopoly on Nuvigil, a wakefulness drug with the generic name Armodafinil. Plaintiffs allege Defendants agreed to stay out of the EpiPen market, allowing Mylan and Pfizer to maintain their EpiPen monopoly. In exchange, Plaintiffs contend, Mylan and Pfizer agreed to stay out of the Nuvigil market, allowing Defendants to maintain their Nuvigil monopoly.[1] Plaintiffs refer to these agreements as the "trade-for-delay" agreement.  Based on these factual allegations, Plaintiffs assert four claims: (1) a Sherman Act claim; (2) claims for Conspiracy and Combination in Restraint of Trade under various state laws; (3) claims for Monopolization and Monopolistic Scheme under various state laws; and (4) a Racketeer Influenced and Corrupt Organizations Act ("RICO") claim.[2]

Early in the case, Defendants filed a motion to dismiss Plaintiffs' claims as barred by the statute of limitations.[3] Judge Crabtree denied Defendants' motion.[4] Pertinent here, he found Plaintiffs' Sherman Act and RICO claims were subject to a four-year statute of limitations, but Plaintiffs had alleged facts "capable of supporting a plausible finding or inference that fraudulent

---

[1] Most of this factual background summary of the case is taken from District Judge Crabtree's Nov. 6, 2024 Mem. & Order (ECF No. 131).

[2] Corrected Second Am. Class Action Compl. (ECF No. 129) filed on Nov. 5, 2024.

[3] ECF No. 47.

[4] Mar. 26, 2024 Mem. & Order (ECF No. 74). *Edgar v. Teva Pharm. Indus., Ltd.*, No. 22-2501-DDC-TJJ, 2024 WL 1282436 (D. Kan. Mar. 26, 2024), motion to certify appeal denied sub nom. *Burge v. Teva Pharms. Indus., Ltd.*, 2024 WL 4692050 (D. Kan. Nov. 6, 2024).

concealment and equitable tolling apply to toll the statute of limitations."[5] He also found Plaintiffs plausibly alleged Defendants "acted affirmatively to conceal their fraud," "acted affirmatively to conceal their exchange of generic entry dates," "concealed the material settlement terms," and "concealed a key fact—that the conspirators settled the two patent lawsuits on the same day—by issuing press releases several days apart."[6] He also found Plaintiffs plausibly alleged "the April 2012 press releases failed to disclose the material terms of the settlements and the accompanying unlawful reverse payment."[7] He further noted a factual dispute exists over whether and when Plaintiffs possessed either actual or constructive knowledge of their claims and over Plaintiffs' "diligence in discovering their claims."[8]

Judge Crabtree's ruling also suggested a bifurcated approach to discovery with initial discovery focused on the pivotal issue of timeliness.[9] The undersigned Magistrate Judge subsequently entered the Phase I Scheduling Order, which limited Phase I Timeliness/Limitations discovery to:

> [T]he timeliness of Plaintiffs' claims under the applicable statutes of limitations and any related statute-of-limitations issues, facts, and circumstances, including Defendants' statute of limitations defense or defenses (and the elements thereof) and the issues of tolling, equitable tolling, and fraudulent concealment (and the elements thereof).[10]

On August 5, 2024, the Court also entered, upon the parties' request, an Order Governing

---

[5] *Edgar,* 2024 WL 1282436, at *14.

[6] *Id.* at *19, *15, *12, and *16.

[7] *Id.* at *12.

[8] *Id.* at *18–19.

[9] *Id.* at *20.

[10] Phase I Sch. Order (ECF No. 92).

the Production of Electronically Stored Information and Documents that includes the parties' agreement that privilege logs be exchanged "within thirty days after *each* document production."[11] The Court later entered an order clarifying that any discovery-related motion for documents withheld from Phase I document production on the basis of attorney-client privilege and/or work product shall be filed "within 30 days after the applicable privilege logs are served."[12]

Defendants made rolling Phase I document productions on September 6, 2024; November 20, 2024; January 6, 2025; January 22, 2025; February 7, 2025; and March 11, 2024.[13] Defendants served their 202-page privilege log, representing approximately 3,760 entries, on March 11, 2025.[14] Plaintiffs filed their motion challenging Defendants' privilege log on April 10, 2025.[15]

Named Plaintiffs Burge, Hockett, Furlan, Ridey, and Sawczuk (collectively the "Consumer Plaintiffs") served their respective separate privilege logs on March 27, 2025. Plaintiff Anne Arundel County ("Anne Arundel") served multiple privilege logs on February 28, 2025; March 3, 2025; and March 27, 2025. Defendants filed their motion challenging Plaintiffs' privilege logs on April 28, 2025. The Consumer Plaintiffs and Anne Arundel served amended privilege logs on May 2, 2025.[16]

---

[11] ESI Protocol (ECF No. 100) at 18 (emphasis added).

[12] Mar. 17, 2025 Text Order (ECF No. 167).

[13] Pls.' Mot. (ECF No. 177) at 3. Defendants confirmed the dates of their rolling Phase I document productions at the July 9, 2025 hearing. *See* July 9, 2025 Hr'g Tr. (ECF No. 222) at 5–14.

[14] ECF No. 177-2.

[15] Plaintiffs' motion was filed within 30 days of the date Defendants served their privilege log on March 11, 2025 and is thus timely.

[16] Plaintiffs attached their amended privilege logs to their Response. ECF Nos. 200-21 to 200-26.

## II.    Legal Standards

In this case, federal law governs attorney-client privilege and any waiver of that privilege because the action arises under federal law—the Sherman Act and RICO.[17] Under federal common law, the essential elements of the attorney-client privilege are:

> (1) where legal advice of any kind is sought (2) from a professional legal advisor in his [or her] capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his [or her] instance permanently protected (7) from disclosure by [the client] or by the legal advisor, (8) except if the protection is waived.[18]

The privilege "protects confidential communications by a client to an attorney made in order to obtain legal assistance from the attorney in his capacity as a legal advisor."[19] The privilege also protects advice given by the lawyer in the course of representing the client.[20] The protection applies to communications with in-house counsel as well as outside attorneys.[21]

The party asserting the privilege bears the burden of establishing its applicability.[22] Moreover, a party must make a "clear showing" that the privilege applies.[23] The existence of the

---

[17] *See* Fed. R. Evid. 501; *In re Universal Serv. Fund Tel. Billing Pracs. Litig.*, 232 F.R.D. 669, 674 (D. Kan. 2005) ("Since this action arises under a federal statutory scheme, federal law provides the rule of decision as to application of the attorney-client privilege.").

[18] *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, No. 17-MD-2785-DDC-TJJ, 2018 WL 5281604, at *1 (D. Kan. Oct. 24, 2018) (hereinafter "*EpiPen I (In Camera)*") (citing *New Jersey v. Sprint Corp.*, 258 F.R.D. 421, 425 (D. Kan. 2009)).

[19] *New Jersey*, 258 F.R.D. at 425 (citation omitted).

[20] *Id.* (citing *Upjohn Co. v. United States*, 449 U.S. 383, 390 (1981)).

[21] *Id.*

[22] *Motley v. Marathon Oil Co.*, 71 F.3d 1547, 1550 (10th Cir. 1995).

[23] *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, No. 17-MD-2785-DDC-TJJ, 2021 WL 2875514, at *2 (D. Kan. July 8, 2021) (hereinafter "*EpiPen II (Clawback)*").

privilege is determined on a case-by-case basis.[24]

A party responding to a discovery request must expressly assert a claim of privilege if the party is withholding otherwise discoverable information on that ground.[25] Under Federal Rule of Civil Procedure 26(b)(5)(A), a party withholding information otherwise discoverable by claiming that the information is privileged or subject to protection as trial-preparation material must:

> (i) expressly make the claim; and
> (ii) describe the nature of the documents, communications . . . not produced or disclosed . . . in a manner that, without revealing the information itself privileged or protected, will enable other parties to assess the claim.

The party who withholds discovery materials under a claim of privilege or work product must provide sufficient information, usually in the form of a privilege log, to enable the party seeking the discovery to evaluate the applicability of the privilege or protection.[26] "Failure to follow the Federal Rules of Civil Procedure may result in waiver of the attorney-client privilege and/or work-product protection."[27] If a party fails to make the required showing, by not producing a privilege log or by providing an inadequate log, the court may deem the privilege waived.[28] However, "[m]inor procedural violations, good faith attempts at compliance and other such mitigating circumstances bear against finding waiver."[29]

---

[24] *Id.*

[25] *Rowan v. Sunflower Elec. Power Corp.,* No. 15-CV-9227-JWL-TJJ, 2016 WL 3745680, at *3 (D. Kan. July 13, 2016) (citing Fed. R. Civ. P. 26(b)(5)(A)).

[26] *White v. Graceland Coll. Ctr. for Prof'l Dev. & Lifelong Learning, Inc.*, 586 F. Supp. 2d 1250, 1266 (D. Kan. 2008).

[27] *Id*.

[28] *New Jersey,* 258 F.R.D. at 448.

[29] *White*, 586 F. Supp. 2d at 1266.

**III.    Plaintiffs' Motion to Compel Regarding Teva Defendants' Privilege Log (ECF No. 177)**

    **A.    Alleged Untimeliness of Defendants' Privilege Log**

As noted above, Defendants served documents on Plaintiffs on September 6, 2024; November 20, 2024; January 6, 2025; January 22, 2025; February 7, 2025; and March 11, 2025. However, Defendants did not serve their privilege log until March 11, 2025.[30] Plaintiffs initially argued in their motion that Defendants waived privilege by failing to timely serve their privilege log within 30 days from the date they withheld documents from their first four rolling document productions.[31] In addition, Plaintiffs questioned why Defendants' log did not have Bates numbers for all entries.

At the July 9, 2025 hearing, the Court inquired regarding whether Defendants withheld privileged documents and/or redacted information from their first four document productions without providing a privilege log. Defendants denied withholding any fully privileged or mixed

---

[30] Defendants claim their privilege log was served one day earlier on March *10*, 2025 at 10:20 pm PACIFIC time. This Court is located in the central time zone so technically Defendants' privilege log was served at 12:20 AM CENTRAL time the following day, on March 11, 2025. However, the Court will not find waiver based upon Defendants' minor 20-minute delay in serving their privilege log, due March 10, 2025, for their February 7 document production. *See Carter v. Spirit Aerosystems, Inc.*, No. 16-1350-EFM-GEB, 2018 WL 5923487, *6 (D. Kan. Nov. 13, 2018) (considering disputed privilege issues in a motion to compel filed two hours late).

[31] Defendants argue Plaintiffs waived their untimeliness argument by failing to raise the issue during the parties' D. Kan. Rule 37.2 meet and confer efforts, prior to filing Plaintiffs' motion to compel. Under the circumstances presented here, the Court finds Plaintiffs did not waive their privilege-waiver argument by not expressly discussing it during the parties' conferring exchanges. While Plaintiffs did not raise this specific privilege-waiver argument, Defendants knew Plaintiffs were questioning why many of Defendants' privilege log entries did not have a "Begin Bates" number. This is shown in an email exchange with Defendants on April 4, 2025, where Plaintiffs asked Defendants to confirm their understanding that Defendants "did not produce slipsheets for documents in families in which every document was withheld for privilege, and that it indicated this on its logs by including a 'Priv Log ID' but not a 'Begin Bates.'" Apr. 4, 2025 Email (ECF No. 192-1) at 3. Defendants confirmed Plaintiffs' understanding in a subsequent email on April 7, 2025, three days before Plaintiffs filed their motion. *Id.* at 2. In any event, the Court finds Defendants did not globally waive privilege for their first four document productions based on an untimely privilege log.

privilege (redacted) documents until their February 7 and March 11, 2025 productions.[32] They also explained why some of their privilege log entries lack "Begin Bates" numbers and only have a "Priv Log ID" number. Defendants stated they typically do not assign Bates numbers to fully withheld documents and only assign Bates numbers for documents they produced or produced with redactions.[33] Plaintiffs acknowledged they understood Defendants' use of "Priv Log ID" and "Begin Bates" numbers on their privilege log and did not offer any other reason to suspect Defendants withheld privileged documents from their first four document productions.[34] The Court did inquire about four documents on Defendants' privilege log with low Begin Bates numbers, which would suggest they were withheld from the November 20, 2024 document production, but Defendants subsequently advised they produced these documents to Plaintiffs.[35] Finding no reason to suspect Defendants withheld additional documents from their first four document productions, the Court finds Defendants have not globally waived privilege by not timely producing a privilege log for those productions.

## B.    Alleged Overclassification or Over-Redaction of Privileged Documents[36]

Plaintiffs argue Defendants overclassified and over-redacted thousands of documents—mostly emails—instead of just redacting the privileged portions. They point to specific examples

---

[32] July 9, 2025 Hr'g Tr. (ECF No. 222) at 6.

[33] Tr. at 18–19.

[34] Tr. at 23–28.

[35] Begin Bates numbers 332, 348, 2400, and 2401. Tr. at 6–13. All Bates numbers and Priv Log IDs used by Defendants are referenced herein by their ending digits rather than the full "TEVA_NUVI" number.

[36] On July 16, 2025, the parties advised the Court by email they resolved their overclassification dispute regarding Defendants' Priv Log IDs: 45, 441, 489, 524, 716, 854, 1392, 1654, 1656, 1657, 1825, 2077, 2846, and 3763.

allegedly illustrating Defendants' full withholding of documents by claiming they contain no non-privileged information.[37]  Based upon the large number of documents Defendants fully withheld—which Plaintiffs estimate as over three thousand privilege log entries—Plaintiffs suggest the Court conduct an *in camera* review of party-selected samples to assess Defendants' assertion of privilege.

Defendants argue Plaintiffs provide no justification for an *in camera* review of the documents, as the privilege log provides a sufficient description of the documents withheld to assess whether the privilege applies. Defendants contend Plaintiffs fail to identify specific deficiencies in the privilege log entries and rely upon speculation that the emails likely have some non-privileged information. Defendants also argue the number of documents they withheld as privileged should not weigh in favor of an *in camera* review, particularly where, as here, eleven of Teva's fifteen custodians are attorneys and the subject matter of Phase I discovery concerns the negotiation and settlement of numerous cases.

The decision whether to review documents *in camera* rests within the trial court's discretion.[38] The court must have some bases or grounds for conducting an *in camera* review.[39] Such review may be useful if there is a genuine dispute between the parties as to the accuracy of the withholding party's description of certain documents.[40] Such review is not, however, to be

---

[37] Plaintiffs specifically identify the following Priv Log IDs as examples of Defendants' overclassification:  214, 441, 490, 525, 579, 870, 1200, 1201, 1316, 2077, 2581, 2591, and 2592. They identify the following as over-redacted: 119, 443, 534, 649, 1049, and 1122. Pls.' Mot. (ECF No. 177) at 5.  Defendants provide more detailed explanations in their response for all but one entry. Defs.' Resp. (ECF No. 185) at 5.

[38] *In re Grand Jury Subpoenas*, 906 F.2d 1485, 1493 (10th Cir. 1990).

[39] *Black & Veatch Corp. v. Aspen Ins. (UK) Ltd.*, 297 F.R.D. 611, 621 (D. Kan. 2014) (citations omitted).

[40] *Id.*

routinely undertaken, particularly in a case involving a substantial volume of documents, as a substitute for a party's submission of an adequate record in support of its privilege claims.[41] In one case from this District where the party sought *in camera* review based upon "over-assertion" of privilege, the court found no basis to conduct an *in camera* review where the privilege log at issue provided sufficient descriptions of the documents withheld, the requesting party had not shown the documents were not privileged, and the underlying dispute came down to whether the privileges applied.[42]

The Court has reviewed the fifteen privilege log entries Plaintiffs identified as examples of Defendants' alleged wholesale overclassification of documents as privileged and over-redaction of partially privileged documents.[43] The Court initially finds, based on the limited information provided on Defendants' privilege log, many logged communications list email subject lines or filenames that do appear likely to contain non-privileged information. An example of this would be the fully withheld email communications with Priv Log ID 214 and subject line: "RE: Nuvigil LCI Meeting on Monday, June 11th."[44] However, Defendants explain in their response that this document is an email chain between in-house counsel (Staci Julie) and client (Teva's Life Cycle Initiative (LCI) team), where the LCI team requests legal advice regarding the impact of the Mylan

---

[41] *Id.*

[42] *Deffenbaugh Indus., Inc. v. Unified Gov't of Wyandotte Cnty./Kan. City, Kan.*, No. 20-2204-JTM-KGG, 2021 WL 1612099, at *3 (D. Kan. Apr. 26, 2021).

[43] Plaintiffs did not compile and attach a privilege log exhibit for their overclassification/over-redaction challenges. The Court therefore limits its review of Plaintiffs' overclassification and over-redaction challenges to Defendants' Priv Log IDs: 119, 214, 443, 490, 534, 579, 649, 1049, 1122, 1200, 1201, 1316, 2581, 2591, and 2592.

[44] ECF No. 177-2, at 69.

Nuvigil settlement agreement and Ms. Julie provides it."[45] The explanation justifies privilege protection for this document.

In their response in opposition, Defendants provide additional information and explanations to support their privilege claims for 14 of the 15 documents challenged by Plaintiffs.[46] After reviewing the additional information provided by Defendants, the Court concludes Defendants' additional explanations support their assertion of privilege for the specific privilege log entries identified by Plaintiffs. The Court therefore declines Plaintiffs' suggestion to conduct an *in camera* review of party-selected samples merely to assess whether Defendants overclassified or over-redacted documents based upon privilege. The large volume of documents logged by Defendants is not surprising given that eleven of Defendants' fifteen Phase I discovery custodians are attorneys and, by itself, is not enough to justify an *in camera* review. Based on the examples Plaintiffs identified in their motion, Defendants either provided further information supporting the assertion of the privilege or agreed to de-designate or downgrade certain documents.[47] Plaintiffs' overclassification and over-redaction argument is not a dispute as to the *accuracy* of Defendants' privilege log document descriptions, but rather a dispute regarding whether the privilege applies to all information in each document. Without some preliminary showing by these examples of Defendants overclassifying or over-redacting documents based upon privilege, the Court finds no

---

[45] Defs.' Resp. (ECF No. 185) at 5.

[46] Defendants do not provide explanations for the allegedly over-redacted Priv Log ID 443. However, the Court has reviewed the applicable privilege log entry and finds it supports Defendants' assertion of privilege as an email chain between in-house counsel reflecting legal advice regarding patent litigation settlements not at issue in this case.

[47] *See* Defs.' Resp. (ECF No. 185) at 5 n.4 (identifying 33 privilege log entries de-designated or downgraded). The Court does not view a party's willingness to de-designate or downgrade privilege entries identified by the opposing party as an admission of overclassification or over-redaction of documents but instead views it as what should happen as part of the conferring process.

grounds for conducting an *in camera* review of party-selected samples to spot-check Defendants' privilege log entries.

### C.     Crime-Fraud Exception—*In Camera* Review

#### 1.     Summary of the Parties' Arguments

Plaintiffs have identified 47 log entries for partially redacted emails they contend Defendants should be compelled to produce under the crime-fraud exception to attorney-client privilege.[48] Plaintiffs state they selected these entries because Defendants' log describes the emails as either (1) involving *both* the EpiPen and Nuvigil settlements in the same communication, or (2) communications that involve how to describe those agreements to regulators and the public. Plaintiffs allege Teva's attorneys were used to facilitate the statutory antitrust violations alleged in this case and to fraudulently conceal those violations, obscuring from the public and regulators that the EpiPen and Nuvigil settlements were actually one settlement. Plaintiffs contend *prima facie* evidence exists that these agreements were negotiated as a trade-for-delay with the assistance of Teva's counsel. Plaintiffs additionally contend *prima facie* evidence exists that Teva's attorneys were involved in fraudulently concealing the trade-for-delay scheme from the public and regulators.[49]

Defendants argue Plaintiffs fail to satisfy their heavy burden of invoking the crime-fraud exception. They contend Plaintiffs cite no authority supporting their argument that the alleged civil "statutory antitrust violations" qualify as a crime, fraud, or tort necessary to invoke the crime-fraud

---

[48] *See* Crime Fraud privilege log (ECF No. 177-3). Plaintiffs compiled a separate privilege log exhibit for Defendants' documents they contend should be produced under the crime-fraud exception.

[49] Plaintiffs attach four email chains between Mylan and Teva (and their attorneys) as *prima facie* evidence that these agreements were negotiated as trade-for-delay with the assistance of counsel. ECF Nos. 177-11 to 177-14.

exception. As for fraudulent concealment, Defendants contend Plaintiffs merely allege Teva concealed information but ignore all other required elements of fraudulent concealment. Defendants also argue Plaintiffs cannot rely on mere speculation or allegations but must present *prima facie* evidence that the allegation of attorney participation in a crime or fraud has some foundation in fact. Defendants contend Plaintiffs cannot use the court's order denying summary judgment in the EpiPen MDL as *prima facie* evidence that Teva's lawyers were involved in furthering any crime, fraud, or tort here.[50] Defendants argue Plaintiffs' reliance on conclusory allegations of "statutory antitrust violations" and fraudulent concealment without the required evidence does not support even an *in camera* review of the challenged documents.

### 2.     Law Regarding Crime-Fraud Exception to Privilege

Under the crime-fraud exception, "[t]he attorney-client privilege does not apply where the client consults an attorney to further a crime or fraud."[51]  The purpose of the crime-fraud exception is to assure that the seal of secrecy between lawyer and client does not extend to communications made for the purpose of getting advice for the commission of a fraud or crime.[52]  The crime-fraud exception applies to both the attorney-client privilege and the work-product doctrine.[53]

To invoke the crime-fraud exception, the party opposing the privilege must present "*prima facie* evidence that the allegation of attorney participation in the crime or fraud has some

---

[50] Defs.' Resp. (ECF No. 185) at 8 (referencing *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, 545 F.Supp.3d 922, 998, 1015, 1029 (D. Kan. June 23, 2021)).

[51] *Motley*, 71 F.3d at 1551. *See Clark v. United States*, 289 U.S. 1, 15 (1933) ("There is a privilege protecting communications between attorney and client. The privilege takes flight if the relation is abused. A client who consults an attorney for advice that will serve him in the commission of a fraud will have no help from the law. He must let the truth be told.").

[52] *United States v. Zolin*, 491 U.S. 554, 563 (1989) (internal quotations and citations omitted).

[53] *In re Grand Jury Subpoenas*, 144 F.3d 653, 660 (10th Cir. 1998).

foundation in fact."[54] "The evidence must show that the client was engaged in or was planning the criminal or fraudulent conduct when it sought the assistance of counsel and that the assistance was obtained in furtherance of the conduct or was closely related to it."[55] The exception does not apply if the assistance is sought only to disclose past wrongdoing, but it does apply if the assistance was used to cover up and perpetuate the crime or fraud.[56]

In *United States v. Zolin*, the Supreme Court held that a district court may conduct an *in camera* review to determine the applicability of the crime-fraud exception to privilege, but only if the party requesting such a review makes a threshold showing that such review is appropriate.[57] A lesser evidentiary showing is needed to trigger *in camera* review than is required ultimately to overcome the privilege.[58] An *in camera* review requires a "showing of a factual basis adequate to support a good faith belief by a reasonable person that *in camera* review of the documents may reveal evidence to establish that the crime-fraud exception applies."[59] Whether to conduct an *in camera* review is left to the sound discretion of the district court.[60] The *Zolin* Court provided the following guidance on whether to conduct an *in camera* review for the crime-fraud exception:

> The court should make that decision in light of the facts and circumstances of the particular case, including, among other things, the volume of materials the district court has been asked to review, the relative importance to the case of the alleged privileged information, and the likelihood that the evidence produced through *in camera* review, together with other available evidence then before the court, will

[54] *Id.*

[55] *Id.*

[56] *Id.*

[57] *Zolin*, 491 U.S. at 570.

[58] *Id.* at 571.

[59] *Id.* at 572, 575–76.

[60] *Id.* at 572.

establish that the crime-fraud exception does apply. The district court is also free to defer its *in camera* review if it concludes that additional evidence in support of the crime-fraud exception may be available that is not allegedly privileged, and that production of the additional evidence will not unduly disrupt or delay the proceedings.[61]

### 3.   Sherman Act Antitrust Violations as Basis for Crime-Fraud Exception

In their motion, Plaintiffs focus their argument that the Court should invoke the crime-fraud exception relative to their alleged statutory antitrust violations on attempting to show "*prima facie* evidence exists that these agreements were negotiated as a trade-for-delay with the assistance of counsel."[62] However, Plaintiffs skip over the pivotal question of whether these alleged statutory antitrust violations constitute the type of crime or fraud which may form the basis for a party to invoke the crime-fraud exception to the attorney-client privilege.[63] Defendants point out this significant omission in their response: "Plaintiffs cite no authority supporting their argument that the alleged civil 'statutory antitrust violation' qualifies as a crime, fraud, or tort necessary to invoke the crime-fraud exception."[64] Still, in their reply, Plaintiffs do not address this issue in any meaningful way. Instead, Plaintiffs devote merely a single sentence of their reply and cite one lone non-binding authority on the issue, stating Defendants also acknowledge that "other courts have applied the crime fraud exception to antitrust violations."[65] However, as discussed below, the Court does not find *Abbott* persuasive here and concludes Plaintiffs have failed to show that the

---

[61] *Id*. at 574.

[62] Pls.' Mot. (ECF No. 177) at 6.

[63] *See In re Abbott Lab'ys*, 96 F.4th 371, 380 (3d Cir. 2024) ("The central merits question . . . is whether sham litigation is a type of fraud which may form the basis for a party to invoke the crime-fraud exception to the attorney-client privilege.").

[64] Defs.' Resp. (ECF No. 185) at 7.

[65] Pls.' Reply (ECF No. 192) at 3 (citing *Abbott*, 96 F.4th 371).

statutory antitrust violations they allege in this case qualifies as a crime or fraud necessary to invoke the crime fraud exception to the attorney-client privilege.

In *Motley v. Marathon Oil Co.*, the plaintiff argued on appeal that illegal racial discrimination is a tort and that the crime-fraud exception is not limited to crime and fraud, but should extend to attorney communications made in furtherance of the commission of a tort.[66] The Tenth Circuit disagreed and found the district court correctly ruled that "the crime-fraud exception does not extend to tortious conduct generally, but is limited to attorney advice in furtherance of a crime or fraud."[67] Yet, Plaintiffs' briefing is devoid of any authority, and the Court could not independently locate any authority, applying the crime-fraud exception based upon alleged statutory "civil" antitrust claims premised on a "trade-for-delay" agreement.[68]

Nor is *Abott*, the lone case cited on the issue, persuasive. *Abott* is factually distinguishable from this case. There, the plaintiff generic drug manufacturers alleged brand-name manufacturers' commencement of earlier patent infringement lawsuits against the generic manufacturers, which the parties settled, constituted sham litigation that delayed market entry of the generic drug in violation of the Sherman Act.[69] In contrast, the Sherman Act antitrust violations in this case are

---

[66] *Motley*, 71 F.3d at 1551.

[67] *Id*. at 1552.

[68] Defendants cite one Kansas Court of Appeals case, *Smith v. Philip Morris Co., Inc.*, 335 P.3d 644, 662 (Kan. Ct. App. 2014). But it is not helpful as it lacks any discussion of the conclusion by the special master in the state district court that the crime-fraud exception did not apply in an antitrust price fixing case. *Id.*  Although not cited by the parties, the Court has also considered and finds distinguishable cases applying the crime-fraud exception based upon allegations of sham litigation and Walker Process fraud violations in obtaining a patent. *See, e.g., Chandler v. Phoenix Servs.*, No. 7:19-CV-00014-O, 2020 WL 487503, at *5 (N.D. Tex. Jan. 30, 2020) (applying the crime-fraud exception to all attorney-client communications and work product made in furtherance of the defendants' assertion of the patent through the alleged sham patent litigation and Walker Process fraud violations).

[69] *Abbott*, 96 F.4th at 376–77.

16

based upon an alleged trade-for-delay agreement. Moreover, in *Abbott,* the court based its application of the crime-fraud exception on simply a tort, finding "it is the [sham] lawsuit's baselessness, combined with the client's subjective intent to interfere with administrative and judicial procedures associated with patent rights, that triggers the crime-fraud exception."[70] However, this is not the law in the Tenth Circuit, where the crime-fraud exception has not been extended to tortious conduct generally.[71]

Finding no binding authority applying the crime-fraud exception to the types of anticompetitive behavior alleged in this case, based on a trade-for-delay agreement, the Court here declines to extend the crime-fraud exception based solely upon Defendants' alleged "statutory antitrust violations." Plaintiffs have failed to show that the alleged statutory antitrust violations qualify as a crime or fraud as required to invoke the crime-fraud exception. Thus, an *in camera* review of the challenged withheld documents is neither justified or warranted.

### 4.    Fraudulent Concealment as Basis for Crime-Fraud Exception

The Court next considers whether a defendant's alleged fraudulent concealment preventing a plaintiff from asserting a claim in a timely fashion is the type of fraud that can serve as the basis for invoking the crime-fraud exception. Again, the parties also do not cite, and the Court could not independently locate, any cases where the underlying "fraud" for purposes of the crime-fraud exception was fraudulent concealment to toll the statute of limitations. Fraudulent concealment, as its name suggests, does fall within the category of "fraud." Two cases from this District have found

---

[70] *Id*. at 382. The *Abbott* court also summarized Third Circuit law on when the crime-fraud exception applied: "[W]e have broadly understood 'wrongdoings' to include not only crimes but also torts . . . [and] recognized that '[a]ll is necessary is that the client misuse or intend to misuse the attorney's advice in furtherance of an *improper purpose.*" *Id.* at 381 (emphasis in original).

[71] *Motley*, 71 F.3d at 1551–52.

showings of deception, or potential deception, sufficient to support an *in camera* review of privileged documents.[72] In *Burton v. R.J. Reynolds Tobacco Co.*, the court found it necessary to conduct an *in camera* review to determine whether defendants knew "nicotine was addictive and failed to disclose that information."[73] The plaintiffs in that case argued that attorneys for tobacco companies, including the defendants, were used to facilitate the perpetration of a continuing fraud by using the Council for Tobacco Research to deceive the public about the health risks associated with smoking.[74] In *AKH Co. v. Universal Underwriters Ins. Co.*, the court granted *in camera* review of privileged communications finding the defendants established a *prima facie* case sufficient to invoke the crime-fraud exception.[75] This finding was based upon false representations made by the plaintiff as to a material fact or the suppression of facts which the plaintiff was under a legal or equitable obligation to communicate and "in respect of which [it] could not be innocently silent."[76] Based on these cases, the Court finds fraudulent concealment and deceitful conduct by Defendants preventing Plaintiffs from asserting their claims in a timely fashion could constitute an eligible "fraud" to invoke the crime-fraud exception to attorney-client privilege.

---

[72] *See Burton v. R.J. Reynolds Tobacco Co.*, 167 F.R.D. 134, 143 (D. Kan. 1996) (granting *in camera* review under crime-fraud exception); *AKH Co. v. Universal Underwriters Ins. Co.*, No. 13-2003-JAR-KGG, 2014 WL 2991130, at *18 (D. Kan. July 3, 2014) (granting *in camera* review under crime-fraud exception based upon false representations made by the plaintiff). *But see Berroth v. Kansas Farm Bureau Mut. Ins. Co.*, 205 F.R.D. 586, 592 (D. Kan. 2002) (denying *in camera* review under crime-fraud exception, finding evidence of perjury did not support a "good faith belief by a reasonable person that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies.").

[73] 167 F.R.D. at 143.

[74] *Id*. at 142.

[75] No. 13-2003-JAR-KGG, 2014 WL 2991130, at *18 (D. Kan. July 3, 2014).

[76] *Id*.

### 5.     Whether Plaintiffs Have Met Their Burden for *In Camera* Review

A plaintiff seeking to utilize the tolling powers of the fraudulent concealment doctrine must show: "(1) the use of fraudulent means by the [defendants]; (2) successful concealment from plaintiffs; and (3) that plaintiffs did not know or by the exercise of due diligence could not have known that they might have had a cause of action."[77] District Judge Crabtree has already addressed Defendants' argument that Plaintiffs failed to plead fraudulent concealment adequately, ruling that Plaintiffs have initially shouldered their burden to establish a basis for tolling the statute of limitations under the doctrine of fraudulent concealment.[78] With respect to the applicable elements, he found Plaintiffs plausibly alleged "an affirmative act of concealment" and they "exercised due diligence in investigating their claims."[79] More specifically, he noted Plaintiffs have alleged:

- Mylan and Pfizer's April 26, 2012 press release about the EpiPen settlement left out that the EpiPen settlement was part of a quid pro quo for Mylan's agreement to simultaneously enter into a settlement agreement resolving the Nuvigil patent litigation in Teva's favor.

- Mylan's April 30, 2012, press release left out that Mylan entered the Nuvigil settlement in return for Teva's agreement to the EpiPen settlement.

- Defendants and their co-conspirators concealed their exchange of generic entry dates [and] on May 10, 2012, Mylan reported the two settlements to the Department of Justice as unrelated.

---

[77] *See Edgar*, 2024 WL 1282436, at *14 (quoting *In re Urethane Antirust Litig*., 913 F. Supp. 2d 1145, 1158 (D. Kan. 2012)). The elements for a state law claim for fraudulent concealment or "fraud by silence" are different. *See Burton v. R.J. Reynolds Tobacco Co.,* 397 F.3d 906, 910 (10th Cir. 2005) (Under Kansas law, to establish fraudulent concealment, or "fraud by silence," the plaintiff must prove by clear and convincing evidence that: (1) the defendant had knowledge of material information the plaintiff did not have and could not have discovered through the exercise of reasonable diligence; (2) the defendant had a duty to communicate that information to the plaintiff; (3) the defendant deliberately failed to communicate the information to the plaintiff; (4) the plaintiff justifiably relied on the defendant to communicate the information; and (5) the plaintiff was injured by the defendant's failure to communicate the information.)

[78] ECF No. 74 at 19, 27. *See also Edgar*, 2024 WL 1282436, at *14.

[79] ECF No. 74 at 29 and 37.

- [E]ven though the two settlements were negotiated in conjunction and signed the same day (April 26, 2012), the conspirators announced the two settlements separately over the course of multiple days to conceal the fact that each settlement was consideration for the other.

- The conspirators intentionally concealed the actual documents for the key settlement agreements and did everything possible to prevent crucial details of those documents from becoming public.

- The parties to the two settlements kept the actual settlement documents confidential, resisted their production in subsequent litigation over the EpiPen, and then marked them CONFIDENTIAL, preventing members of the public from seeing them.[80]

Plaintiffs cannot invoke the crime-fraud exception based upon merely plausible allegations, but must make a "showing of a factual basis adequate to support a good faith belief by a reasonable person that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies."[81] In their motion, Plaintiffs argue Defendants' attorneys were used to fraudulently conceal and obscure from the public and regulators that the EpiPen and Nugivil settlements were actually one settlement. Plaintiffs attach emails they argue are *prima facie* evidence of fraudulent concealment sufficient to trigger *in camera* inspection of these documents to determine whether the communications were "in furtherance of—and therefore relate in some way to—the crime or fraud."[82] Plaintiffs contend these emails show Teva's attorneys were involved in fraudulently concealing the trade-for-delay scheme from the public and

---

[80] *Id.* at 27–28. *See also* Pls.' Corrected Second Am. Class Action Compl. ECF No. 129 at ¶¶ 91, 157, 193, 194, and 199.

[81] *Zolin*, 491 U.S. at 572.

[82] Pls.' Mot. (ECF No. 177) at 9 (quoting *Burton v. R.J. Reynolds Tobacco Co.*, 177 F.R.D. 491, 502 (D. Kan. 1997)).

regulators.[83] In one email sent late at night on April 25, 2012, Teva's counsel (David Stark) tells business employees and other Teva counsel the "Less said the better" for both the Teva/Antares and Mylan press releases.[84] Another email chain dated April 19–20, 2012 shows that Teva's inside and outside counsel drafted the press release and investor relations ("IR") talking points for the Nuvigil settlement.[85] Another email chain dated April 29–30, 2012 shows that Mylan's counsel (Jill Ondos) sent Teva's counsel (David Stark and Staci Julie) Mylan's April 30, 2012 Nuvigil settlement press release and Stark reviewed it stating, "Looks like [it] tracks ours on quick read."[86]

Plaintiffs argue the linkage between these two settlements was decidedly material because it evidenced an illegal agreement. This evidence is sufficient to support the conclusion that Teva, its internal counsel, and its outside counsel knew that the trade-for-delay agreement was illegal and made the intentional decision not to disclose the true nature of the agreement, so as to deliberately mislead the public and regulators. Plaintiffs' argument is bolstered by Judge Crabtree's Order finding Plaintiffs plausibly alleged Defendants "acted affirmatively to conceal their fraud," "acted affirmatively to conceal their exchange of generic entry dates," "concealed the material settlement terms," and "concealed a key fact—that the conspirators settled the two patent lawsuits on the same day—by issuing press releases several days apart."[87] It is also supported by the finding Plaintiffs plausibly alleged "the April 2012 press releases failed to disclose the material

---

[83] Plaintiffs also attach and discuss another set of emails (ECF Nos. 177-11 to 177-14) but those emails pertain to the alleged antitrust violations (the trade-for-delay agreement) and not fraudulent concealment.

[84] ECF No. 177-15 at 2.

[85] ECF No. 177-16 at 2.

[86] ECF No. 177-17 at 2.

[87] *Id.* at 29, 30, and 37.

terms of the settlements and the accompanying unlawful reverse payment."[88]

These findings, along with the emails provided by Plaintiffs, are enough for Plaintiffs to meet their burden justifying an *in camera* review of the allegedly partially privileged communications, which may show Defendants, through their attorneys, fraudulently and deliberately concealed or misled the public and regulators about the settlements. Plaintiffs have provided sufficient email evidence Defendants' attorneys were materially and significantly involved in the concealment and false or misleading representations. Specifically, Plaintiffs have provided 2012 emails showing that Teva's internal counsel were heavily involved in the discussions intended to conceal and make false or misleading representations about the Spring 2012 EpiPen and Nuvigil settlements, and the associated press releases, and statements to the Federal Trade Commission ("FTC"). The importance of the discovery being sought here also weighs in favor of granting an *in camera* review of these communications. Evidence of Defendants' alleged fraudulent concealment is critical to the Court's decision whether the statute of limitations will be tolled on Plaintiffs' claims in this case.

The Court has reviewed the 47 partially privileged entries from Defendants' privilege log that Plaintiffs contend Defendants should be compelled to produce unredacted under the crime-fraud exception. Based upon that review, the Court finds they can be grouped into three categories based upon the privilege log descriptions:  (1) Emails regarding negotiation of the EpiPen patent litigation settlement with Mylan and Pfizer and the Nuvigil patent litigation settlement with Mylan; (2) Emails regarding public statements concerning the EpiPen and/or Nuvigil patent litigation settlements; and (3) Emails regarding communication with the FTC concerning the settlements. The first category of emails relates to Defendants' alleged antitrust violations for which the Court

---

[88] *Id.* at 22.

has already concluded Plaintiffs are not entitled to an *in camera* review. An *in camera* review, however, is justified for the "Crime-Fraud" privilege log entries described by the second and third categories, e.g., emails regarding public statements concerning the settlements and communications with the FTC. Defendants shall submit these documents to chambers for an *in camera* review. [89]

### D.     Documents Prepared Primarily for Business or Public Relations Purposes

Plaintiffs next challenge Defendants' privilege log entries for documents that Plaintiffs claim appear to be primarily for business or public relations purposes rather than the pursuit or provision of legal advice.[90] They claim it is impossible to tell from Defendants' log whether the documents listed involve predominantly legal advice as opposed to legal advice that is merely incidental to business advice. Plaintiffs request the Court either determine these communications that deal with business, marketing, and public relation topics are not privileged, or conduct an *in camera* review of the documents identified by Plaintiffs.

Defendants argue Plaintiffs fail to establish the challenged communications were predominantly for business or non-legal purposes. They contend Plaintiffs' arguments are based upon speculation the logged communications are of a business or non-legal nature, and this speculation is an insufficient basis for *in camera* review of those documents. Defendants state they frequently consult their attorneys regarding public statements, particularly if those statements

---

[89] To be clear, Defendants shall provide for *in camera* review the following documents (identified in the order they appear) on the "Crime Fraud" privilege log (ECF No. 177-3): Priv Log IDs 362, 302, 307, 319, 320, 479, 562, 563, 649, 823, 824, 825, 828, 1413, 1432, 2345, 2354, 845, 1122, 1414, 62, 64, 2068, 2085, 2842, 1707, 1146, 1147, 1148, 1149, 1708, 1156, 1710, and 1174. The parties advise they resolved their dispute regarding Priv Log ID 323.

[90] "PR & Business Comms" privilege log (ECF No. 177-4). The parties later advised they resolved their disputes regarding Priv Log IDs: 110, 314, 323, 340, 953, 1000, 1162, and 1199

involve ongoing litigation and where confidential settlements and negotiations are at issue. Defendants contend their entries show that where emails include both non-privileged business and privileged legal communications, they appropriately redacted privileged content and produced the rest.

"Not every communication between an attorney and client is privileged, only confidential communications which involve the requesting or giving of *legal* advice."[91] For the privilege to apply, a connection between the subject of the communication and the rendering of legal advice must exist and legal advice must form the *predominant* purpose of the communication.[92] In contrast, where legal advice is "merely incidental to business advice" the privilege does not apply.[93] And where "the legal and business purposes of the communication are inextricably intertwined, the entire communication is privileged if the legal purpose outweighs the business purpose."[94]

Defendants bear the burden of establishing the applicability of attorney-client privilege[95] and must make a "clear showing" that the privilege applies.[96] To accomplish this, Defendants must provide sufficient information in their privilege log to enable Plaintiffs (and the Court) "to evaluate the applicability of the privilege or protection."[97] For many of Defendants' privilege log entries,

---

[91] *In re Universal Serv. Fund*, 232 F.R.D. at 674 (citations omitted) (emphasis added).

[92] *Id.* at 675.

[93] *Id.*

[94] *Byrnes v. St. Catherine Hosp.*, No. 21-2086-DDC-ADM, 2023 WL 2734229, at *14 (D. Kan. Mar. 31, 2023) (citations omitted).

[95] *Motley*, 71 F.3d at 1550.

[96] *EpiPen II (Clawback)*, 2021 WL 2875514, at *2.

[97] *White*, 586 F. Supp. 2d at 1266.

the Court cannot determine from the information provided whether the documents being withheld contain predominantly business or public relations advice. Some of the log descriptions suggest they might, particularly those with subject lines that reference quarterly earnings and earnings call talking points, and those described as regarding public statements and communications with the FTC.

In its discretion and in accordance with the law governing when a court may conduct an *in camera* review, the Court finds that is necessary and appropriate for it to conduct an *in camera* review of these disputed documents likely containing business advice. Nearly all of the 35 documents the Court is reviewing *in camera* under the crime-fraud exception are also being challenged by Plaintiffs as communications with predominantly business and PR purpose.[98] Because the Court is already reviewing these emails regarding public statements concerning the settlements and communications with the FTC *in camera* for crime-fraud, the Court will also review these same documents to determine whether the purpose of the communication is for predominantly business advice.

### E.    Draft Documents

Plaintiffs challenge Defendants' withholding and assertion of attorney-client privilege for drafts of documents or versions that do not show legal advice.[99] They argue Defendants have improperly withheld many draft documents submitted to third parties as clean versions, claiming draft documents submitted to third parties, although prepared by counsel, are not generally privileged. Plaintiffs argue drafts from parties opposing Defendants are not privileged, should be

---

[98] *See, e.g.*, Priv Log IDs 62 and 64 in ECF Nos. 177-3 and 177-4.

[99] "Drafts" privilege log (ECF No. 177-5). The parties later advised they had resolved their disputes regarding Priv Log IDs 340 and 3655.

produced, and should only be redacted to withhold any information that might reveal legal advice. They also argue the fact of submission of a draft work statement to in-house counsel for legal input is not a protected communication.

Defendants state they have produced all drafts submitted to or received from third parties. They contend Plaintiffs are instead challenging *internal* drafts of documents seeking legal input from Defendants' counsel or prepared by their counsel, which are plainly attorney-client privileged or attorney work product.

As a practical matter, "[o]rganizational clients and business entities often are personified by a number of employees. In preparation for, or in the midst of, consultations with an attorney, employees of the client will often consult one another to ensure that the attorney's advice is based on full knowledge of all relevant facts."[100] "Communications which reflect advice given by counsel to a corporation do not lose their privileged status when they are shared among corporate employees who share responsibility for the subject matter of the communication."[101]

Thus, internal drafts prepared for the purpose of obtaining or communicating legal advice do not lose their privileged status by being sent internally among corporate employees, in-house counsel, and outside counsel. However, drafts of documents to be submitted to third parties are not generally privileged.[102] The submission of documents to a third party outside the relationship removes any cloak of privilege.[103] "Because confidentiality is key to the privilege, '[t]he attorney-client privilege is lost if the client discloses the substance of an otherwise privileged

---

[100] *EpiPen II (Clawback)*, 2021 WL 2875514, at *2.

[101] *Deffenbaugh*, 2021 WL 1612099, at *11.

[102] *In re Universal Serv.*, 232 F.R.D. at 675.

[103] *Id.*

communication to a third party.'"[104] Any voluntary disclosure by the client is inconsistent with the attorney-client relationship and waives the privilege.[105]

Defendants may claim privilege for internal drafts of documents prepared by their attorneys (both in-house and outside counsel) and emails transmitting those drafts if they are prepared for the purpose of providing legal advice to the client. The privilege also applies to an attorney's changes and revisions to those documents if made for the purpose of providing legal advice. However, the privilege is waived if the documents are disclosed to a third party. Thus, attorney-client privilege would be waived for any documents Defendants emailed to third parties. The Court's review of the challenged privilege log entries reveals that some emails appear to have been sent to external attorney recipients, including for example, the entries for emails sent to "EXT" "chlh.com" attorneys, who do not appear to be Defendants' attorneys.[106] Defendants have waived attorney-client privilege for any drafts or emails transmitting those drafts disclosed externally to third parties or their attorneys. Defendants shall produce all documents identified on the "Drafts" privilege log with entries showing they were sent externally to third parties or their attorneys.

### F.     Privilege Log Entries Merely Copied to Counsel

Plaintiffs next challenge Defendants withholding as privileged documents that were merely copied to counsel.[107] They claim numerous emails listed on Defendants' privilege log do not have

---

[104] *In re Qwest Commc'ns Int'l Inc.*, 450 F.3d 1179, 1185 (10th Cir. 2006) (quoting *United States v. Ryans*, 903 F.2d 731, 741 n.13 (10th Cir. 1990)).

[105] *Id.*

[106] *See, e.g.,* "Drafts" privilege log entries for Priv Log IDs 527, 529, 530, 534, 535, 540, 858, 895, 951, 952, 1115, and 1116.  ECF No. 177-5.

[107] *See* "Atty cc" privilege log. ECF No. 177-6. Of the twenty-six entries Plaintiffs initially identified in their motion, the parties advise they have subsequently resolved the following eight Priv Log IDs: 110, 483, 486, 487, 3557, 3645, 3650, and 3654.

an attorney listed in the "from" or "to" line but instead were merely copied via a carbon copy to an attorney. Plaintiffs argue that simply because an attorney is copied on the email does not entitle that document to protection as privileged. They contend several of these documents are fully withheld, so it is impossible to tell if some of the emails in the chain include non-privileged information

Defendants argue documents can contain privileged content even if an attorney is not a sender or recipient. They explain their privilege log "from/to/cc/bcc" columns reflects metadata from the topline email and thus cannot serve as the only indicator of whether information in the document warrants privilege protection. For this reason, Defendants say they included the "Description" and "Attorney/Firm" fields to identify the privilege source where it is not apparent from email metadata. Defendants contend the privilege log entries make clear there are numerous situations that warrant privilege protection where an attorney is not listed in the to or from fields, including for example, those forwarding or discussing legal advice or recommendations and those collecting and/or preparing something at the direction of counsel. Defendants also contend, for redacted documents, the privileged portion of an email chain may be further down the chain.

The attorney-client privilege does not require an attorney to have either authored or received the document at issue in order to maintain the privilege.[108] Attorney-client privilege may attach to documents transmitted between non-attorney employees of a corporate client if the communications are confidential and are for the purpose of obtaining legal advice from an attorney.[109] However, simply copying attorneys on emails between non-attorney business

---

[108] *Rowan v. Sunflower Elec. Power Corp.*, No. 15-CV-9227-JWL-TJJ, 2016 WL 3743102, at *3 (D. Kan. July 13, 2016) (citing *High Point SARL v. Sprint Nextel Corp.*, No. 09-2269, 2012 WL 234024, at *13 (D. Kan. Jan. 25, 2016)).

[109] *EpiPen II (Clawback)*, 2021 WL 2875514, at *2.

representatives that deal primarily with business and/or marketing issues or noting an attorney viewed the message or attachments does not cloak the emails with privilege.[110] "For a communication between non-attorney employees to be held privileged, it must be 'apparent that the communication from one employee to another was for the purpose of the second employee transmitting the information to counsel for advice' or the document itself must 'reflect the requests and directions of counsel.'"[111]

Defendants bear the burden to establish the applicability of the attorney-client privilege for the challenged privilege log entries where no attorney is listed in the "from/to/cc/bcc" column. Defendants have explained the "from/to/cc/bcc" columns on their logs reflect meta-data from the topline email and therefore are not the only indication of whether a document should be privilege protected. As Defendants point out, the "Description" and "Attorney/Firm" fields also provided on their logs may identify the privilege source when it is not apparent from the email metadata. Defendants offer as examples two entries on their "Atty cc" privilege log, Priv Log IDs 2353 and 3651. The Court notes the log shows these emails were sent internally between high-level Teva non-attorney employees and were withheld as partially privileged (redacted). The email identified as ID 2353 has no attorney listed in the "attorney/firm" column, but the "Description" column states it is an "email chain between clients reflecting legal advice regarding the EpiPen patent litigation settlement agreement with Pfizer and Mylan."[112] Priv Log ID 3651 has five attorneys listed in the "attorney/firm" column and the "Description" column states it is an "email chain between in-house counsel and clients providing legal advice regarding Nuvigil patent litigation

---

[110] *Id*. at *1.

[111] *Id*. at *3.

[112] "Atty cc" privilege log (ECF No. 177-6) at 3.

settlement with Mylan." The majority of challenged entries for emails sent in 2012 have subject line descriptions indicating the communications are requesting, discussing, or providing legal advice regarding the Nuvigil or EpiPen settlements. All of the individuals listed in the "from/to/cc/bcc" columns have a "teva," "tevapharm," or "tevausa" email address, suggesting that all are employees of Teva. As noted previously, communications that reflect advice given by counsel to a corporation do not lose their privileged status when shared among corporate employees who share responsibility for the subject matter of the communication.[113] Defendants' privilege log, with the additional explanations provided in their response, meets their burden to establish the email communications between non-attorney corporate employees reflect the requests and directions of counsel and thus are privileged.

### G.     Privilege Log Entries for Withheld Documents Forwarded to Counsel

Plaintiffs next challenge approximately 70 of Defendants' privilege log entries for partially privileged documents they argue merely reflect the activities or actions of an attorney or forward information.[114] Plaintiffs argue such information is not privileged.

Defendants argue forwarded privileged communications remain privileged so long as the attorney-client privilege of the communication is not broken. In addition, they contend certain actions made at the direction of counsel, such as gathering information to aid counsel in providing legal services are privileged. Defendants also contend Plaintiffs do not challenge the adequacy of any specific privilege log entries in this category or otherwise show that the referenced documents

---

[113] *Deffenbaugh*, 2021 WL 1612099, at *11.

[114] *See* "Reflecting or Forwarding" privilege log (ECF No. 177-7). On July 16, 2025, the parties advise they resolved their dispute for the following six Priv Log IDs: 128, 160, 355, 513, 827, and 3565. Plaintiffs challenge a few entries that appear on both the "Reflecting or Forwarding" and "Atty cc" privilege logs. E.g., Priv Log IDs 2353, 2354.

are not privileged.

Unlike the privilege log entries discussed in the preceding section, the challenged privilege log entries here have at least one in-house or outside attorney listed in the "from" or "to" column. Plaintiffs do not challenge the adequacy of any particular privilege log entries in this category. They only make a brief and conclusory argument that these documents merely reflect the activities or actions of an attorney or are just forwarding information. The Court finds Plaintiffs' speculative argument about these challenged privilege log entries unpersuasive.

## IV.     Defendants' Motion to Compel Regarding Plaintiffs' Privilege Logs (ECF No. 187)

### A.     Timeliness of Defendants' Motion as to Anne Arundel's First and Second Privilege Logs

Plaintiffs argue Defendants' motion to compel is untimely as it relates to Plaintiff Anne Arundel's first and second privilege logs. Plaintiffs stress that Defendants did not file their motion to compel until April 28, 2025, which is more than 30 days after Anne Arundel served its first and second privilege logs, on February 28 and March 3, 2025, respectively.

Defendants argue in their reply that the motion is timely because they filed it on April 28, 2025, which they contend is the date this Court clarified as the deadline for filing "[a]ny discovery-related motion for documents withheld . . . on the basis of attorney-client privilege and/or work product[.]"[115]

Defendants' argument is unpersuasive. They seize upon the partial quote above from the Court's Order (ECF No. 167) to support their argument that the April 28 deadline applied to "all Volumes" of Anne Arundel's privilege logs. They are incorrect.

The text order Defendants partially quote reads in full:

---

[115] Defs.' Reply (ECF No. 201) at 2.

> Any discovery-related motion for documents withheld from Phase I document production on the basis of attorney-client privilege and/or work product shall be filed within <u>30 days</u> after the applicable privilege logs are served on March 27, 2025, that is <u>April 28, 2025</u>. This deadline will not be extended.[116]

Thus, the quoted language emphasized the 30-day deadline for filing any discovery-related motion based on attorney-client privilege and/or work product and further clarified that any such motion as to the privilege logs served on March 27, 2025 would be due 30 days later, on April 28, 2025. The Court's March 17, 2025 Order (ECF No. 167) was entered in response to a letter from Defendants requesting an extension of the March 18, 2025 deadline for any "discovery-related motion regarding the sufficiency of the parties' Phase I document production."[117] Defendants requested a short extension of that deadline to review and confer with Plaintiffs on their forthcoming privilege logs, which they expected on March 27, 2025. Prior to entering its Order (ECF No. 167), the Court emailed the parties' counsel regarding the request and clarified:

> [T]he March 18th deadline does not apply to documents being withheld on the basis of privilege and/or work product. Any discovery-related motion for documents withheld from Phase I document production on the basis of attorney-client privilege and/or work product shall be filed within 30 days after the applicable privilege logs are served.
>
> Teva indicates that parties' privilege logs are due on March 27th, which would make any discovery-related motion due April 28, 2025.[118]

This email shows the deadline for any discovery-related motion for documents withheld from production was 30 days after service of the privilege logs and the April 28 deadline was for the privilege logs that were due on March 27, 2025.

---

[116] Text Order (ECF No. 167).

[117] The March 18, 2025 deadline was set by the January 29, 2025 Status Conference Order (ECF No. 150) as five weeks from the date the Court ruled on the parties' then-pending motions to compel discovery. The Court ruled on both motions on February 11, 2025 (ECF Nos. 152 and 153) thus making the deadline five weeks later on March 18, 2025.

[118] Mar. 17, 2025 Email.

The Court thus finds Defendants' motion to compel, filed on April 28, 2025, is untimely as to all documents listed on Anne Arundel's first two privilege logs because it was filed more than 30 days after those logs were served on February 28 and March 3, 2025. However, Defendants motion is timely as to all documents listed on Anne Arundel's third privilege log.[119]

### B.     Improper Withholding of Facts as Privileged

#### 1.     Challenges to Consumer Plaintiffs' Privilege Logs[120]

Defendants argue Plaintiffs are improperly withholding or have over-redacted a significant number of documents and communications that Defendants contend do not contain a request for legal advice, do not contain legal advice, or contain non-privileged facts. They contend the case law in the District of Kansas is clear that (i) not every communication between an attorney and client is privileged, rather just those communications that involve requesting or providing legal advice and (ii) underlying facts are not protected by privilege. Defendants point out Plaintiffs' productions do not contain any documents or communications showing what facts each Plaintiff learned in support of its claims, when it learned those facts, or that those facts were not knowable within the statute of limitations period. Defendants contend that information is discoverable and non-privileged and must be produced. Further, Defendants contend Plaintiffs' privilege log descriptions make clear that underlying facts are, at minimum, contained within the documents and communications being withheld in full or in part based on assertions of attorney-client privilege or work product.

---

[119] In their motion, Defendants specifically challenge documents identified with "Doc ID Beg" numbers:  19870, 19880, 19912, 19595, 19902, 19448, and 19449. ECF No. 189 at 4–5. All but two  are listed on Anne Arundel's *third* privilege log. Doc IDs 19448 and 19449 are listed on Anne Arundel's *first* privilege log.  ECF No. 187-1.

[120] Defendants subsequently advised the Court the parties resolved their dispute regarding Plaintiffs' fee agreements and engagement letters.

Plaintiffs argue facts disclosed to an attorney are privileged if they are given to enable the attorney to provide sound and informed advice, and the fact that non-privileged information was communicated to an attorney may be privileged, even if the underlying information remains unprotected. They assert this is why depositions and not production of attorney–client communications are the appropriate method to interrogate any underlying fact. Plaintiffs argue Defendants only offer speculation that because they did not unearth the information they wished, such information must exist in privileged communications. Plaintiffs point out their investigation of their claims and their communications with counsel take multiple forms and their written email correspondence is only one. As log entries show, Plaintiffs discussed their case with counsel over Zoom or phone.

The attorney-client privilege protects not only the giving of professional advice to those who can act on it but also the giving of information to the attorney to enable him or her to give sound and informed advice.[121] Although the attorney-client privilege protects disclosure of substantive communications between attorney and client, it does not protect disclosure of the underlying facts by those who communicated with the attorney.[122] "[T]he protection of the privilege extends only to *communications* and not to facts."[123] The Supreme Court in *Upjohn* illustrated the distinction with this example:

> A fact is one thing and a communication concerning that fact is an entirely different thing. The client cannot be compelled to answer the question, "What did you say or write to the attorney?" but may not refuse to disclose any relevant fact within his

---

[121] *Upjohn*, 449 U.S. at 390.

[122] *Upjohn*, 449 U.S. at 395; *New Jersey*, 258 F.R.D. at 444.

[123] *Upjohn,* 449 U.S. at 395 (emphasis in original).

knowledge merely because he incorporated a statement of such fact into his communication to his attorney.[124]

The Consumer Plaintiffs' logs show that all the withheld communications are between each Plaintiff and his or her attorney.[125] If these communications otherwise meet all the elements of the privilege, then those communications are privileged notwithstanding the fact they may contain factual information that is not privileged. Stated a different way, the privilege applies to the *communication* that may convey a fact, but including the fact in the communication does not make the fact itself privileged. It's the difference between asking, "What fact did you speak or write to your attorney?" (privileged) and "What fact do you know?" (not privileged). Requiring Plaintiffs to produce documents that disclose the facts they included in their communications with their attorneys is equivalent to asking them to disclose "what fact(s) did you write to your attorney." Plaintiffs' email communications conveying facts to their attorneys for the purpose of obtaining legal advice are therefore privileged. There are no grounds for the Court to conduct a "fact" finding *in camera* review of Plaintiffs' attorney-client privileged communications.

Moreover, the Court notes that none of the Plaintiffs' amended logs contain entries describing communications with "sent" dates before 2022. The key time period relevant to Plaintiffs' actual or constructive knowledge of their claims and their diligence in discovering their claims would be December 2018 (and earlier), which is four years prior to the December 2, 2022 date Plaintiffs filed this action. Communications made in 2022 and later would not show when each Plaintiff learned any facts because the communications all post-date the relevant time period.

Defendants point out the Court has already overruled some of Plaintiffs' attorney work

---

[124] *Id.* at 395–96 (citation omitted).

[125] ECF Nos. 200-22 to 200-26.

product objections and found post-attorney contact documents and communications are relevant:

> Documents and communications concerning Plaintiffs' investigation into their claims and those received or reviewed while determining whether to take part in this action—even after the dates Plaintiffs contacted their attorneys in October 2022 (March 2023 for Plaintiff Anne Arundel)—are relevant to when Plaintiffs had actual or constructive knowledge of their claims and their diligence or lack thereof in discovering their claims. For example, the documents Plaintiffs reviewed in 2022 or 2023 after they contacted their attorneys could include documents that were already in existence before 2018 and which Plaintiffs could or should have been aware of prior to 2018.[126]

The Court's prior relevancy finding for post-attorney-contact documents does not bar Plaintiffs from claiming privilege for those communications if all elements of the privilege are established. The Consumer Plaintiffs' amended privilege logs are sufficient to establish all elements for the privilege claimed. The Court denies Defendants' request that Consumer Plaintiffs be ordered to de-designate, downgrade, and produce allegedly improperly withheld documents and communications containing facts.

## 2. Challenges to Plaintiff Anne Arundel's Third Amended Privilege Log

The Court next considers Defendants' request that Anne Arundel be compelled to de-designate, downgrade, and produce documents and communications it is improperly withholding as attorney-client privileged and work product. As noted above, Defendants' motion is untimely with respect to their challenges to entries on Anne Arundel's *first* privilege log, which includes Doc IDs 19448 and 19449 (the email chain with filename "2023-03-13 Cappio Anne Arundel County Re Potential Litigation Nuvigil.pdf;" and an April 4, 2023 email with the subject line "Re: Attorney Advertising – Teva Lawsuit" sent to in-house counsel).[127] Therefore, the Court will not consider challenges to these documents listed on the first privilege log.

---

[126] Feb. 11, 2025 Mem. & Order (ECF No. 153) at 11.

[127] Anne Arundel Privilege Log No. 1. ECF No. 187-1.

Defendants' motion is timely as to the other five challenged entries from Anne Arundel's third privilege log: Doc IDs 19870, 19880, 19912, 19595, and 19902. The Court has reviewed the privilege log entries. All have the email subject line description "Attorney Advertising – Teva Lawsuit," are dated in 2023, and are described as communications:

- providing legal advice re potential Nuvigil and directing the preparation of materials in furtherance of development of legal advice regarding potential Nuvigil litigation, (Doc ID 19870),

- re preparation of materials at direction of County counsel in furtherance of development of legal advice re potential Nuvigil litigation (Doc IDs 19880, 19912, and 19902), or

- reflecting legal advice re EpiPen MDL claim submissions. (Doc ID 19595).[128]

For essentially the same rationale discussed above for the Consumer Plaintiffs, the Court rejects Defendants' argument Anne Arundel is improperly withholding or redacting non-privileged facts from otherwise privileged communications.

Defendants also argue Anne Arundel is improperly claiming work product protection over facts contained in work product and should be compelled to produce all documents and communications discussing facts. Anne Arundel responds that it is not relying on work product to justify its right to recovery or to respond to Defendants' defenses. Nor has it used the advice of counsel to make their fraudulent concealment arguments rather than focusing on Defendants' conduct. The Court rejects Defendants' sword and shield argument with regard to Anne Arundel's work product protection argument. As Plaintiffs point out, they are not relying on work product to support a claim for recovery or to rebut Defendants' defenses. Plaintiffs are not using advice of counsel as a sword to make their fraudulent concealment argument, instead they are relying on

---

[128] Anne Arundel Privilege Log No. 3 – Updated May 2, 2025. ECF No. 200-21.

Defendants' own conduct.  Accordingly, the Court denies Defendants' request that Anne Arundel be ordered to de-designate, downgrade, and produce allegedly improperly withheld documents and communications containing facts from its third privilege log.

**IT IS THEREFORE ORDERED** that Plaintiffs' Motion to Compel Regarding Teva Defendants' Privilege Log (ECF No. 177) is **granted in part and denied in part**.

**IT IS FURTHER ORDERED** that <u>within fourteen (14) days of the date of this Order</u>, Defendants shall provide to the chambers of the undersigned Magistrate Judge for an *in camera* review all communications identified in the "Crime-Fraud" privilege log prepared by Plaintiffs (ECF No. 177-3) described as emails "regarding public statements" concerning the settlements and "communications with the FTC."[129] The Court will review these documents *in camera* for a determination of whether they should be disclosed (1) under the crime-fraud exception and/or (2) because the predominant purpose of the communication is for business and not legal advice.

**IT IS FURTHER ORDERED** that <u>within fourteen (14) days of the date of this Order,</u> Defendants shall produce all documents identified on the "Drafts" privilege log (ECF No. 177-5) with entries showing they were sent externally to third parties or their attorneys.

**IT IS FURTHER ORDERED** that Defendants' Motion to Compel Regarding Plaintiffs' Privilege Logs (ECF No. 187) is **denied**.

IT IS SO ORDERED.

Dated July 31, 2025, at Kansas City, Kansas.

Teresa J. James
U. S. Magistrate Judge

---

[129] To be clear, Defendants shall provide for *in camera* inspection the following documents (identified in the order they appear) on the "Crime Fraud" privilege log (ECF No. 177-3): Priv Log IDs 362, 302, 307, 319, 320, 479, 562, 563, 649, 823, 824, 825, 828, 1413, 1432, 2345, 2354, 845, 1122, 1414, 62, 64, 2068, 2085, 2842, 1707, 1146, 1147, 1148, 1149, 1708, 1156, 1710, and 1174.